Filed 8/29/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S045078 |
| v. | ) | |
| | ) | |
| ROYAL CLARK, | ) | |
| | ) | Fresno County |
| Defendant and Appellant. | ) | Super. Ct. No. 446252-9 |
| _____ | ) | |

After a jury found Royal Clark competent to stand trial, another jury convicted him of the first degree murder of Billie-Jo Laurie Farkas (Pen. Code, §§ 187, subd. (a), 189),[1] the premeditated attempted murder of Angie Higgins (§§ 187, subd. (a), 664, subd. (a)), two counts of robbery (§§ 211, 212.5, subd. (b)), the attempted rape of Farkas (§§ 261, subd. (a)(2), 664), assault upon Higgins by force likely to produce great bodily injury (§ 245, subd. (a)(1)), and the false imprisonment and kidnapping of Higgins (§§ 236, 207, subd. (a)). The jury found true the three special circumstance allegations that the murder was committed while defendant was engaged in the commission of robbery and attempted rape (§ 190.2, subd. (a)(17)(A), (C)), and for the purpose of preventing the victim's testimony in a criminal proceeding (§ 190.2, subd. (a)(10)). The jury

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

also found true the allegations that defendant personally used a deadly weapon (a rope) during the commission of the murder, attempted murder and assault (§ 12022, subd. (b)), and that he intentionally inflicted great bodily injury on Higgins during the commission of the attempted murder and assault (§ 12022.7). The jury further found that defendant, who entered pleas of not guilty and not guilty by reason of insanity, was sane when he committed all of the charged crimes. Following the penalty phase of the trial, the jury returned a verdict of death. Defendant moved for new guilt and penalty trials (§ 1181) and for modification of his sentence to life without the possibility of parole (§ 190.4, subd. (e)). The trial court denied the motions and sentenced defendant to death. The court also sentenced defendant to consecutive determinate terms totaling 15 years for the noncapital offenses, but stayed sentence on the premeditated attempted murder. Defendant's appeal is automatic. (§ 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

## I. FACTS

### A. Guilt Phase Evidence

#### 1. Prosecution evidence

At the time of the crimes in January 1991, defendant was 27 years old and resided with Donna Kellogg and their young children in Kellogg's Fresno home. The murder victim, 14-year-old Billie-Jo Laurie Farkas (Laurie), was Kellogg's cousin. Laurie's mother, Venus Farkas, testified that Kellogg introduced defendant to the family in 1986 when he and Kellogg moved to the Fresno area. According to Mrs. Farkas, defendant visited the Farkases' residence often.

In the year preceding the murder, family members noticed that defendant's visits became more frequent and that he was paying particular attention to Laurie. Mrs. Farkas testified that defendant often asked Laurie to go places with him and

2

was teaching her to drive his car. According to Laurie's older sister, Angelique, defendant sometimes commented on the tightness of Laurie's clothing. He also once asked the girls whether they were virgins, how "far" they had "gone with boys," and if they had ever considered having an older, more experienced boyfriend like him.

Defendant's growing interest in Laurie also was apparent to individuals outside the family. Defendant's friend Michael Hall testified that, in late August 1990, six months before the offenses occurred, he warned defendant to stay away from Laurie's house. Defendant responded, "I know she wants me." When Hall pointed out that Laurie was Kellogg's cousin and that she was only 14 years old, defendant replied, "So what?" or "I don't care."

Laurie's best friend was 15-year-old Angie Higgins (Angie). She was acquainted with defendant because he was sometimes at the Farkases' home when she was there with Laurie. Angie testified that defendant once appeared at their school unexpectedly at the end of the day to give Laurie and her a ride home. Laurie's father, William Farkas, Sr., testified that when he asked defendant why he picked up the girls, defendant said he was "in the area."

On Saturday afternoon, January 26, 1991, Angie met Laurie at the Farkases' home and she and Laurie decided to go to a movie.

Around the same time, defendant called the Farkases, saying he wanted to come by the house with a new video game. According to Mr. Farkas, defendant arrived about 45 minutes later and played the video game with Laurie's brother. At some point he stopped playing, entered Laurie's bedroom, and spoke with her as she was preparing to leave for the movie. Angie testified that she overheard some of their conversation, including defendant asking Laurie if she wanted to go "cruising."

3

Mr. Farkas testified that he drove Laurie and Angie to the Festival theater and dropped them off in front around 8:15 p.m. Laurie took $7 with her. Angie had $10.

According to Mrs. Farkas, about 10 to 15 minutes after Mr. Farkas left with the girls for the movie theater, defendant asked her where they had gone. After being informed, he then grabbed his jacket and left, telling Mrs. Farkas he was going to meet a couple of friends. She found his abrupt departure unusual because defendant ordinarily would stay and play the video games that he had brought over.

Meanwhile, Laurie and Angie discovered that the movie they wanted to see had already started, so they decided to wait for the next showing. Angie testified that to pass the time, they went into a nearby music store. When they left the store, defendant drove up next to them and invited the girls to get inside his car, which they did.

As Angie recounted, defendant first drove to a nearby McDonald's restaurant because Laurie said she was hungry. When they arrived, defendant asked Laurie to buy him something. She refused his request saying, "Buy yourself something to eat. You've got your own money." Defendant responded that he did not have any money. While defendant stood near the doorway of the restaurant watching the girls, Laurie bought a milkshake and french fries and put her change into her right pants pocket. Angie spent $1.12 for a milkshake and put her remaining $8.88 into her left pants pocket.

The group returned to the car and defendant drove to Roeding Park. According to Angie, defendant told them people he knew would be "kicking back" there. They drove around the park for 20 minutes but saw only parked vehicles.

By now, it was after 9:00 p.m. and, according to Angie, Laurie said she wanted to return to the movie theater. Defendant responded there was another

4

place where his friends would be "kicking back" and that he needed to talk with one of them. With the girls' assent, defendant drove off, entering Highway 99 and exiting at Herndon Avenue. They stopped briefly at a service station.

Angie testified that after leaving the service station, defendant drove for a while until they reached Lost Lake Recreation Area (Lost Lake). They traveled along a winding road until it became a dead end. Seeing that the park was deserted, the girls suggested they leave. Defendant said he needed to use the restroom. He made a U-turn and headed back toward the park entrance, stopping at the first toilet facility en route. Seeing a car parked in front, he said, "I don't trust this car," and continued driving. He pulled up to the next facility and went into the restroom while the girls stayed in the car. After several minutes passed, Laurie moved over to the driver's seat, started the car, and drove a short distance to an area just beyond the restroom. Defendant then started yelling that he needed something with which to wipe himself. At first, the girls ignored him. However, after locating some paper towels in the backseat, Laurie drove the car to the other side of the restroom. Angie went halfway to the restroom door with the paper towels in hand, but then returned to the car, telling Laurie that she should deliver them to defendant because she knew him better. Laurie drove to the other side of the restroom. Meanwhile, defendant continued shouting for the girls to bring him toilet paper and yelled at them to "stop messing with [his] car."

Laurie finally agreed to bring the paper towels to defendant. Angie testified that almost immediately after entering the restroom, Laurie started screaming and yelling, "Roy, stop" and "Roy, leave me alone." Laurie then called out for Angie to help her. As Angie neared the restroom's entrance, she heard a scuffling sound and then silence. She went inside and saw Laurie lying facedown on the concrete floor, motionless. Defendant was sitting on the back of his legs with Laurie's head between his knees. Angie shouted at defendant and grabbed Laurie's legs to pull

5

her away from him.  But defendant jumped up, knocked Angie to the ground and started choking her with his hands.  When Angie struggled, defendant used his knee to slam her head to the floor.  As the attack continued, Angie's nose began to bleed and her resistance waned.  Defendant then let go of her and walked out of the restroom.

Angie crawled over to Laurie and shook her back to consciousness.  Meanwhile, defendant reentered the restroom with a small flashlight, which he shone around the area.  The floor was spattered with blood and strewn with rings, earrings, and other small items that Laurie had been carrying in the inside pocket of her jacket.  The jacket, which Laurie had been wearing when she first entered the restroom, was lying in the corner.  Laurie picked up the jacket and put it back on, then retrieved the items from the floor.  Defendant walked out again.

The girls were frightened and wondered what to tell their parents.  They decided to tell defendant that they would say they had gotten into a fight at the movie theater.

The next time defendant entered the restroom, he carried a small container, which he filled with water and poured on the floor to rinse off the blood.  At some point, he hugged Laurie and told her he was sorry.  When Laurie told defendant about what they planned to say to their parents, defendant replied, "No, I don't trust you.  You'll tell like you did the last time."  Defendant left the restroom again and returned holding a small rope, which he used to bind Angie's hands behind her back.  He then pulled Laurie off to the side, placed his hand around the back of her neck, and tried to kiss her.  Laurie twice pulled away, telling defendant, "I can't.  I'm on the rag," a statement Angie interpreted to mean she was having her monthly period.  Defendant again left the restroom.

Defendant returned with another rope and tied Angie to a toilet.  He then directed Laurie to accompany him to find fresh water with which to clean Angie.

6

Laurie initially refused to leave and held on to Angie's leg. Defendant insisted, protesting that Laurie did not trust him. Laurie acquiesced and left the restroom with him.

Angie heard defendant and Laurie walk next door to the women's restroom. Shortly after that, she heard Laurie screaming and pleading, "Roy, don't," and "Leave me alone," and the sound of scuffling. Laurie also called out for Angie, and started crying and then gasping for air. The gasping continued for a while, then there was silence.

According to Angie, defendant reentered the men's restroom and told her that Laurie had run away and that he was going back out to look for her. Angie heard footsteps and the shutting of a car door. Defendant then returned to the restroom and announced they were going to leave without Laurie. He untied Angie from the toilet but kept her hands bound. After wiping the blood from Angie's face, defendant directed her to his car, which was now parked closer to the restroom.

Defendant placed Angie in the front passenger seat and covered her with Laurie's jacket, which he grabbed from the backseat. He then asked her, "Will you do it?" which she understood to mean would she have sex with him. She declined, saying that she was waiting for someone special, to which defendant responded, "See, both of you don't trust me." When Angie first got into defendant's car, the clock on the dashboard showed 11:11 p.m.

Angie testified that defendant initially drove back to the dead end, saying he was looking for Laurie. He then turned around and drove to the park entrance. Just outside the park, defendant stopped at a pay telephone. He said he wanted to call Laurie's mother but did not have any change. When Angie mentioned that she had money in her pocket, defendant reached in and removed all of it. He put the dollar bills in the car's coin compartment and held the change in his hand. Angie saw defendant insert the coins into the pay slot and enter a telephone

7

number, but he hung up without speaking to anyone and retrieved the change. Defendant returned to the car and explained to Angie that he did not know what to say to Laurie's mother.

After leaving the public telephone, defendant told Angie he would take her back to Laurie's house. He entered the freeway, but drove past the exit. When Angie pointed out to defendant that he had missed the turnoff, he told her he had changed his mind and that they were going to Kellogg's house to get Angie cleaned up. Defendant continued on the freeway and exited in the town of Selma. After driving around a residential area, defendant informed Angie they were not going to Kellogg's house because Kellogg would "kick him out." Instead, he would take Angie to Laurie's house.

Before reentering the freeway, defendant pulled into a service station and directed Angie to stay low so no one would see her. It was now almost 1:00 a.m. Before defendant got out of the car, he retrieved the dollar bills he had taken from Angie and placed in the coin compartment earlier that night.

Defendant left the service station and entered the freeway. But instead of traveling north toward the Farkases' home, he drove south, which Angie immediately brought to his attention. Defendant exited and reentered the freeway going in the opposite direction, but passed the exit for the Farkases' residence. When Angie mentioned to defendant that he had once again missed the exit, he replied that he wanted to go back to look for Laurie.

Defendant exited the freeway at the Herndon Avenue turnoff, then turned onto Ingram Avenue. Angie had no memory of what occurred at this point, however, and her next recollection was of defendant driving around a rural area of southwest Fresno called "Chateau Fresno." Angie repeatedly asked defendant if he was lost. He eventually admitted that he did not know where he was, pulling

8

over to the side of the road to look for a map.  When another car approached, defendant quickly started the engine and drove off.

Defendant soon pulled over again.  Angie noticed it was now after 2:00 a.m. By this time, she had managed to untie her hands.  Defendant gave her a cigarette lighter and directed her to get out of the car and walk to the trunk so he could look for a map while she held the lighter.  As she stood by the back bumper holding up the lighter, defendant approached her from behind and choked her with a cord until she lost consciousness.

Defendant sped away from the scene around 3:00 a.m. when a motorist approached his parked vehicle from the opposite direction.  Joel Suarez testified that as he drove past the car's former location, he saw a body lying on the side of the road.  When he made a U-turn and drove by again, he noticed movement and went to a friend's house to notify police.

Responding officers testified they had great difficulty communicating with Angie because her voice was so raspy.  But she was able to nod her head "yes" when asked if she knew who had beaten her and shook her head "no" when asked if she had been raped.  Emergency personnel transported Angie to a nearby hospital, where she was treated for her injuries and released three days later.

The emergency department physician who treated Angie testified that her eyes showed signs of hemorrhaging and her face and neck were swollen.  An abrasion encircled more than half her neck and she had bruises behind her ears. Based on the nature and extent of Angie's injuries, the prosecution's medical expert expressed the opinion that she had been strangled by someone who stood

9

behind her and pulled a ligature against the front of her neck.  He also noted a marked abrasion on the left side of her face, but was uncertain what had caused it.[2]

Between 1:00 and 1:30 a.m., several hours before Joel Suarez discovered Angie, another motorist noticed Laurie's body lying on a rural road in nearby Madera County.  Gilbert Garcia testified that after realizing he had seen a body, he stopped and exited his van.  Pressing his fingers to Laurie's neck, Garcia found her skin cold and detected no pulse.  He also felt a rope encircling her neck.  Garcia left the scene to call police.  According to one of the responding officers, Laurie's blouse was pulled up and her bra was above her breasts.  Another officer testified there was no money in Laurie's pants pockets.

Forensic pathologist Jerry Nelson, M.D., performed an autopsy shortly after the discovery of Laurie's body.  He measured Laurie's height as five feet, one and one-half inches and estimated her weight as 110 to 115 pounds.  Dr. Nelson testified that he observed small petechial hemorrhages on Laurie's face and eyelids and a larger "flare of hemorrhages" in the whites of her eyes.  There also was blood inside her nose and a "frothy, sanguinous stain" in the pharynx at the back of her mouth.  Given these findings, and the prominent ligature abrasion on her neck, Dr. Nelson determined the cause of Laurie's death to be asphyxia due to ligature strangulation.  In his opinion, the strangulation rendered Laurie

---

[2]     The prosecutor pointed to this injury and other circumstantial evidence to support his theory that after killing Laurie and loading her body into the trunk, defendant placed Angie in the car and drove around with her while deciding where to dispose of Laurie's body.  The prosecutor theorized that once defendant had devised a plan, he rendered Angie unconscious by hitting her on the left side of the face, drove to nearby Madera County where he dumped Laurie's body on a country road, and then drove to a rural area in Fresno County known as Chateau Fresno, where Angie regained consciousness.  At that point, the prosecutor argued, defendant then strangled Angie and left her for dead on the side of the road.

10

unconscious in four to six seconds. Dr. Nelson also described lacerations above Laurie's right eyebrow and abrasions on the left side of her neck. Based on these injuries, Dr. Nelson surmised Laurie was conscious when the ligature was wound around her neck three times and tied in place, and that she struggled to push it away or loosen it.

Dr. Nelson further testified Laurie sustained other, nonfatal injuries close in time to her death based upon several hemorrhage sites of varying size within the scalp and on the surface of the skull. In Dr. Nelson's opinion, these injuries could have been caused by either multiple blunt blows to the head or the head striking the concrete floor. Dr. Nelson also observed that although four ribs on Laurie's left side were fractured, there was no bruising of the skin or soft tissue over the area. In his view, the fractures were probably caused by blunt impact from a smooth, rounded object, which could have been a person's knee. Dr. Nelson could not determine, however, whether the fractures occurred before or after Laurie was strangled.

Dr. Nelson informed the jury that at the time of the autopsy, Laurie had a sanitary pad in place and there was blood in her vagina. During a vaginal examination, he found nothing consistent with sexual assault.

Within 12 hours of the discovery of Laurie's body, officers from the Fresno County Sheriff's Department located defendant at his residence and took him into custody. Mr. Farkas had given defendant's address to the officers after asking a relative to have defendant telephone him with that information. According to Mr. Farkas, when defendant called the Farkases' residence as requested, he inquired about the Super Bowl party that was scheduled for that afternoon and indicated he was planning to attend.

Officer Melinda Ybarra testified that when she and her partner arrived at defendant's home around noon on January 27, 1991, he was standing in the

11

driveway with a small child. In the garage there was a faded orange Datsun sedan, which matched Suarez's description of the vehicle that sped away from the location where he discovered Angie on the roadway.

The officers transported defendant to the Fresno County Sheriff's Department headquarters. There, Officer Ybarra noticed minor scratches on the right side of defendant's face. Officer Souza testified that he collected the clothing defendant was wearing at the time of his arrest, which included white boxer shorts. He found 8 cents on defendant's person and no money in the wallet seized from defendant's residence.

Forensic testing of defendant's clothing and other items collected during a search of his residence and vehicle, although not conclusive, linked him to the crimes in important respects. For instance, according to crime scene technician William Stones, the shoe tracks found at the Chateau Fresno and Lost Lake crime scenes had similar characteristics, that is, the same length, width, tread wear design and wear pattern, as the Nike shoes seized from defendant's residence. Criminalist Allen Boudreau testified that tire marks, and pine needles and hair found inside defendant's car likewise connected him to the crimes.

Serology expert Andrea Van der Veer de Bondt testified extensively concerning her testing of the bloodstains on various articles of clothing worn by Laurie, Angie, and defendant. Several blood smears originating on the inside of Laurie's blouse were consistent with Angie's blood and inconsistent with Laurie's blood. She agreed with the prosecutor that a hand might have smeared the blood but she could not say so conclusively. De Bondt believed that Laurie's bra had been displaced when the blood was smeared or transferred onto it.

De Bondt also testified about a three-inch off-white stain on the left front area of the boxer shorts that defendant was wearing at the time of his arrest. The shorts tested positive for the presence of P-30, a protein produced in the prostate

gland that is one of the components of semen. De Bondt was unable to determine the identity of the donor or how old the stain was.

Urologist Gary Storey, M.D., testified regarding the physiological significance of the semen stain. Based on the results of the P-30 analysis, Dr. Storey was certain that the stain on defendant's shorts was the result of ejaculation following sexual arousal.

### 2. *Defense evidence*

The defense presented evidence to support the theories of unconsciousness and diminished actuality.[3] Defendant testified in his own defense, providing his account of the events leading up to the crimes and describing his background and psychiatric history. The defense also called three mental health experts who testified about defendant's brain damage and the mental disorders and complex partial seizures that resulted from it.

### a. *Defendant's version of the crimes*

Defendant's account of his activities preceding the crimes was consistent in some respects with the prosecution witnesses' version of events. Defendant testified that on Saturday, January 26, 1991, he left his home around 7:00 p.m., made several stops, and then drove to the Farkases' home to play video games with Laurie's younger brother. At one point, he spoke with Laurie in her bedroom and asked her if she and Angie wanted to go "cruising," but they did not make any plans to get together that evening.

---

[3] To support a defense of "diminished actuality," a defendant presents evidence of voluntary intoxication or mental condition to show he "actually" lacked the mental states required for the crime. (*People v. Steele* (2002) 27 Cal.4th 1230, 1253, italics omitted.)

13

Defendant testified that he left the Farkases' house around 20 to 30 minutes after speaking with Laurie, and drove to a bowling alley. He played an arcade game using no more than $1 of the $5 in change that Kellogg had given him.

According to defendant, as he drove home from the bowling alley, he noticed Laurie and Angie walking on the sidewalk on the opposite side of the street. He turned the car around and pulled up beside them, and the girls got inside. Defendant briefly stopped at a nearby McDonald's restaurant because Laurie said she wanted something to eat. Defendant stayed in the car while the girls went inside to order their food; he could not recall conversing with either one of them before they exited the vehicle. Several minutes later, defendant went inside to use the restroom, but changed his mind after seeing the long line of people and waited for the girls at the front door. When the group returned to the car, he suggested they go to Roeding Park to look for parties. The girls said, "Let's go."

Defendant testified that he drove around Roeding Park but they saw no one they knew and left a short time later. After stopping at a service station to purchase about $2 worth of gasoline, defendant suggested they go to Lost Lake to see if some of his friends might be there.

Defendant explained that when the group arrived at Lost Lake, he drove to a picnic spot but saw no one there. He turned around and headed back toward the exit, then needed to find a restroom. About five minutes after using the toilet, defendant realized there was no toilet paper and yelled for the girls to bring him something with which to wipe himself. But as he sat on the toilet, he could hear the girls laughing and driving his car around. He became upset and very angry. When Laurie walked into the restroom with a smirk on her face, defendant became enraged and filled with hate. He jumped on Laurie, then got onto his knees and started choking her with both of his hands until she lost consciousness. In the meantime, Angie entered the doorway and crawled toward Laurie. Defendant

14

lunged at Angie and started hitting her in the face with his fists and choking her. According to defendant, after that, everything went blank.

Defendant testified that his memory of the remainder of the evening was patchy. He remembered dragging Laurie's dead body outside the restroom, but did not recall taking her to the women's restroom, tying a rope around her neck and killing her, or placing her body in the trunk of his vehicle. Although he believed he must have killed her, he did not know why he did so.

As for the evening's other events, defendant remembered standing at a pay telephone and driving with Angie in the fog, but he had no recollection of how he ended up back at his own house. When he awoke around 9:00 a.m., he had a feeling that "something wasn't right" but no memory of what had happened the night before. Although defendant slept in the clothing he had been wearing the previous night, he removed it and changed into a pair of previously worn white boxer shorts, Raiders shorts, and blue jeans after Kellogg told him she was collecting the dirty laundry to wash.

### b. *Defendant's background and mental health history*

Defendant testified that his parents separated in 1965 when he was three years old. His mother moved him and his siblings first to San Francisco and then to Los Angeles, where they lived on welfare in a one-bedroom house. When he was 10 years old, he was hit accidentally in the head with a baseball bat and rendered unconscious.

At the age of 13 or 14, defendant suffered a seizure, began running away from home, sometimes to travel across the country, and began to behave violently toward family members. In October 1976, when defendant was 12 years of age, he locked his brother and mother out of the house, then hurled a bottle at his brother and threatened his mother with a butcher knife. He was apprehended after

15

escaping through a second story window and committed to Los Angeles County+University of Southern California Medical Center (LAC+USC) for several weeks.

Defendant was returned to LAC+USC in December 1977, again following an incident in which he became angry at his mother. This time, defendant locked all of the doors to the house and set fire to some curtains. His intention at the time was to commit suicide, although he could not remember much of the incident before setting the fire. During this hospitalization, defendant complained of auditory hallucinations.

When defendant was released from his second commitment at LAC+USC, he failed to follow through with the recommended outpatient treatment. Within one month, in January 1978, he was hospitalized again, this time at Camarillo State Mental Hospital (Camarillo). In the incident leading to that hospitalization, defendant's sister and her friend were making noise in the house while defendant was trying to sleep. When he asked them to quiet down, they began to tease him and call him names, which enraged him. Defendant locked the girls in the bedroom, poured gasoline on the door, and set it on fire. Defendant was arrested and taken to a juvenile detention facility. After feigning a suicide attempt, he was first transferred to LAC+USC and ultimately placed in a voluntary program for teenagers at Camarillo. Defendant testified that he did not remember walking to the service station to fill a gasoline can or returning to the house. He also testified that after setting fire to the door, things "went black" and he had a "funny feeling" when he woke up the day after the incident.

While at Camarillo, defendant attempted suicide by hanging himself with a bed sheet. Although the teen program was designed to last six months, defendant spent 11 months at the facility and was eventually discharged in January 1979 without having successfully completed all of the program's levels.

16

After his release from Camarillo, defendant returned to Los Angeles to live with his mother. In late 1980 or early 1981, he set off by train to visit relatives in New Orleans. When passing through Texas, however, defendant was arrested for robbery.

Defendant pleaded guilty to the robbery charge and served a prison term in Texas. After his release in June 1983, at age 21, he returned to Los Angeles and stayed in youth shelters. Shelter administrators helped him obtain employment in the California Conservation Corps. He left that program after three months and returned to Los Angeles in January 1984, this time moving into a garage converted into a living space. Defendant admitted that during this period, he broke into other garages, stealing tools to sell for money to buy food. He also acknowledged being arrested for and/or being convicted of various crimes, including burglary, joy riding, robbery, and battery against his former girlfriend. He served a two-year prison term for the robbery.

Following his release from prison in 1986, defendant lived in a halfway house in Inglewood for three months and worked as a warehouse clerk. He left that employment and relocated to Long Beach, where he met Donna Kellogg. He eventually moved with her to Fresno, where they lived as husband and wife.

### c. Expert testimony

Psychologist Paul S. Berg, Ph.D., examined defendant for the defense. After his first interview with defendant, which included administering a series of preliminary tests for brain abnormality, Dr. Berg suspected the possibility of brain damage. He asked Neuropsychologist Ronald McKinsey, Ph.D., to determine whether there was an organic component to defendant's mental status.

Dr. McKinsey testified that he tested defendant using the Luria-Nebraska Neuropsychological Battery. He concluded that defendant suffered brain

17

dysfunction in the frontal and temporal lobes. As Dr. McKinsey explained, individuals with frontal lobe damage exhibit poor judgment, poor control of impulses and emotions, unreliability, and immaturity. They can also suffer from organic personality syndrome, a disorder associated with recurrent outbursts of aggression and rage.

To further confirm the results of his evaluation, Dr. McKinsey asked Neurologist Sateesh Apte, M.D., to administer a quantitative electroencephalogram (qEEG), which detects and "maps" the brain's electrical activity. Dr. Apte testified that testing showed moderate to severe dysfunction in defendant's frontal and temporal lobes that more likely was caused by trauma than by heredity. He explained that individuals with temporal lobe dysfunction can suffer lack of emotional control and impaired memory indexing, which is an inability to keep a series of events in sequential order in memory.

Dr. Apte also found evidence suggesting defendant was vulnerable to seizures. In his opinion, defendant more likely than not suffered from seizures, including complex partial seizures. According to Dr. Apte, severe rage and hyperventilation can trigger a seizure. During a complex partial seizure, an individual can carry out "primitive" acts of violence, such as hitting, choking, or pushing someone, but have no recollection of what occurred. A person experiencing such a seizure cannot plan, reason, or consider the consequences of his or her actions.

Dr. Berg testified that the findings of Drs. Apte and McKinsey confirmed his initial suspicions of neurological damage and supported his diagnosis that defendant suffered from organic personality syndrome (hereafter sometimes OPS)

18

manifested by rage reaction.[4]  Dr. Berg believed the diagnosis was substantiated further by defendant's background and psychiatric history, which demonstrated a recurrent pattern of becoming angry and losing control when emotionally overstimulated.  Dr. Berg found it significant that even when defendant was living in a highly structured environment at Camarillo State Hospital, he had great difficulty controlling himself.  Dr. Berg also noted that defendant's physicians at Camarillo prescribed chlorpromazine, which is contraindicated for individuals with a history of seizures because it may lower the seizure threshold.

Dr. Berg further believed that on the night the crimes occurred, defendant suffered an OPS-induced rage reaction that interfered with his ability to form intent and affected his mental processes.  According to Dr. Berg, the significant preexisting stressors in defendant's life at the time, coupled with his perception that Laurie was teasing and mocking him when she entered the restroom, rendered him explosive, impulsive, and out of control.  In this mental state, defendant was incapable of thinking, considering, or making a judgment.  Dr. Berg explained that defendant's claim to have no memory after lunging at Angie was consistent with rage reaction; in essence, his impaired brain became "unplugged."  He also

---

[4]     The Diagnostic and Statistical Manual of Mental Disorders classifies organic personality syndrome as a "Personality Change Due to a General Medical Condition" and describes as its "essential feature . . . a persistent personality disturbance that is judged to be due to the direct physiological effects of a general medical condition. . . .  [¶]  Common manifestations of the personality change include affective instability, poor impulse control, outbursts of aggression or rage grossly out of proportion to any precipitating psychosocial stressor, marked apathy, suspiciousness, or paranoid ideation."  (American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000) p. 187.)

19

believed it highly probable that defendant suffered a seizure and lost consciousness at the time he first attacked Angie.

### 3. *Prosecution rebuttal evidence*

In rebuttal, the prosecution presented five medical and mental health experts who disagreed with the methodology, findings, and opinions of the defense experts. Testimony by lay witnesses contradicted the foundation of the defense experts' opinions and supported the diagnoses of the prosecution's experts.

The prosecution's experts challenged the efficacy of qEEG testing and the Luria-Nebraska Neuropsychological Battery as diagnostic tools for determining brain dysfunction, and disagreed with the defense experts' conclusions. For instance, Neurologist Harvey Edmonds, M.D., testified that the qEEG has a high incidence of false positives. The witnesses also disputed the defense expert's interpretation of the test results. According to Neurologist Douglas Goodin, M.D., under the defense expert's analysis, "almost everybody in the normal population will have some abnormality on [his or her] qEEG." Similarly, Neuropsychologist Bradley Schuyler, Ph.D., testified that the results of the Luria-Nebraska Neuropsychological Battery could have reflected defendant's limited educational background, not brain injury.

The prosecution's expert witnesses also disputed the defense experts' opinions that defendant's blow to the head from a baseball bat caused a serious brain injury that led to OPS. Dr. Schuyler testified that such an injury would cause, at most, only mild dysfunction. Dr. Edmonds found that the likelihood such a scenario would result in posttraumatic epilepsy was less than 1 percent.

Psychiatrist James Missett, M.D., and Clinical Psychologist Michael Thackrey, Ph.D., each found strong indications that defendant suffered from antisocial personality disorder (hereafter sometimes APD) rather than OPS.

20

Dr. Missett believed it significant that none of the records from any of defendant's prior hospitalizations suggested a diagnosis of OPS. Drs. Missett, Thackrey, and Schuyler further concluded that even if defendant suffered from OPS, his organized, goal-directed behavior on the night of the crimes was inconsistent with the rage reaction associated with that diagnosis. For instance, Dr. Schuyler found that defendant's repeated trips in and out of the bathroom to clean up the mess demonstrated that, once the initial attacks were over, he was no longer acting impulsively or out of control. According to Dr. Schuyler, amnesia is not a feature of rage reaction.

The prosecution experts further testified that even if defendant suffered from seizures, his sustained and goal-directed behavior on the night of the crimes could not be considered seizure activity. Dr. Goodin explained that seizures are short in duration and unprovoked. According to Dr. Edmonds, defendant's conduct amounted to a complex group of actions that were responsive to his environment and thus inconsistent with his being in seizure.

Lay witnesses' testimony supported the prosecution experts' diagnoses of antisocial personality disorder. For instance, Donna Kellogg testified that she was defendant's sole source of income, he never expressed a desire to find a job, and he habitually slept until noon each day. Kellogg and other witnesses also testified that they had never seen defendant behave violently when provoked, nor were they aware that he suffered from seizures or memory lapses. According to Kellogg and her sister, Tina Edmonds, defendant never "flew off the handle," even when taunted with disparaging names.

### 4. *Defense surrebuttal*

Dr. Berg criticized the observations and conclusions of the prosecution's expert witnesses, disputing Dr. Missett's assertion that amnesia is not a feature of

OPS, and testifying that although amnesia is not one of the diagnostic criteria of OPS, the literature documents cases in which individuals suffering from OPS experience amnesia. He also disapproved of Dr. Missett's reliance on Angie's testimony. Noting the significant differences between Angie's preliminary hearing testimony and her testimony at trial, Dr. Berg believed Angie's memory of events was no better than defendant's. Based upon the scientific literature, Dr. Berg also disagreed with the experts' assertions that a seizure lasts only minutes. Finally, Dr. Berg was unpersuaded by the experts' diagnoses of antisocial personality disorder because none of the experts had spent much time talking with defendant.

### B. Sanity Phase Evidence

Dr. Berg testified for the defense again at the sanity phase. Drawing on the same materials he used to prepare for his guilt phase testimony, Dr. Berg believed that defendant became insane at the point he assaulted Angie and that he remained in that state during the next four to six hours until he returned home. According to Dr. Berg, at the time defendant killed Laurie and attempted to kill Angie, he was unconscious as a result of a brain damage-induced rage reaction and/or a seizure. Although unconsciousness is not the equivalent of insanity, Dr. Berg explained, defendant's rage reaction "was so enormous and so beyond what we normally even think of as anger or rage that he could not at that time understand and know and appreciate . . . what he was doing or know the difference between right and wrong . . . ."

The prosecution called two mental health experts to testify, both of whom disagreed with Dr. Berg's opinion that defendant was insane at the time he committed the crimes. Guilt phase expert Dr. Missett, and Psychologist Mark Brooks, Ph.D., found no indication that defendant suffered from a mental disease

or disorder or that he was unconscious when he committed the crimes. In their view, defendant was aware of the nature of his actions and their possible consequences.

### C. Penalty Phase Evidence

#### 1. Prosecution evidence

The prosecution presented the following evidence of defendant's other crimes of violence and prior convictions.

#### a. 1980 aggravated robbery

Retired train conductor Earl Bradley testified that at around 4:00 a.m. on November 25, 1980, he observed an elderly man sitting in the lounge of a train traveling through Texas. When the conductor returned 15 minutes later, he found the man slumped in his seat with his throat slit. The victim reported to him, "A [B]lack man cut my throat and took my wallet." The conductor went in search of the robber and discovered defendant locked inside the restroom in the next car. According to court records, defendant later pleaded guilty to aggravated robbery and received a five-year prison term.

#### b. 1981 assault

David Atwood, an inmate in the Texas prison where defendant was serving his sentence for the 1980 aggravated robbery conviction, testified that in September 1981, he was sitting in his cell rolling a cigarette. Defendant banged on the wall of his cell next door, demanding a cigarette. Atwood did not respond and defendant became abusive and called him names. When Atwood returned the insults and told defendant he had no cigarettes to spare, defendant threatened him, saying "When the door swing, you swing." Atwood and defendant later exchanged heated words while on their way to the dayroom. Defendant then

23

knocked him to the ground with a blow to the mouth. A fight ensued, which prison guards eventually defused.

### c. 1982 assault

Edward Salazar also was an inmate in the Texas prison where defendant was incarcerated. According to Salazar, in April 1982, defendant cut in front of him in the "chow line," and when Salazar shoved him, defendant told him, "We'll deal with this later, mother fucker." Several days later, while defendant and Salazar were paired together in the prison's trade school, defendant directed Salazar to pour water into a pot of hot lead. Another inmate warned Salazar that the lead would blow up in his face if he did so. Salazar became angry and threw the water aside. Defendant then struck him in the head with a ball-peen hammer, knocking him to the floor and injuring his scalp. On cross-examination, Salazar disputed a prison disciplinary report indicating that after the hot lead incident, Salazar initiated a fight with defendant.

### d. 1985 assault

Officer Dugan of the Long Beach Police Department testified that in February 1985, he contacted 16-year-old Carrie Parks, defendant's girlfriend at that time. He observed that she had a swollen lip, a lump over one eye, and an abrasion on her arm.

### e. 1985 robbery

Manuel Gutierrez testified that while driving home from a nightclub in the early morning hours of July 27, 1985, he pulled off on a side street to sleep. He was awakened by a man, later identified as defendant, poking him in the neck with what he thought was a knife. Defendant directed Gutierrez to give him his wallet. Gutierrez complied, but then tried to grab the weapon from defendant's hand and exit the car. He managed to escape, but defendant followed and they continued to

24

wrestle. During the struggle, defendant yanked a gold chain from Gutierrez's neck and an accomplice struck Gutierrez on the back of the head with a hard object. Court documents showed that defendant later pleaded guilty to robbery.

### 2. *Defense evidence*

The defense case in mitigation emphasized that defendant's upbringing in a violent, destructive environment with a mother who was incapable of protecting him interfered with his ability to develop coping skills, positive self-esteem, and impulse control.

Clinical Psychologist Gretchen White, Ph.D., expressed the opinion that environmental and genetic factors had a profound, adverse affect on defendant's psychological development. Based on her interviews with defendant and his family members, former girlfriends and friends, Dr. White described for the jury defendant's upbringing in a dangerous and frightening Los Angeles neighborhood. From age three to 10, defendant and his two brothers and a sister lived with their mother, Daisy Clark, in a community that was economically depressed but safe. Daisy later moved the family to a neighborhood beset by poverty, crime and violence, where defendant was constantly frightened. Defendant's sister Kim joined a gang and his younger brother Ezra became involved with guns and drugs.[5] Although defendant was constantly pressured to become a gang member, he joined the Explorer Scouts instead.

According to Dr. White, Daisy was an ineffective parent. Daisy often left the children unattended while she worked, sometimes locking them outside the house.

---

[5] Both of defendant's brothers ultimately met violent deaths. In 1989, Ezra was shot fatally with a shotgun. The following year, defendant's older brother Larry was stabbed to death.

25

From an early age, defendant and his brothers Ezra and Larry frequently ran away to the Bay Area home of their father's wife and their two half siblings, Ricky and Richelle. They behaved well during those visits. Daisy also was inappropriately harsh on some occasions and overly indulgent on others, and was described as having a "Jekyll and Hyde" personality. Dr. White also noted that Daisy had a history of becoming disoriented and losing consciousness.

Dr. White explained that defendant's upbringing in a violent neighborhood by an ineffective parent interfered with his ability to develop coping skills and impulse control. Instead, as his psychiatric and criminal history disclosed, he developed paranoid tendencies, rage reactions, and low self-esteem. Dr. White found it significant that teasing was often the triggering event for defendant's violent acts. She also noted defendant's tendency to associate with individuals who were younger than he, which she attributed to his low self-esteem and lack of a male role model. Finally, she observed that, without adequate coping skills, the recent stressors in defendant's life, which included the violent deaths of his two brothers, had a tremendous impact on his psychological functioning.

Testimony by members of defendant's family echoed the defense expert's observations. Daisy begged the jury to spare her son's life, for the sake of his children.[6]

---

[6] Defendant fathered three children with Donna Kellogg, a daughter with former girlfriend Tina Beamon, and another daughter with former girlfriend Belinda Jones.

## II. DISCUSSION

### A. Asserted Evidentiary Error at the Competency Hearing

Prior to trial and pursuant to a defense request, the court conducted a jury trial on defendant's competence to stand trial. Defendant contends the court erred by admitting irrelevant and highly prejudicial lay testimony at the hearing.[7] As we shall explain, there was no error.

#### 1. Background

In September 1991, defendant entered pleas of not guilty as to all counts. In June 1993, against the advice of counsel, he entered an additional plea of not guilty by reason of insanity. Several days after the entry of that plea, the trial court and the parties returned to the courtroom to discuss administrative matters. The court remarked that defendant appeared withdrawn and depressed, inquiring

[7] Defendant contends the admission of the evidence in question violated his state and federal constitutional rights to confrontation, counsel, due process, fair trial, and reliable guilt and penalty verdicts as guaranteed by the Sixth, Fourteenth and Eighth Amendments to the United States Constitution and article I, sections 7, 15, and 17 of the California Constitution. He invokes the same constitutional provisions in nearly every other claim raised in this appeal. "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind . . . that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional legal consequence of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17, italics omitted.) " 'No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or "gloss" raised for the first time here.' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 811, fn. 8; *People v. Boyer, supra*, at p. 441, fn. 17.)

about his ability to stand trial. Defense counsel stated her belief that defendant was not incompetent.

At a subsequent hearing in June 1993, defendant requested permission to absent himself from trial. When counsel stated she would not waive his presence, defendant became disruptive. He later rose from his chair and raised his voice when a member of the local media entered the courtroom. After the news reporter departed, counsel voiced her concern that defendant would disrupt the proceedings if ordered to be present. She suggested that his inability to remember portions of the events at issue in the charged crimes might explain his angry outbursts in the courtroom.

The trial court was troubled by counsel's report of defendant's "aberrations of memory." Although counsel did not affirmatively request a competency hearing, the court nonetheless declared a doubt regarding defendant's ability to assist counsel in his defense and suspended proceedings pending evaluation of his mental competence by two court-appointed mental health experts. (See §§ 1368, 1369.) Both experts later reported they found defendant competent to proceed to trial. However, defendant asked for a jury trial on the question and the court granted the request.

Psychiatrist George Woods, M.D., testified for the defense. According to Dr. Woods, defendant suffered from major depressive disorder with psychotic features, which included profoundly paranoid delusions that almost everyone involved in the court proceedings, including defense counsel, had turned against him. Dr. Woods testified that defendant's psychotic symptoms directly related to the pending legal proceedings and, in the four months preceding the competency hearing, he had developed paranoid thoughts about his attorneys and refused to talk with them. In Dr. Woods's opinion, although defendant understood the nature

28

of the criminal proceedings against him, he was so overwhelmed by his psychosis and paranoid delusions that he was unable to assist his attorneys.

The prosecution called three mental health experts to testify, each of whom expressed the view that defendant suffered no disease or defect that rendered him incapable of cooperating with counsel. For example, Psychiatrist Charles Davis, M.D., found defendant *unwilling*, not unable, to assist his attorneys. He believed defendant's conduct to be a "manipulation rather than true paranoid delusion." Psychologist Frank Powell, Ph.D., testified that defendant suffered from delusional disorder, persecutory type, but that he was capable of assisting his attorneys "should he so desire, and if they can help him get beyond his suspicions."

To further demonstrate defendant's present competence and rebut the defense expert's opinion, the prosecution called a number of lay witnesses, most of whom testified over defense objection. Court reporter Rudy Garcia, who recorded the June 1993 proceeding in which defendant entered a plea of not guilty by reason of insanity against counsel's advice, read into the record the eight-page nonconfidential transcript of that proceeding. The transcript reflected that in defendant's lengthy exchange with the court before entering the plea, he stated, "I want to specify. I'm not saying I'm insane now; I'm talking about as far as the time the crime was committed."

Defense counsel challenged Garcia's proposed testimony on the ground that whether or not defendant appeared normal was irrelevant to the competency determination because the defense expert testified that defendant at times can act normally. The court disagreed, finding the evidence of defendant's demeanor and recent participation in a courtroom proceeding relevant to his demeanor in the present proceeding and hence proper rebuttal to Dr. Woods's testimony.

29

The court likewise overruled defense counsel's relevancy and Evidence Code section 352 objections to the proposed testimony of Deputy Randall Haw, the bailiff who regularly accompanied defendant to and from the courtroom for pretrial proceedings. Characterizing Deputy Haw's intended testimony as an attempt to demonstrate that defendant was normal at times, counsel repeated her argument that the defense already had conceded that point. What was at issue, she asserted, was whether defendant could assist counsel when he was confronted with a courtroom situation. The court found the proposed testimony proper rebuttal. Deputy Haw later testified that when he engaged defendant in casual conversation, he was responsive and appropriate in his manner. Deputy Haw also related that in June 1993, three days before the court declared a doubt as to defendant's competence, defendant informed him that he no longer wanted to attend the proceedings and that, if forced to do so, and if television cameras or members of the victims' families were present, he would disrupt the courtroom. Defendant also told the bailiff that he wanted to plead guilty to the charged crimes but his attorneys would not permit him to do so.

Directly after Rudy Garcia's testimony and again before deliberations, the trial court instructed the jurors that the only issue before them was defendant's present mental competence, not the question of his guilt or innocence or his legal sanity at the time of the crimes. The jury ultimately found defendant competent to proceed to trial.

### 2. *Discussion*

The question presented in a competency proceeding is whether "as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a

30

defense in a rational manner."  (§ 1367, subd. (a); *People v. Jablonski* (2006) 37 Cal.4th 774, 807-808.)

According to defendant, the sole issue at the competency hearing was whether he could rationally assist counsel in the conduct of his defense; he did not claim he lacked the ability to understand the nature of the court proceedings or the charges against him.  Thus, defendant asserts, the lay witnesses' testimony regarding his courtroom behavior, his threat to disrupt the proceedings, his plea of not guilty by reason of insanity against his attorney's advice, and his desire to plead guilty to the charged crimes was irrelevant to any contested issue presented at the competency trial and its admission amounted to prejudicial error requiring reversal of the entire judgment.

"Except as otherwise provided by statute, all relevant evidence is admissible."  (Evid. Code, § 351; *People v. Williams* (2008) 43 Cal.4th 584, 633.) "Evidence is relevant if it tends ' "logically, naturally, and by reasonable inference" to establish material facts . . . .' " (*Williams,* at p. 633.)  We long have recognized that "[t]he trial court has considerable discretion in determining the relevance of evidence.  [Citations.]"  (*Id.* at p. 634.)  We conclude there was no abuse of discretion here.

Contrary to defendant's assertion, the testimony of Rudy Garcia and Deputy Haw was relevant to the issue of his ability to assist counsel in his defense. Evidence of defendant's behavior and interactions with court personnel and his attorneys in the courtroom setting tended to rebut Dr. Woods's opinion that for the previous four months, defendant's psychotic symptoms and paranoia stemming from the pending legal proceedings had interfered with his ability to rationally assist his counsel.  This evidence also presented the jury with a contrast between defendant's demeanor at the competency hearing, which prosecution expert

31

Dr. Powell described as "somewhat withdrawn or uninterested," and his conduct in the courtroom on other occasions.

As for testimony that defendant entered an insanity plea against counsel's advice and wanted to plead guilty to the charges but counsel refused to permit him to do so, that evidence likewise was relevant because it buttressed the prosecution's position that defendant was unwilling, rather than unable, to cooperate with counsel. (See *People v. Superior Court* (*Campbell*) (1975) 51 Cal.App.3d 459, 464 ["the test, in a section 1368 proceeding, is competency to cooperate, not cooperation"].) Defendant insists that evidence of his disregard of counsel's advice not to plead insanity was irrelevant because the decision was one for him, not counsel, to make. Defendant is correct that the choice to enter a plea of not guilty by reason of insanity is a matter within the defendant's, rather than counsel's, ultimate control. (§ 1018; *People v. Medina* (1990) 51 Cal.3d 870, 899-900.) The principle does not advance his claim of irrelevance, however. That defendant exercised his prerogative to enter a plea against counsel's advice tended to show he was capable of intelligently participating in his defense.

Defendant further claims the challenged evidence should have been excluded because its prejudicial effect far outweighed its probative value in showing he was capable of rationally assisting counsel with his defense. Evidence Code section 352 accords the trial court broad discretion to exclude even relevant evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) We review a trial court's ruling under Evidence Code section 352 for an abuse of discretion. (*People v. Williams, supra*, 43

Cal.4th at pp. 634-635; *People v. Robinson* (2005) 37 Cal.4th 592, 625.) Applying this standard, we conclude there was no error in the court's implied finding that the danger of prejudice did not substantially outweigh the probative value of the challenged evidence.[8]

Defendant argues the admission of evidence of his desire to plead guilty and his entry of an insanity plea against counsel's advice created an overwhelming temptation for jurors to base their competency determination on improper considerations, such as defendant's beliefs about his own guilt and sanity. That assertion is purely speculative, however. The court instructed the jurors that the issue before them was defendant's present competence, not the question of his guilt or innocence or his sanity or insanity at the time of the charged crimes. The court's instruction diminished the risk that the jury, which had been impaneled to determine only the question of defendant's competence, would misuse the evidence in the manner defendant asserts, and we presume the jurors followed the court's directive. (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1326.) Defendant points to nothing in the record suggesting otherwise.

Defendant also argues that even if the challenged evidence was probative of his demeanor, it should have been excluded as "wholly unnecessary" because the prosecutor presented other lay witnesses who described defendant's apparent ability to function in the courtroom and jailhouse milieu. We disagree. That the prosecutor could have relied on other testimony and evidence of defendant's

---

[8]     To the extent defendant argues the evidence that he entered an insanity plea against counsel's advice should have been excluded on this ground, his claim is forfeited because counsel did not object to Garcia's testimony on that basis. (*People v. Dykes* (2009) 46 Cal.4th 731, 778-779.) The claim lacks merit in any event, as we explain.

demeanor in these settings does not diminish the probative value of the challenged evidence or require its exclusion under Evidence Code section 352. As we have observed, the prosecutor is not required "to present its case in the manner preferred by the defense." (*People v. Salcido* (2008) 44 Cal.4th 93, 150.)

Finally, because defendant fails to point to anything in the record suggesting any infirmity in the competency proceeding, we reject his argument that a defective and unfair adjudication of his competence deprived him of due process and a reliable guilt, sanity, and penalty determination in violation of the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution.

## B. Jury Selection Claims

### 1. Rulings on challenges for cause

Defendant asserts that his death sentence must be reversed because the trial court erroneously granted the prosecutor's challenges for cause against three prospective jurors and improperly overruled defense challenges for cause to eight prospective jurors. He argues that the court's rulings failed to meet the constitutional standards articulated in *Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*) and other pertinent United States Supreme Court precedent. He further asserts that because the court engaged in an assertedly discriminatory pattern of favoring the prosecution when ruling on the parties' challenges for cause, its rulings are not entitled to deference on appeal. We reject these arguments.

### a. Governing principles

Under both the state and federal Constitutions, a criminal defendant is guaranteed the right to be tried by an impartial jury. (Cal. Const., art. I, § 16; U.S. Const., 6th & 14th Amends.) A prospective juror may be excused for cause only if his or her views in favor of or against capital punishment "would 'prevent or

substantially impair the performance of his [or her] duties as a juror in accordance with [the court's] instructions and [the juror's oath.]' " (*Witt*, *supra*, 469 U.S. at p. 424; see *Uttecht v. Brown* (2007) 551 U.S. 1, 9.)  Although opposition to the death penalty does not necessarily afford a basis for excusing a juror for cause (*People v. Martinez* (2009) 47 Cal.4th 399, 425), the prosecutor may properly challenge those prospective jurors whose opposition to the death penalty "would not allow them to view the proceedings impartially, and who therefore might frustrate administration of [the] death penalty scheme." (*Witt, supra,* at p. 416.)

We will uphold a trial court's ruling on a challenge for cause " ' " 'if it is fairly supported by the record.' " ' " (*People v. Lewis* (2008) 43 Cal.4th 415, 483.)  The trial court is in the best position to determine the potential juror's true state of mind because it has observed firsthand the prospective juror's demeanor and verbal responses.  (*People v. Martinez, supra*, 47 Cal.4th at p. 426; see also *Uttecht v. Brown*, *supra*, 551 U.S. at p. 9.)  Thus, " ' "[o]n review of a trial court's ruling, if the prospective juror's statements are equivocal or conflicting, that court's determination of the person's state of mind is binding." ' " (*People v. Solomon, supra,* 49 Cal.4th at p. 830; *Witt, supra*, 469 U.S. at pp. 425-426, 428.)

The erroneous excusal of even a single prospective juror under the principles of *Witt* and its progeny requires reversal of the penalty judgment.  (*Gray v. Mississippi* (1987) 481 U.S. 648, 663-666; *People v. Stewart* (2004) 33 Cal.4th 425, 454-455.)  To prevail on a claim that the court erroneously denied a challenge for cause, however, the defendant must show " 'that the court's rulings affected his right to a fair and impartial jury.' [Citation.]" (*People v. Mills* (2010) 48 Cal.4th 158, 187.)

### b. *Exclusion of prospective jurors for cause*

#### i. *Prospective Juror L.C.*

Prospective Juror L.C. wrote in his questionnaire that he was "not really for" the death penalty but that he could "consider it." He repeated the point when responding to the court's question whether he believed the death penalty should be automatic for any type of crime. He answered, "Yes, sir" to the court's questions whether he could look at the evidence and law and then decide the appropriate penalty, and whether he could vote for either death or life without the possibility of parole if he felt one sentence was more appropriate than the other.

The prosecutor asked L.C. to clarify what he meant when he stated that he was "not really for" the death penalty. L.C. explained that although some cases deserved the death penalty, "that would be a tough issue to vote on." When asked whether he believed he could actually cast a vote to impose a death sentence on another human being, L.C. replied, "I probably could," but added that it was a "heavy responsibility" to have a man's life in his hands. The prosecutor probed further, asking L.C., "When you say . . . 'I probably could,' does that mean that you have a doubt that you could?" L.C. replied, "I probably would have a doubt." When the prosecutor then inquired if being frightened of the penalty decision would affect his ability to vote for the death penalty, L.C. responded that he "probably could."

The court resumed questioning L.C., asking, "[A]ssuming . . . the evidence is very substantial that death is deserved . . . and you personally feel that death is deserved . . . would you vote for it?" L.C. replied, "Yeah." The prosecutor followed up with a similar question, asking L.C. whether he could put aside his personal beliefs "and actually impose the death penalty on another human being." L.C. responded, "Yes."

The prosecutor challenged L.C. for cause, arguing that his answers were conflicting and equivocal and that he generally was unable to say whether he could ever impose the death penalty in an appropriate case. Defense counsel objected to the challenge, arguing that none of L.C.'s responses rose to the level of substantial impairment. In counsel's view, L.C.'s responses expressed the seriousness and difficulty of the penalty determination, not an inability to follow the law.

The court observed that toward the end of the voir dire examination, L.C. expressed more certainty in his ability to apply the death penalty in an appropriate case. It found, however, that L.C.'s declaration that he could apply the law fairly and impartially was contradicted by his equivocal responses and his demeanor. It appeared to the court at several points that L.C. "might lose emotional control over himself" and it noted L.C. had difficulty swallowing and was "visibly upset and nervous." In the court's view, L.C. "would find it difficult, if not impossible, to impartially apply the law."

We defer to the trial court's determination of L.C.'s true state of mind and conclude there is ample support for its ruling excusing him for cause. The record shows the court "supervised a diligent and thoughtful voir dire" (*Uttecht v. Brown, supra*, 551 U.S. at p. 20, italics omitted), which enabled the court to engage with L.C., hear his responses, and observe his demeanor. (*People v. Stewart, supra,* 33 Cal.4th at p. 451.) Although at the end of the voir dire questioning L.C. expressed greater certainty concerning his ability to vote for the death penalty in an appropriate case, the court was entitled to find those assurances were severely undercut by his demeanor and his hesitant, inconsistent, and equivocal responses. Those answers, "combined with the court's firsthand assessment of [his] responses and demeanor could give rise to a 'definite impression' on the part of the court that [L.C.'s] views would substantially impair the performance of [his] duties as a

37

juror." (*People v. Solomon, supra,* 49 Cal.4th at p. 836; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1007.)

Defendant argues that the court's determination of L.C.'s true state of mind is not deserving of deference because the prospective juror's responses were neither conflicting nor ambiguous. The record, however, shows that L.C. equivocated and contradicted himself numerous times. For instance, when the prosecutor asked L.C. whether he believed he could actually vote to impose a death sentence, he first responded that he "probably could," then stated he "probably would have a doubt," and indicated finally he "probably could" vote for death.

Defendant complains it was improper for the court to rely on L.C.'s emotional state and nervousness in granting the prosecutor's challenge for cause, citing *Adams v. Texas* (1980) 448 U.S. 38. (See *id*. at p. 50 ["neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty"].) Contrary to the premise of defendant's argument, the court did not excuse L.C. simply on the basis of his nervousness and emotional state. Rather, the court excused him because his responses and demeanor demonstrated his views on the death penalty would substantially impair his duties as a juror. Visible emotion and nervousness are factors a trial court properly may consider in evaluating a juror's demeanor, which is highly relevant to a trial court's ultimate determination. (*People v. Martinez, supra*, 47 Cal.4th at p. 438; *Uttecht v. Brown, supra*, 551 U.S. at p. 9.)

### ii. Prospective Juror A.K.

Prospective Juror A.K. wrote in her questionnaire that she supported the death penalty and believed most death sentences were appropriate. During

questioning, she confirmed her strong support for capital punishment. When asked by the court whether she could vote to impose death if she felt the death penalty was appropriate, however, she stated, "I think so. I can't tell for sure," and she acknowledged she would "feel a little uncomfortable." A.K. voiced similar views when questioned by the parties, saying, for instance, she "would probably have a little problem with the death penalty" that she would have to "work through." When asked whether she could choose either of the two penalties if it was warranted, A.K. replied, "I think so. I think so," but then indicated she would "have a hard time" voting for the death penalty even though she believed in it. She also responded, "I don't know," when asked whether she could see herself actually voting to impose the death penalty on a person. A.K. explained that she probably would rather "have someone else make that decision instead of me." After pointing out to A.K. that her responses seemed inconsistent, the court inquired whether she could set aside her personal beliefs. She replied, "I probably would not."

Over defense objection, the court granted the prosecutor's motion to excuse A.K. for cause. The court remarked that A.K.'s responses were equivocal and conflicting: Although she initially stated she could set aside her problem with the death penalty, her later responses indicated that those problems would substantially interfere with her ability to vote for the death penalty. The court stated it had the "definite impression" that A.K. would be unable to truthfully and impartially apply the law.

We again defer to the court's determination of A.K.'s state of mind and conclude its decision to excuse her finds ample support in the record. Defendant observes, and we agree, that A.K. voiced no opposition to the death penalty. Indeed, she characterized her support for capital punishment as "strong." But A.K. also indicated she would "have a hard time" voting to impose death and

39

would rather have someone else make that decision for her. When asked whether she could set aside those feelings and vote for the death penalty in an appropriate case, she offered conflicting and equivocal responses. Those answers, coupled with the court's observations of A.K.'s responses and demeanor, could create a " 'definite impression' " that her "views would substantially impair the performance of her duties." (*People v. Solomon, supra,* 49 Cal.4th at p. 836.)

### *iii. Prospective Juror P.Y.*

Prospective Juror P.Y., a middle school social science teacher, provided lengthy, rhetorical, and sometimes cynical responses to many of the death qualification questions on the questionnaire. For instance, when asked about his general views on the death penalty, he wrote, "Not a yes or no, simple question. I am not a vengeful, vindictive person, and strive to be understanding and compassionate. The only reason someone should be killed by the state is if it brings a greater good." When asked whether the death penalty is imposed too often, too seldom, or randomly, he found the question "too simplistic" and wrote, "There are probably better alternatives. . . . But society must also be assured of safety." To the question whether he held any religious or philosophical principle that would affect his ability to vote for the death penalty, he replied, "Of course! What person could decide a question of this magnitude without profound examination of one's thoughts?" As to whether he could set aside his personal feelings regarding what he thought the death penalty law should be and follow the law as given by the court, he wrote, "Anybody who answers yes to this is a liar. When people are arguing in the jury room, it's very heavily based on personal feelings, regardless of what they say." P.Y. also wrote that he would do his best to examine and hear all sides, and that he deplored "simplistic thinking." Finally, in response to the question whether there were any reasons he might not be a

40

completely fair and impartial juror in the case, he queried, "What's impartial in today's society? I will do my best to be fair."

During questioning, P.Y. expressed his view that the "most obvious" consideration in deciding whether to impose the death penalty was "to know if someone can cause damage again if they're out of prison or if they're in prison." In response to that comment, the court asked P.Y. whether he could set aside his personal criteria for when death is appropriate and follow the court's instructions. P.Y. answered, "I think I could follow . . . the directions of the court." However, he then reiterated his belief that persons who state they are able to set aside their feelings about the death penalty are lying. When the court again asked P.Y. whether he could set aside his views, P.Y. posed questions of his own about whether imposition of the death penalty was mandatory. The court explained the penalty determination was not automatic, and the jury had wide discretion in reaching its verdict. Instead of answering the court's inquiry, however, P.Y. "wondered what it would be like to be in a jury room with 12 people and the amount of logic there. And to be honest, I don't hold a real high opinion of my fellow human beings as far as — look who we put in public office over and over again. Eleven more of those together, actually how many folks will follow the letter of the law and won't bring in their own personal prejudices . . . ."

The prosecutor moved that P.Y. be excluded for cause, arguing that his responses were framed to avoid shedding light on his attitudes about the death penalty. The court found P.Y.'s answers "basically incomprehensible and illogical," observing that P.Y. "never gave a straight answer" as to whether he could set aside his own opinions, and that his questionnaire answers made it "very clear" he had no intent to do so. Defense counsel objected, arguing that unless P.Y.'s personal feelings were such that he could never vote for the death penalty, or never vote for life without parole, he could not be disqualified for refusing to

41

set aside his personal feelings. The court disagreed, noting that some of P.Y.'s views might be impermissible considerations in the penalty determination. For instance, the court pointed out, P.Y. suggested that the death penalty is an appropriate sentence when there is a potential for future dangerousness. The court also noted that P.Y. was 35 minutes late to the courtroom and that he "jabber[ed] away."

The record fairly supports the court's determination that P.Y.'s views on capital punishment would substantially impair his performance as a juror. P.Y. declared in his questionnaire that his philosophical beliefs would affect his penalty decision. He also gave equivocal, conflicting, nonresponsive, and confusing answers when asked about his ability to set aside his personal views and follow the law. And in his statements at the end of voir dire he expressed a deeply cynical and presumptuous view of his fellow jurors, suggesting among other things that few individuals, perhaps himself included, were capable of setting aside their own personal prejudices. Because the court was in the best position to observe P.Y.'s responses, demeanor, tone of voice, and other cues not readily apparent to the reviewing court (*People v. Stewart, supra,* 33 Cal.4th at p. 451), we defer to its determination that P.Y. "had no intent" to set aside his personal opinions and follow the court's instructions on the law.

Defendant takes issue with the court's remark that P.Y. "never would give a straight answer" about whether he could set aside his own opinions, claiming any uncertainty as to P.Y.'s views was due partly to the court's vague questioning, as in *People v. Heard* (2003) 31 Cal.4th 946. (See *id.* at pp. 963-966 [the trial court improperly excused for cause a prospective juror who clearly and unambiguously stated he would follow the law; any vagueness in his answers was attributable to the court's imprecise questioning].) In the present case, unlike in *Heard*, the court made repeated attempts to ascertain from P.Y. whether he could set aside his

42

personal opinions and follow the court's instructions, but P.Y. responded to the court's clear, comprehensible inquiries by offering lengthy answers expounding on his views on human nature. Because the court was able to see and hear P.Y. and assess his demeanor and other nonverbal cues during questioning, its " 'definite impression' " that he would be unable to carry out his duties as a juror is entitled to deference here. (*People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 1007.)

To the extent defendant suggests that a court may not properly excuse a prospective juror for cause in a capital case for reasons other than his or her unyielding support for, or opposition to, the death penalty, he is wrong. A juror whose personal views on any topic render him or her unable to follow jury instructions or to fulfill the juror's oath is unqualified. (See *People v. Tate* (2010) 49 Cal.4th 635, 667-672 [a prospective juror's apparent misstatement of her academic credentials on the juror questionnaire called into doubt her general qualifications for jury service].) *Witt* identifies a particular, but not exclusive, ground for doubting a juror's ability to follow instructions. The *Witt* standard comports with "traditional reasons for excluding jurors and with the circumstances under which such determinations are made. . . . Here, as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts." (*Witt, supra*, 469 U.S. at p. 423.) In any event, contrary to defendant's argument, the court properly could and did conclude that P.Y. harbored views on capital punishment and other issues that, "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.* at p. 424.)

Defendant complains finally that the court based its decision to excuse P.Y. on irrelevant factors, such as his tardiness to court and his "jabbering away." His assertion fails, however, because its premise is belied by the record, which discloses the court did *not* base its ruling on such factors but rather mentioned

them as an afterthought following its determination that P.Y. was unable to set aside his opinions and follow the law.

### c. Denial of defense challenges for cause

Defendant claims he was denied his right to a fair and impartial jury by the court's assertedly erroneous denial of defense challenges for cause against eight prospective jurors who, he asserts, exhibited strong anti-defense or pro-death-penalty biases.

The record shows that the defense used five of its 20 peremptory challenges to excuse some of the complained-of jurors from the petit jury, Prospective Jurors V.D., D.M., L.M., C.W., and S.L. Later, after expressing dissatisfaction with the jury as then constituted, counsel declined to use her final peremptory challenge because Prospective Juror M.L., whom she had unsuccessfully challenged for cause, was in line to fill the next vacancy in the jury box. Counsel asked for additional peremptory challenges, but the court denied the request. During selection of alternate jurors, counsel exhausted all three of her allotted peremptory challenges, using two of them to excuse M.L. and Prospective Juror S.F, whom she also had unsuccessfully challenged for cause. Prospective Juror M.K., another unsuccessful challenge, was not called to the jury box.

Defendant's claim of error does not succeed because he fails to show he was prejudiced by the court's denial of his challenges for cause. As previously noted, to prevail on his claim, defendant must show the court's denial of the challenges for cause "affected his right to a fair and impartial jury." (*People v. Mills, supra*, 48 Cal.4th at p. 187; *People v. Yeoman* (2003) 31 Cal.4th 93, 114.) Here, none of the eight prospective jurors actually sat on the jury.[9] Thus, none of the court's

---

**9** For a similar reason, we reject defendant's additional argument that the court improperly prevented counsel from asking D.M. whether he would

*(footnote continued on next page)*

44

rulings could have affected defendant's right to a fair and impartial jury. (*People v. Yeoman, supra,* at p. 114.)

Defendant nonetheless asserts that because the court's rulings compelled him to use his peremptory challenges to excuse jurors who should have been excused for cause, he was deprived of his federal constitutional right to a state-created liberty interest in 20 peremptory challenges. (See Code Civ. Proc., § 231.) We have repeatedly rejected the identical argument. (See *People v. Weaver* (2001) 26 Cal.4th 876, 913; *People v. Gordon* (1990) 50 Cal.3d 1223, 1248, fn. 4.) Defendant provides no persuasive basis for revisiting our prior pronouncements here.

### d. Asserted unfairness in applying the Witt standard

Defendant claims that deference to the trial court's for-cause rulings is inappropriate because the court exhibited bias in favor of the prosecution.[10]

"[T]rial courts should be evenhanded in their questions to prospective jurors during the 'death qualification' portion of the voir dire, and should inquire into the jurors' attitudes both for and against the death penalty to determine whether these views will impair their ability to serve as jurors." (*People v. Champion* (1995)

---

*(footnote continued from previous page)*

automatically vote to impose the death penalty on a defendant who had "some prior bad acts or prior convictions in their life." (*People v. Carter* (2005) 36 Cal.4th 1114, 1178; *People v. Roldan* (2005) 35 Cal.4th 646, 692.)

[10]     Respondent asserts that we should reject as forfeited defendant's contention that the trial court engaged in a discriminatory pattern of ruling on challenges for cause because he failed to raise a claim of judicial bias below. We have reached the merits of similar claims in other decisions (*People v . Martinez, supra*, 47 Cal.4th at p. 439, fn. 8; *People v. Thornton* (2007) 41 Cal.4th 391, 419-425), and shall do so again here.

9 Cal.4th 879, 908-909.) Contrary to defendant's assertion, there was no lack of evenhandedness and no misapplication of the *Witt* standard here.

Defendant's argument is premised on the record of voir dire of eight prospective jurors whom the defense unsuccessfully challenged for cause compared to three prospective jurors whom the court excused for cause over defense objection. Our review of the pertinent portions of the record shows that although the eight prospective jurors whom the court declined to excuse for cause generally favored the death penalty, all of them stated unequivocally that they could set aside their views and consider both penalty alternatives with an open mind. Each of the three prospective jurors excused for cause demonstrated an inability either to consider or vote for the death penalty in an appropriate case, or to set aside his or her personal opinions and follow the law. (See *ante*, pt. II.B.1.b.) Nothing in the record discloses that in ruling on the parties' challenges for cause, the court applied the *Witt* standard in a disparate manner, as defendant insists.

We also disagree with defendant that the court was not evenhanded in its assessments of the prospective jurors' demeanor. Defendant points out that Prospective Jurors L.C., whom the court excused for cause, and C.W., whom the defense unsuccessfully challenged, both were visibly emotional during questioning. He complains that although the court found L.C.'s emotional state a factor detracting from his credibility, it ignored the same factor when determining C.W.'s suitability to serve as a juror in the case. Defendant's assertion is belied by the record, however. Defense counsel challenged C.W. for cause on a number of grounds, including that her demeanor and body language conveyed hostility to the defense. In denying the challenge, the court did not ignore C.W.'s demeanor. Rather, it credited her explanation that she was nervous because of having "all these people watching me"—not hostile. Contrary to defendant's assertion,

46

"[n]othing in the court's conduct of voir dire indicates we should withhold deference to its ability to evaluate and rely upon the jurors' demeanor in making its rulings in this matter." (*People v. Martinez, supra,* 47 Cal.4th at p. 446.)

### 2. *Prosecutor's exercise of peremptory challenges*

Defendant contends the trial court erred in denying two defense motions under *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79, which asserted that the prosecutor impermissibly used peremptory challenges to remove four African-American prospective jurors based on their race. We find no error.

" 'Under *Wheeler, supra*, 22 Cal.3d 258, "[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution. [Citations.]" [Citation.] "Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment. [Citations.]" ' " (*People v. Taylor* (2010) 48 Cal.4th 574, 611.)

In ruling on a motion challenging the exercise of peremptory strikes, the trial court follows a three-step procedure. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved

47

purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted (*Johnson*).)

Under *Johnson,* a defendant establishes a prima facie case "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson, supra*, 545 U.S. at p. 170; see also *People v. Taylor, supra*, 48 Cal.4th at p. 614.) In *Johnson*, the United States Supreme Court concluded that California courts had been applying too rigorous a standard in deciding whether defendants made out a prima facie case of discrimination. (*Johnson, supra*, at pp. 166-168.) When, as here, it is unclear from the record whether the trial court employed this disapproved-of standard, " 'we review the record independently to "apply the high court's standard and resolve the legal question whether the record supports an inference that the prosecutor excused a juror" on a prohibited discriminatory basis.' [Citations.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 342, italics omitted.)

The prosecutor exercised his fifth and sixth peremptory challenges against two African-American women, J.J. and S.B. When the prosecutor used his 15th challenge to excuse an African-American man, A.M., defense counsel moved for mistrial under *Wheeler/Batson*. Counsel complained that the prosecutor had excused three of the four African-American prospective jurors seated in the jury box, and argued that the only reason they were dismissed was because they, like defendant, were African-American. The court denied the motion on the ground the defense failed to state a prima facie case. It found "no particular racial bias" in the prosecutor's exercise of the three peremptory challenges in question, and noted the prosecutor had used a total of 15 challenges so far. It also observed the prosecutor had not challenged an African-American woman who was then in the jury box. Although the court made clear it found no prima facie case, it asked the prosecutor to make a record of the reasons for his excusals, in the event a "higher

authority" disagreed with its conclusion. After the prosecutor's explanations, the court repeated its ruling denying the *Wheeler/Batson* motion.

The following day, after the prosecutor challenged another African-American prospective juror, T.C., the defense again moved for mistrial under *Wheeler/Batson.* Counsel noted T.C. was the only African-American to come into the jury box since the first motion. The court again found no prima facie case, but again invited the prosecutor to explain the basis of his challenge. After the prosecutor's explanation, the court repeated its ruling denying the motion. One African-American woman, J.C., remained on the panel. She ultimately served on the guilt phase jury but was excused for hardship during the sanity phase.

Defendant rests his claim of error on the statistical frequency with which the prosecutor excused African-Americans from the jury pool. He points out that at the time the court heard the second *Wheeler/Batson* motion, the prosecutor had used 20 percent of his total peremptory challenges (four of 20) to excuse 80 percent of the eligible African-Americans (four of five), even though African-Americans comprised only 5 percent of the jury panelists not excused for cause.[11]

Standing alone, defendant's statistics do not raise an inference of discrimination. Notably, African-Americans comprised 5 percent of the jury pool but represented nearly 10 percent of the selected jury. (See *People v. Hartsch* (2010) 49 Cal.4th 472, 694 [the defendant's statistics showed Whites were actually underrepresented on the panel as compared with African-Americans].)

Nor does the totality of the relevant facts provide a basis for inferring that the prosecutor challenged the four prospective jurors in question because of their race.

---

[11]    Of the 250 prospective jurors who were individually questioned, approximately 95 persons, including five African-Americans, remained in the jury pool after hardship excusals and challenges for cause.

*Wheeler, supra*, 22 Cal.3d 258, describes the type of evidence that may be useful in determining whether a defendant has carried his or her burden of showing an inference of discriminatory excusal. Such an inference may arise, for example, when the record shows the prosecutor "struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group." (*Id.* at p. 280.) Also relevant is whether the excused jurors have little in common other than their membership in the group, and whether the prosecutor engaged in "desultory voir dire" or no questioning at all. (*Id.* at p.281.) Although a "defendant need not be a member of the excluded group," it is significant if he is and if, in addition, his victims are members of the group to which the majority of the remaining jurors belong. (*Ibid.* ; see also *People v. Kelly* (2007) 42 Cal.4th 763, 779-780.) "[T]he burden rests on the defendant to ' "show[] that the totality of the relevant facts give rise to an inference of discriminatory purpose." ' [Citations.]" (*People v. Carasi* (2008) 44 Cal.4th 1263, 1292.)

In the present case, the fact that defendant and the prospective jurors in question are African-American supports an inference of discrimination. (*Wheeler, supra*, 22 Cal.3d at p. 281.) In addition, although defendant points to no definitive evidence regarding the race or ethnicity of the seated jurors, we shall assume for argument that most of them were White, like the victims. (*People v. Taylor, supra*, 48 Cal.4th at p. 615.) However, other circumstances appearing in the record dispel any inference of discriminatory motive. Although the prosecutor ultimately excused four of the five African-Americans called to the jury box, there was no discernable pattern from which to infer discrimination. (*People v. Bonilla, supra,* 41 Cal.4th at p. 343, fn. 12.) Notably, the prosecutor passed J.J. and S.B. during several rounds of peremptory challenges before finally excusing them. Moreover, the prosecutor repeatedly passed J.C., an African-American woman

50

who ultimately served as a juror in the guilt phase.[12]  (See *People v. Cornwell* (2005) 37 Cal.4th 50, 69-70 [no inference of bias in excusing one of two African-American prospective jurors, given that the other African-American prospective juror was passed repeatedly by the prosecutor and sat on the jury].)  Although the circumstance that the jury included a member of the identified group is not dispositive (*People v. Snow* (1987) 44 Cal.3d 216, 225-226), "it is an indication of good faith in exercising peremptories" and an appropriate factor to consider in assessing a *Wheeler/Batson* motion.  (*People v. Turner* (1994) 8 Cal.4th 137, 168; *People v. Howard* (1992) 1 Cal.4th 1132, 1156.)  Further, defendant points to nothing in the record suggesting that the four challenged jurors shared no characteristics other than their race.  And although he asserts the prosecutor asked few questions of J.J. before excusing her, that factor is of limited significance in a case such as this one, in which the prosecutor reviewed the jurors' questionnaire answers and was able to observe their responses and demeanor, first, during extensive individual questioning by the court and later, during group voir dire.  (*People v. Taylor, supra*, 48 Cal.4th at pp. 615-616.)

In addition, the record of voir dire suggests race-neutral reasons for excusing each of the four jurors in question.  J.J. indicated in her questionnaire and during questioning that she was an administrative law judge.  The prosecutor reasonably could believe that, given J.J.'s profession, she might consciously or unconsciously exert undue influence during the deliberative process, or that fellow jurors would ascribe to her a special legal expertise.  (*People v. Reynoso* (2003) 31 Cal.4th 903,

---

[12]  During the sanity phase, J.C. requested to be excused from jury service due to stress at home and the need to seek employment.  The court excused her for cause, finding that, under the circumstances, it would be difficult, if not impossible, for J.C. to pay attention to the case.

51

924-925, fn. 6 [noting that a prosecutor properly may excuse a prospective juror in the belief that his or her occupation renders him or her ill-suited to serve as a juror on the case]; *People v. Buckley* (1997) 53 Cal.App.4th 658, 667-668 [prosecutor stated race-neutral grounds for excusing a prospective juror who had a history of working in various legal departments].)

Similarly, the record shows race-neutral reasons for excusing S.B., who reported on her questionnaire that she had taken college courses in psychology, and expressed the view during voir dire questioning that someone who commits murder must have "something wrong with them in their mind." (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1124-1125 [prosecutor's belief that the prospective juror would place too much weight on the opinion testimony of mental health experts justified the peremptory challenge]; *People v. Landry* (1996) 49 Cal.App.4th 785, 790-791 [that a prospective juror's educational background and experience in psychiatry or psychology might cause him to favor the defense constituted a valid explanation for his excusal].)

A.M. explained during voir dire that he had no problem with the death penalty but believed that facts could be manipulated and anyone could be "hoodwinked" by corrupt attorneys. A prospective juror's distrust of the criminal justice system is a race-neutral basis for his excusal. (*People v. Turner, supra*, 8 Cal.4th at pp. 170-171.)

Finally, the record discloses ample race-neutral reasons for excusing T.C. He wrote on his questionnaire that he was a licensed pastoral counselor. During voir dire questioning, he indicated he had a master's degree in theological studies and was working toward a Ph.D. Two Sundays a month he and his wife led religious services for the homeless and also helped them obtain social service benefits. Peremptory challenges based on a juror's experience in counseling or social services is a proper race-neutral reason for excusal. (*People v. Trevino* (1997) 55

52

Cal.App.4th 396, 411-412.)  Further, T.C. indicated that serving on the jury might be problematic because he recently had been promoted to a management position in the company where he worked as a truck driver, and he was scheduled in the following month to begin 15 weeks of training.  The court asked T.C. whether the impending promotion would cause him to be distracted if he were selected as a juror.  T.C. replied that he felt he "could be conscious of what's happening around here," but emphasized how much the promotion meant to him and that it was "a great step" for him in his career.  Although the court found T.C.'s promotion obligations an insufficient ground on which to excuse him for hardship, the prosecutor reasonably could have believed T.C.'s divided loyalties to jury service and career would impair his ability to give the former his full attention.  (See *People v. Jenkins* (2000) 22 Cal.4th 900, 994 [the risk of detriment to the prospective juror's employment if he was required to serve on a lengthy trial was a proper race-neutral ground for his excusal].)

In sum, based on our independent review of the entire record of voir dire, we conclude the record fails to support an inference that the prosecutor excused the four jurors in question because of their race.  Rather, the record reflects race-neutral grounds for the peremptory challenges at issue.  The trial court did not err in denying defendant's *Wheeler/Batson* motions.[13]

---

[13]     Because defendant failed to establish a prima facie case, we reject his assertion that reversal is required on the ground that the trial court assertedly "failed to make a ' "sincere and reasoned effort to evaluate" ' " the genuineness of the prosecutor's explanations for his peremptory challenges.  (*People v. Mills, supra,* 48 Cal.4th at p. 180.)  The court's invitation to the prosecutor to state for the record his reasons for excusing the prospective jurors in question did " 'not convert [this] first-stage *Wheeler/Batson* case into a third-stage case.' [Citations.]"  (*People v. Taylor, supra*, 48 Cal.4th at p. 616.)  For a similar reason, "we decline his request that we engage in comparative juror analysis.  [Citations.]"  (*Id*. at p. 644, fn. 20.)

### 3. Cumulative effect of asserted errors

We have concluded above that the court did not err in granting the challenges for cause to Prospective Jurors L.C., A.K., and P.Y., or in denying defendant's *Wheeler/Batson* motions. We also have concluded that defendant was not prejudiced by the court's denial of his challenges for cause against eight prospective jurors who did not sit on the jury. We thus reject defendant's claim that the cumulative prejudicial effect of the asserted errors in the jury selection process infringed his state and federal constitutional rights to a fair and impartial jury, due process, and a reliable guilt, sanity, and death judgment.

## C. Requests for Substitution of Counsel Before and During the Guilt Phase

Defendant was represented at trial by Deputy Public Defenders Barbara O'Neill and Margarita Martinez. In a series of motions beginning midway through jury selection, defendant sought to discharge O'Neill and Martinez and substitute new counsel. The court conducted hearings on each of the motions and denied all of them. Defendant contends the court's rulings violated his Sixth Amendment right to counsel. As we shall explain, there was no error.

### 1. Denial of pretrial motions

#### a. Background

One morning in late September 1993, shortly before prospective jurors were scheduled to appear for individual questioning, the court conducted a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118. Defendant claimed lead defense counsel O'Neill did not want "to fight for [him]" at trial because she had already decided the jury would convict him of first degree murder and find the special circumstance allegations true. He pointed out that O'Neill twice urged him to plead guilty in exchange for a sentence of life without the possibility of parole, which he strongly opposed. He also complained about O'Neill's failure to keep

54

him informed. According to defendant, he had been told about only the penalty phase witnesses; he had not been informed about the defense guilt phase witnesses or strategy.

In response, O'Neill acknowledged she had strongly encouraged defendant to offer to plead guilty, but said she dropped the subject when defendant made it clear he absolutely opposed the idea. She also disclosed that she had tried for more than two years to convince defendant to testify on his own behalf at the guilt phase of trial, but he refused that suggestion as well. O'Neill refuted defendant's claim that he was unaware of the defense guilt phase plans. According to O'Neill, defendant knew which witnesses would be called and had "known all along" that the defense strategy was to convince the jury that the special circumstance allegations could not be proved. As for defendant's claim that she would not "fight for [him]," O'Neill emphasized that she sought dismissal of the special circumstances "all the way up to the Supreme Court" and she assured the court the defense team would do all it could for defendant.[14] O'Neill suggested that part of the problem between her and defendant was due to defendant's mental illness and paranoia, noting defendant told the mental health evaluators that he believed she was trying to poison him. Defendant admitted making such a claim, but indicated he no longer believed that to be true.

The court denied the *Marsden* motion, finding no basis for defendant's belief that O'Neill would not vigorously advocate for him at trial or for his claim he was uninformed about the guilt phase witnesses and strategy. As the court explained,

---

[14] On June 18, 1992, this court denied review of the Fifth District Court of Appeal's summary denial of a defense petition for writ of prohibition challenging the sufficiency of the three special circumstance allegations. (*Clark v. Superior Court*, S026590.)

O'Neill's advice to settle the case did not mean she would not work hard to convince the jury that it should reject the special circumstance allegations. The court also noted, and defendant agreed, that he was able to communicate well with cocounsel Martinez.

Later that day, the court conducted a second *Marsden* hearing after defendant indicated he wanted to raise additional points. Noting that O'Neill was strongly opposed to his plea of not guilty by reason of insanity, defendant believed she would not assist him in that defense. He also declared he could not communicate with her because he did not trust her. In response to the court's questioning, defendant again acknowledged he communicated easily with Martinez.

O'Neill explained that none of the eight experts who had examined defendant concluded he had a viable insanity defense. She also indicated, however, that she was seeking a reexamination by the expert who concluded defendant was incompetent to stand trial, and she assured the court that if the defense could find an expert to support the insanity plea, "that expert will be here." As for the asserted breakdown in communication, O'Neill noted she had visited defendant more than 70 times over a three-year period and had spent countless hours with him. She acknowledged that sometimes they did not communicate well, which she attributed to defendant's paranoia about her. But she believed Martinez bridged the gap. Martinez confirmed she had no problem communicating with defendant and that she passed along to lead counsel anything of significance. Both O'Neill and Martinez reiterated their reasons for proposing to defendant that he enter into a plea bargain, which included their belief that a majority of the prospective jurors strongly supported the death penalty. But they reassured the court that, notwithstanding their advice to plead guilty, they were convinced that they could mount a successful defense against the special circumstance allegations.

56

The court again denied defendant's request to relieve O'Neill and appoint new counsel, repeating its earlier conclusion that she would fight for him "tooth and nail."

The court conducted a third hearing on October 8, 1993, when defendant asked the court to appoint independent counsel to assist him in discharging his attorneys. The court denied the request, finding no authority for such an appointment in the absence of any credible evidence that his present counsel were incompetent.

Later that day, defendant sought another *Marsden* hearing to discharge both of his attorneys. Defendant asserted he could not communicate with O'Neill, and Martinez was not qualified to serve as counsel in a capital case. According to defendant, he was entitled to communicate with both lawyers, not just the one who lacked experience and control over his case. He further complained that neither attorney had discussed defense strategy with him, even though trial was set to begin in four days, and that for more than a month they had not visited him. Defendant also renewed his request for the appointment of independent counsel.

The court again denied the request for independent counsel. It then asked counsel to respond to defendant's latest complaints. As Martinez was outlining the extent of her communication with defendant and her preparedness in the case, defendant angrily blurted out, "They're saying all this stuff to cover their asses," and he angrily insisted he did not want "these bitches" for his attorneys. He repeated the latter point several times as his outburst continued. He also reprised his earlier claims that counsel would not give him "a proper defense" and that he could not communicate with lead counsel. When O'Neill observed that their communication had deteriorated as defendant had grown increasingly paranoid, defendant commenced another tirade in which he asserted he was "not fucking paranoid either" and claimed paranoia was O'Neill's "main excuse."

57

O'Neill expressed the view that "defendant would not be happy with any woman attorney," a point defendant confirmed to the court. She also advised the court that she had received a letter from defendant's treating psychologist warning her and Martinez of the possible danger posed by the fact that two women were controlling defendant's case because the same dynamic was at work when defendant set fire to his sister's bedroom and when he committed the charged crimes.

O'Neill explained further, as she had in earlier hearings, that communication with defendant became a problem soon after she urged him to plea bargain for a sentence of life without the possibility of parole. She also indicated that their communication continued to deteriorate. For instance, she explained, defendant never wanted to discuss the penalty phase and became upset whenever she scheduled an interview for such purposes. Further, defendant categorically refused to testify, despite repeated efforts by counsel and defendant's treating psychologist to convince him to do so. As in the earlier hearings, O'Neill asserted that defendant was fully informed about the defense strategies.

The court found defendant was represented by competent counsel who had his best interests at heart, and denied the *Marsden* motion. In so doing, the court encouraged defendant to start communicating with O'Neill and to assist both of his attorneys.

### b. Discussion

Settled principles guide our resolution of defendant's claim that the court erred in denying his three *Marsden* motions. Once a defendant is afforded an opportunity to state his or her reasons for seeking to discharge an appointed attorney, the decision whether or not to grant a motion for substitution of counsel lies within the discretion of the trial judge. The court does not abuse its discretion

in denying a *Marsden* motion " 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.' " (*People v. Taylor, supra,* 48 Cal.4th at p. 599; *People v. Crandell* (1988) 46 Cal.3d 833, 859.)  Substantial impairment of the right to counsel can occur when the appointed counsel is providing inadequate representation or when "the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result  [citation]." (*People v. Smith* (1993) 6 Cal.4th 684, 696; *People v. Crandell, supra,* at p. 854.)

Applying these principles, we conclude defendant fails to show the court abused its discretion in refusing his requests to substitute counsel.  Defendant's primary complaint at the September hearings was his belief that O'Neill would not fight for him because she had urged him to plea bargain for a sentence of life without the possibility of parole, which defendant strongly opposed, and that she disapproved of his plea of not guilty by reason of insanity.  However, " '[t]actical disagreements between the defendant and his attorney do not . . . constitute an "irreconcilable conflict" ' " unless they portend a complete breakdown in the attorney-client relationship.  (*People v. Jackson* (2009) 45 Cal.4th 662, 688; see *People v. Freeman* (1994) 8 Cal.4th 450, 481 [defendant's distrust of counsel who suggested he plead guilty did not state an adequate basis for substitution of counsel].)  Although O'Neill acknowledged a recent breakdown in communication with defendant, the record suggested that Martinez ably filled the gap.  Notwithstanding defendant's complaint that counsel failed to keep him informed of the defense strategy at the guilt phase, the court was entitled to accept O'Neill's assertion that defendant had "known all along" about the intended approach. (*People v. Abilez* (2007) 41 Cal.4th 472, 488; *People v. Smith, supra*, 6 Cal.4th at p. 696.)

The court also acted within its discretion at the hearings in October, despite defendant's insistence that he could not communicate with O'Neill because he no longer trusted her. "A trial court is not required to conclude that an *irreconcilable* conflict exists if the defendant has not made a sustained good faith effort to work out any disagreements with counsel . . . ." (*People v. Crandell, supra*, 46 Cal.3d at p. 860.) Given defendant's frequent repetitive attempts to replace O'Neill, the court reasonably could find he had made insufficient efforts to resolve his disagreements with her. Indeed, defendant's proclamation during an angry tirade that he did not want "these bitches" for his attorneys strongly suggests that any breakdown in his relationship with counsel was attributable to his own attitude and refusal to cooperate. (*People v. Michaels* (2002) 28 Cal.4th 486, 523 [a defendant cannot compel a substitution of counsel by simply refusing to cooperate].)

Defendant counters that O'Neill admitted an irreconcilable conflict when she informed the court that she believed the breakdown in communication was the result of defendant's mental problems involving women, specifically, his feelings of paranoia and distrust engendered by having two female attorneys in control of his case. He also relies upon O'Neill's report that defendant's psychologist warned her that the dynamics of such representation placed her and Martinez in potential danger.

Defendant's argument notwithstanding, O'Neill's suggestion that the deterioration in the attorney-client relationship was attributable to defendant's paranoia did not entitle him to new counsel. Nor was he entitled to decline representation by a female attorney. The court was not required to accept O'Neill's assessment of defendant's mental illness or her view that "defendant would not be happy with any woman attorney." Despite O'Neill's concerns, she repeatedly assured the court she would fight hard for defendant and she expressed her firm belief that the special circumstance allegations could be defeated.

60

Further, defendant informed the court that although he once told a mental health evaluator that O'Neill was trying to poison him, he no longer believed this was true. On this record, the court reasonably could conclude that any conflict between defendant and his counsel was not irreconcilable.

Defendant gains no ground relying on *People v. Stankewitz* (1990) 51 Cal.3d 72, a case in which we approved—in dictum—a trial court's decision to substitute counsel based upon our own suggestion in a prior appeal that, under those particular facts, substitution of counsel might have resolved a conflict between the mistrustful and highly emotional defendant and counsel. (*Id*. at pp. 86-87.) The decision certainly does not state a broad rule that trial courts are *required* to grant substitution of counsel to defendants whose paranoia concerning defense counsel has impaired communication. Furthermore, given O'Neill's report that communication with defendant broke down after she strongly encouraged him to enter into a plea bargain, the court reasonably could conclude the lapse in communication was caused by unwelcome legal advice, not mental illness.

### 2. *Denial of midtrial motion*

Defendant asserts that the court erred in denying his midtrial request for substitution of counsel. As we explain, there was no error.

#### a. *Background*

Defendant renewed his *Marsden* motion when the guilt phase of trial began on October 12, 1993, asking the court to reconsider his request to appoint independent counsel to assist him in discharging his attorneys. The court denied the request on the ground that it found no merit to defendant's reasons for wanting new counsel. The court then inquired of counsel whether they had visited defendant. O'Neill informed the court they had met with defendant the previous day, but that he had communicated poorly with them. According to O'Neill,

61

defendant reiterated his belief that they were not working in his best interests and indicated he wanted a male attorney. After O'Neill and Martinez both assured the court that they were making every effort to gain defendant's cooperation, the court called a recess.

The court revisited the matter later in the afternoon, after opening remarks and testimony by two prosecution witnesses, this time granting defendant's request for independent counsel to represent him in a *Marsden* motion. The court explained it had reversed its earlier ruling "just to make sure every possible point will be brought forth that legally can be brought forth" on defendant's behalf. However, the court also warned defendant against any "false hopes," noting that all of the grounds he had raised so far lacked merit. The trial then resumed.

The next day, October 13, 1993, an attorney from the firm of Barker and Associates was appointed independent counsel. The following day, in a hearing held outside the prosecutor's presence, defendant asked the court not to proceed with trial until he had the opportunity to consult with independent counsel. The court denied the request, reiterating that it found defendant's grounds for requesting new counsel lacking in merit.

On October 15, 1993, the court conducted another hearing outside the prosecutor's presence. After defendant confirmed that independent counsel had met with him the previous night, he again asked the court to halt the proceedings until the conflict with his defense attorneys had been resolved. The court again denied the request. When defendant complained that counsel were ignoring him, the court disagreed, noting for the record that Martinez was seated next to defendant and that they were conversing back and forth continuously.

Four days later, on the morning of October 19, 1993, independent counsel filed a *Marsden* motion on defendant's behalf and the court immediately conducted a hearing. The motion claimed a total breakdown of communication

between defendant and counsel, which was caused to some extent by defendant's difficulty relating to women. Many of the specific complaints articulated by independent counsel in support of the motion were the same points defendant raised in earlier *Marsden* motions. New complaints presented by independent counsel included defendant's assertion that counsel were distancing themselves from him by excluding him from bench conferences and failing to seek his input on matters such as juror excusals. Finally, independent counsel emphasized defendant's feelings of enmity toward, and distrust of, his attorneys.

The court explained to defendant that the bench conferences held in his absence concerned administrative matters or were later summarized on the record. The court also remarked that independent counsel's main points already had been raised and rejected.

O'Neill primarily addressed defendant's complaint about lack of communication. She acknowledged that for the past eight months, she and defendant had not been communicating, but noted they had related well for the first two years of her representation. O'Neill disagreed with defendant's claim that she ignored him, except when he attempted to talk with her during witness testimony. She also disagreed that counsel were not sharing with defendant information about the defense strategy and witnesses.

In O'Neill's view, the biggest breakdown in their communication had come approximately two months earlier, when she and Martinez urged defendant to offer to plead guilty in exchange for a sentence of life imprisonment without the possibility of parole. She also attributed the communication problem in part to defendant's mental illness and his deep dislike of women, and she suggested defendant might be better served by a male attorney. O'Neill pointed out that one of the mental health experts who evaluated defendant for the June 1993 competency hearing expressed a similar view. Noting her concern that

63

defendant's paranoia and inability to communicate with women could prevent him from providing important information in his own defense, O'Neill proposed that the court appoint a male attorney to meet with defendant daily for several weeks to "see if we can get something out of him." The court questioned whether a paranoid dislike of women was an appropriate ground for such an arrangement, but granted O'Neill's request that she be permitted to consult with her supervisors at the Fresno County Public Defender's Office about it. The court then asked her to respond to defendant's other complaints. In relevant part, O'Neill conceded that she and Martinez had made only two jail visits in the past two months because they found such visits futile. But she pointed out that, during that period, they had spoken with defendant almost daily in the courtroom. O'Neill assured the court that if defendant's "barriers [came] down," she would speak with him.

The court granted O'Neill's request to continue the hearing until after the noon recess, which would allow her to consult with defendant's psychologist and her supervising attorneys. Trial resumed with testimony from two more prosecution witnesses.

The court denied the *Marsden* motion at a hearing conducted the following day. The court reiterated its earlier conclusion that counsel were providing effective representation. It also found that counsel were attempting to communicate with defendant. In the court's view, the lack of communication was the result of defendant's willful failure to communicate. As the court observed, even at the present hearing, defendant talked back and forth with O'Neill and Martinez. The court also noted it had seen defendant pointing out matters to counsel that he believed they had overlooked and passing notes to Martinez who then passed them to O'Neill.

### b. *Discussion*

At the outset, we reject defendant's assertion that the court erred when it allowed trial to continue while his October 12 motion was pending. It is well settled that a court "must promptly consider a motion for substitution of counsel when the right to effective assistance 'would be substantially impaired' if his request were ignored." (*People v. Stankewitz, supra*, 51 Cal.3d at p. 88, italics omitted; see also *Schell v. Witek* (9th Cir. 2000) 218 F.3d 1017, 1025 [under Cal. law, a *Marsden* motion must "be resolved on the merits before the case goes forward"].) Here, however, the record shows that on October 12, defendant did not seek the discharge of his attorneys but rather requested appointment of independent counsel to assist him in bringing such a motion. Because there was no pending *Marsden* motion, the court did not err in proceeding with trial. (See *People v. Majors* (1998) 18 Cal.4th 385, 411-413 [the court did not err in failing to conduct a *Marsden* hearing before the penalty phase because no motion was before the court at that time].)

Defendant correctly points out that the court proceeded with trial even after independent counsel filed the October 19 *Marsden* motion. As the record shows, the prosecutor examined two witnesses after the *Marsden* hearing on October 19 and continued questioning the second witness on October 20 before the court formally denied the *Marsden* motion. But although defendant expressly objected to resuming trial before he could consult with independent counsel on his *Marsden* motion, he said nothing when trial proceeded after the *Marsden* hearing on October 19, during which time the court and defense counsel pursued the possibility of adding a male attorney to the defense team. Furthermore, defendant fails to show that he was prejudiced by the resumption of proceedings. The testimony presented during the period between the October 19 *Marsden* hearing and the court's ruling on October 20 helped establish defendant's identity as the

65

perpetrator, an issue uncontested by the defendant. And defendant points to nothing in the record suggesting that his relationship with counsel or their performance was compromised at any point during the testimony of the two prosecution witnesses on October 19 and 20.

Nor are we persuaded by defendant's argument that the court erred in granting his request for independent counsel to assist him in renewing his *Marsden* motion. A trial court is not required to appoint separate counsel to press a *Marsden* claim for a defendant (*People v. Barnett* (1998) 17 Cal.4th 1044, 1112; *People v. Hines* (1997) 15 Cal.4th 997, 1024-1025), but a trial court has discretion to make such an appointment. (*People v. Memro* (1995) 11 Cal.4th 786, 858-859; *People v. Hardy* (1992) 2 Cal.4th 86, 132.) Here, the court thoughtfully considered *defendant's insistent and repeated pleas* for independent counsel and, with defense counsel's assent, eventually granted the request "just to make sure every possible point will be brought forth that legally can be brought forth" on defendant's behalf. The court did not abuse its discretion in appointing independent counsel in this case.

We have warned that appointment of independent counsel for purposes of a *Marsden* motion could "cause unnecessary delay, and may damage the attorney-client relationship in those cases in which the trial court ultimately concludes the motion should be denied." (*People v. Hines, supra*, 15 Cal.4th at p. 1025.) Neither of those concerns is implicated here, however. First, there was no delay because trial resumed immediately after the appointment of independent counsel. Nor was there any likelihood of damage to the attorney-client relationship. Defense counsel supported defendant's request for the appointment, independent counsel's role was to serve as a conduit for defendant's point of view, and the *Marsden* motion was based not on defense counsel's asserted incompetence but on an assertedly irreconcilable conflict. (Cf. *People v. Stanley* (1995) 10 Cal.4th 764,

805 [no error in the court's unopposed appointment of an additional attorney at a competency hearing to represent the defendant's point of view that he was not incompetent].)

In sum, defendant fails to demonstrate that the trial court abused its discretion in denying his midtrial request for substitution of counsel. The request was based primarily on points raised in the previous *Marsden* hearings. The court was entitled to credit once again O'Neill's assertions that she was keeping defendant informed about defense strategy and was not ignoring him, and that she wanted to communicate with him. (*People v. Abilez, supra*, 41 Cal.4th at p. 488.) The court also properly could rely on its own observations of defendant's frequent, collaborative interactions with counsel to find untenable defendant's assertion that counsel had "distanced themselves." (*People v. Hines, supra*, 15 Cal.4th at p. 1026 [when the defendant's dissatisfaction with counsel was based on his attorney's courtroom performance, the court did not err when it relied on its personal observations to reject the defendant's complaints].) After permitting defendant to fully air his complaints with counsel, inquiring into those complaints, and evaluating them against counsel's explanations and the court's own observations of defendant's in-court communication with his attorneys, the court reasonably could find defendant's claimed inability to communicate was volitional and contrived. A defendant "cannot simply refuse to cooperate with his appointed attorney and thereby compel the court to remove that attorney." (*People v. Michaels, supra,* 28 Cal.4th at p. 523; *People v. Smith, supra,* 6 Cal.4th at p. 697 [a defendant may not manufacture a conflict by his own conduct to force the substitution of counsel].)

Defendant claims the trial court was required to substitute counsel because O'Neill conceded that communication had deteriorated and that defendant's paranoia prevented him from cooperating with a female attorney. Although

67

counsel's evaluation of the attorney-client relationship is important (*People v. Memro, supra,* 11 Cal.4th at p. 855; *Cuyler v. Sullivan* (1980) 446 U.S. 335, 347), it is not binding in the face of the court's own observations and appraisal. (See *People v. Smith* (2003) 30 Cal.4th 581, 605-606 [defense counsel's agreement with the defendant's claim of a breakdown in communication did not compel the court to grant new counsel].) It is the *trial court's* duty at a *Marsden* hearing to "listen to and evaluate a defendant's claim that counsel are failing to perform adequately." (*People v. Memro, supra*, at p. 859.) Moreover, a defendant is not entitled to substitution of counsel on the ground he is unable to cooperate with a female attorney. A " ' "lack of trust in, or inability to get along with, an appointed attorney" ' " is an inadequate basis on which to substitute counsel. (*Id*. at p. 857; *People v. Berryman* (1993) 6 Cal.4th 1048, 1070.)

### 3. Appointment of a third attorney to the defense team

Defendant claims the court erred by appointing Ernest Kinney to facilitate communication between him and his other attorneys. We disagree, as explained below.

#### a. Background

When the October 19, 1993, hearing on independent counsel's *Marsden* motion resumed after a midday break, the court noted that O'Neill had agreed to explore the possibility of replacing Martinez with a male attorney from her office. The following morning, O'Neill informed the court that Martinez could not be replaced with a male attorney, nor did the Fresno County Public Defender have the personnel to add another member to the defense team. The court then proposed the appointment of a third attorney from outside the public defender's office who would act as an intermediary between defendant and defense counsel. The court explained that although it saw no solid evidence that the breakdown in attorney-

68

client communication was the result of defendant's mental illness, it was "trying to lean over backwards" to attempt to overcome the communications barrier. O'Neill and Martinez indicated they would discuss the proposal with defendant.

The court denied the *Marsden* motion later that afternoon. In so doing, the court stated it was willing to appoint a male attorney to the defense team to serve, not as a replacement, but rather as an intermediary between defendant and his deputy public defenders. After defendant agreed to such an arrangement, the court reminded him that the new attorney's role was to facilitate his communication with O'Neill and Martinez and he would have no authority over either of them.

The following day, the court informed defendant that a seasoned attorney, Ernest Kinney, had expressed an interest in the facilitator role and would visit defendant during the weekend. The next week, on October 25, 1993, the court appointed Kinney as "special counsel" with "absolutely no responsibility for any part of the defense except to facilitate communications between defense counsel and the defendant." Defendant indicated to the court he was satisfied with Kinney.

As the prosecution's case-in-chief progressed, Kinney undertook a more active role on the defense team, sometimes addressing the court directly during defense objections. On November 1, 1993, after Kinney interjected several comments during an evidentiary dispute between the parties, the court reminded him about his limited responsibilities in the case and suggested he pass a note to O'Neill. Kinney informed the court he would be asking permission to assume a "regular role" on the defense team.

The next day, the prosecutor filed a written objection to the "dual representation" of defendant and the apparent conflict between the defense lawyers. He asked the court to "take a position" on whether the "defense team" was the deputy public defenders or Kinney.

The following week, on November 8, 1993, the court conducted what it described as a "follow-up" to the October 19 *Marsden* motion. In response to the court's inquiry about the present arrangement with Kinney, defendant indicated it was "working out fine" and that they were communicating well. After confirming with O'Neill, Martinez, and Kinney that there was no conflict among them, the court then addressed Kinney's request to be appointed as a third member of the defense team. Kinney confirmed his understanding that O'Neill had final authority for defense strategy and he emphasized that his primary focus would be the direct examination of defendant and the defense psychiatric expert. After defendant, O'Neill, and Martinez each agreed that Kinney should join the defense team, the court appointed him counsel of record.

### b. Discussion

Defendant contends the court's midtrial appointment of Kinney to facilitate communication between him and his female deputy public defenders was an "unauthorized experiment" that disrupted the already strained relationship between him and his legal team and violated his constitutional rights to due process, the effective assistance of counsel, and a reliable death verdict. Had there been no breakdown in communication between him and his deputy public defenders, he argues, there would have been no need for the court to appoint a "facilitator."

Defendant's claim is untenable. As previously discussed, the court acted well within its discretion in concluding that any conflict between defendant and O'Neill and Martinez was not irreconcilable and in denying his repeated motions to replace them. The court's subsequent appointment of Kinney to facilitate communication between defendant and his female attorneys does not undermine those rulings. It was within the court's discretion to appoint a third lawyer to further ensure the adequacy of defendant's representation, especially when his

70

existing attorneys and defendant himself unequivocally supported the arrangement. A discretionary action will not be set aside on appeal so long as there exists " ' "a reasonable or even fairly debatable justification, under the law, for the action taken . . . ." ' [Citations.]" (*People v. Crandall, supra*, 46 Cal.3d at p. 863, see *id.*, at p. 861.) Here, although the court was not required to appoint a third attorney, we cannot say there simply was no justification for its attempt to "lean over backwards" to help break down the communication barrier, regardless of its source. (See *People v. Panah* (2005) 35 Cal.4th 395, 425 [trial court appointed second counsel as a " 'special benefit bestowed' " on the defendant to facilitate a settlement].)**15**

Characterizing Kinney's role as a "watch dog" over his deputy public defenders, defendant cites cases describing the risks posed to the primary attorney-client relationship by the appointment of independent counsel to assist a defendant in a *Marsden* motion. (See, e.g., *People v. Smith, supra*, 6 Cal.4th at p. 695.) The record does not support the premise of his argument, however. The court made clear from the outset that Kinney's role was limited to facilitating communication and was subject to the authority of O'Neill. Even when Kinney later was appointed counsel of record, he confirmed his understanding that O'Neill, as lead counsel, had final authority.

Defendant complains that difficulties between Kinney and his deputy public defenders surfaced later during trial after Kinney's gradual transformation into a

---

**15**     For similar reasons, we reject the claim that the court erred in denying Kinney's post-sanity-phase motion for mistrial on the ground the court should not have appointed him as facilitator of communications, but instead should have granted defendant's *Marsden* motions. The court was within its discretion in concluding defendant was not incurably prejudiced by the addition of a third attorney to the defense team.

71

full-fledged member of the defense team, but we review defendant's complaint regarding the appointment of a third attorney in light of the evidence that was before the court at the time it took such action. (*People v. Martinez, supra*, 47 Cal.4th at p. 423, fn. 5.) Kinney's expanded role and his subsequent conduct in that regard are of little consequence to the question whether the court erred at the outset in appointing him to facilitate communications between defendant and his female attorneys.

### D. Asserted Evidentiary Errors at the Guilt Phase

#### 1. Semen stain

At the time of his arrest, defendant wore unwashed boxer shorts, which the police collected.

Prior to trial, defense counsel sought to exclude evidence of a semen stain on the shorts, arguing, in part, that such evidence was irrelevant because there was no showing that defendant was wearing the shorts during the commission of the crimes. The court deferred ruling on the admissibility of the evidence pending expert testimony on the stain's significance.

Two of the prosecution's experts testified at trial about the three-inch, off-white stain on the left front area of the shorts. Urologist Gary Storey, M.D., testified regarding the physiological significance of the semen stain. As he explained, except in certain clinically induced situations, sexual arousal is necessary to produce ejaculation of semen. He acknowledged on cross-examination that masturbation could have produced the sexual arousal resulting in ejaculation. Serologist Andrea Van der Veer de Bondt testified that the shorts tested positive for the presence of P-30, a protein produced in the prostate gland that is one of the components of semen. However, although she employed three different methods to type the stain, all of the results were inconclusive and she was

unable to determine the identity of the donor. Nor could she determine the age of the stain.

At the end of the prosecutor's direct examination of de Bondt, defense counsel moved to strike the testimony of Dr. Storey and de Bondt as irrelevant. The court overruled the objection without comment.

Defendant renews on appeal his earlier challenge to the admissibility of the semen stain evidence. We conclude the evidence was properly admitted.

"The trial court has considerable discretion in determining the relevance of evidence. [Citations.]" (*People v. Williams, supra,* 43 Cal.4th at p. 634.) Under Evidence Code section 210, relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." Put another way, "[e]vidence is relevant if it tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Williams, supra,* at p. 633.)

Here, the semen stain evidence was relevant to the jury's consideration of the attempted rape charge and the rape-murder special-circumstance allegation, both of which require a showing of intent to rape. (§§ 21a, 190.2, subd. (a)(17)(C).) Specifically, the evidence tended to prove, by reasonable inference, defendant's intent to engage in intercourse with Laurie. There was no dispute that the boxer shorts belonged to defendant. That evidence therefore tended to prove that the semen had come from him. There also was evidence tending to prove, by reasonable inference, that defendant wore the shorts at the time of the crimes. Defendant would have arrived home well after 3:00 a.m., when Joel Suarez noticed him speed away from the side of the road in Chateau Fresno where Angie was lying. He arose early the same morning and was arrested around noon. Given this relatively brief period between the crimes and the arrest, it could be inferred

73

that at the time of his arrest defendant was still wearing the clothes he had worn the night before.

Defendant argues nonetheless that because there was no proof he was wearing the boxer shorts at the time of the crimes, the semen stain evidence was irrelevant and should have been excluded. Defendant points out, for instance, that he testified he was wearing briefs, not boxer shorts, on the night of the crimes, and that he had removed most of his clothing the next morning after Kellogg told him she was going to do the laundry. Notably, however, that testimony was not before the trial court at the time of its ruling. In any event, Kellogg testified on rebuttal that she did not ask for, and defendant did not give her, the clothes he was wearing that morning and that he was wearing those clothes at the time of his arrest. Defendant's argument goes to the weight, not the admissibility, of the semen stain evidence.

Although defendant correctly observes that the serology expert was unable to determine the age of the semen stain, that deficiency in the evidence likewise goes to its weight and not its admissibility. Nor is it significant that the expert was unable to identify defendant as a possible source of the semen. As explained above, because the underwear belonged to defendant, it could be inferred he was the source of the semen. Defendant's citation to *People v. Schultz* (Ill. App. Ct. 1987) 506 N.E.2d 1343 does not advance his argument. In that case, the prosecution presented expert testimony that the defendant could not be excluded as a donor of seminal fluid found on the victim's rectum. Noting that the group of possible donors was 20 percent of the population, the appellate court concluded that the evidence should have been excluded as irrelevant because it had no tendency to prove the defendant committed the crime. (*Id.* at pp. 1346-1348.) Here, notwithstanding the expert's inability to type the semen stain, the evidence

tended to show defendant's guilt of attempted rape. The court did not abuse its discretion in admitting it.

### 2. *Defendant's preoffense sexual activity*

During direct examination, the prosecutor asked Donna Kellogg when, before the night of the crimes, she and defendant last had sexual relations. Over defense objection, she testified it was "a couple of weeks" earlier. Also over objection, the prosecutor was permitted to ask Kellogg whether, around the time of the crimes, defendant had admitted to her he was having sexual relations with any other person. She answered, "No." The issue arose again during testimony by Deputy Sheriff Caudle, who testified over objection that Kellogg told him several days after defendant's arrest that she had had sexual relations with him approximately two weeks earlier.

Defendant contends the testimony about his sexual inactivity two weeks prior to the crimes was irrelevant and thus inadmissible. Specifically, he argues that whether he had not engaged in consensual sexual intercourse with Kellogg or any other person in the weeks preceding January 26, 1991, had no tendency in reason to prove the charge of attempted rape or the rape-murder special-circumstance allegation.

We agree, and respondent essentially concedes, that even were such evidence probative of motive or intent, the testimony presented here was far too speculative to allow its use for that purpose. (*People v. Stitely* (2005) 35 Cal.4th 514, 549; *People v. Lewis* (2001) 26 Cal.4th 334, 373.) Kellogg testified only that she and defendant had not engaged in sexual intercourse during the two weeks preceding the crimes and that she was unaware whether he had done so with any other woman. To infer from such testimony that at the time of the crimes defendant was

sexually frustrated and thus motivated to rape Laurie was highly speculative and thus irrelevant.

Any error was harmless, however, because there is no reasonable probability that defendant would have obtained a more favorable outcome had the evidence been excluded from trial. (*People v. Watson* (1956) 46 Cal.2d 818, 836-837.) The prosecution presented substantial evidence that defendant's sexual interest in Laurie had arisen long before the events that led to her death. According to family members, one year before Laurie was killed, defendant's visits to the Farkases' home became more frequent and he began to pay particular attention to Laurie. During such visits, defendant complimented Laurie on her tight-fitting clothes, asked about her virginity, and once recommended to her that she consider an older, more experienced boyfriend like him. When a friend warned defendant to stay away from Laurie, he rebuffed him, saying, "She wants me." Furthermore, the prosecutor did not discuss any "sexual deprivation" evidence during closing argument. On this record, any error unquestionably was harmless.

### 3. *Defendant's threat to kill the victims*

Defendant contends the trial court erred in allowing an emergency room physician to testify that Angie reported to her that the person who had inflicted her injuries threatened to kill her. As we explain, the admission of the testimony did not violate state evidentiary law or offend constitutional principles.

During Angie's testimony, the prosecutor elicited from her that she had only a vague recollection of the events occurring between the time she lost consciousness after being strangled and when she awoke in the hospital. She remembered that people asked her questions, but could not recall who they were, where she was, or what they asked. Later, during the testimony of Ann Fisher, M.D., the defense renewed an earlier objection to the admission of a statement

76

Dr. Fisher had recorded in her sexual assault examination report. On the standardized form, Dr. Fisher marked "Yes" to the question whether the victim reported "threats of harm," and wrote in the space provided, "To kill them if not quiet." The court held a sidebar conference at which Dr. Fisher was questioned further. She indicated that she first saw Angie at 4:50 a.m., asked her the questions on the form, and recorded Angie's answers at approximately 9:45 a.m. The court determined that the statement recorded by Dr. Fisher was admissible as a spontaneous utterance. (Evid. Code, § 1240.)[16] Dr. Fisher was then permitted to testify that when she asked Angie if she had been threatened with harm, Angie told her "that the person who injured her would kill them if not quiet."

We conclude that the court correctly admitted the evidence under the "spontaneous utterance" exception to the hearsay rule. A "spontaneous utterance[]" is considered trustworthy, and admissible at trial despite its hearsay character, because "in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief." (*People v. Farmer* (1989) 47 Cal.3d 888, 903.) Evidence Code section 1240 provides that "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." For admission of a spontaneous statement, " '(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance

---

**16**    The court ruled the statement also was admissible under Evidence Code section 1237 as a past recollection recorded.

77

spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318.)  Whether the statement was made before there was "time to contrive and misrepresent" is informed by a number of factors, including the passage of time between the startling occurrence and the statement, whether the statement was a response to questioning, and the declarant's emotional state and physical condition.  (*People v. Lynch* (2010) 50 Cal.4th 693, 113; *People v. Raley* (1992) 2 Cal.4th 870, 894.)

Defendant argues that Angie could not have been under the "stress of excitement" when she spoke with Dr. Fisher because the examination occurred many hours after the asserted threat, giving Angie ample time for reflection and fabrication.  As defendant points out, the threat would have been made between 11:00 p.m. and 2:00 a.m. on the night of the crimes, but Dr. Fisher first saw Angie in the emergency room around 5:00 a.m. and questioned her sometime before 9:45 a.m.

It is undisputed that Angie related defendant's threat many hours after it was made.  However, "[t]he amount of time that passes between a startling event and subsequent declaration is not dispositive, but will be scrutinized, along with other factors, to determine if the speaker's mental state remains excited."  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 810; see *People v. Poggi, supra*, 45 Cal.3d at p. 319 [although lapse of time is relevant, a statement remains spontaneous if made under the stress of excitement while the reflective powers were still in abeyance].)

Here, the record shows that over the course of the six-hour period between approximately 9:00 p.m. and 3:00 a.m., Angie heard and saw her best friend

78

injured by defendant. Also during this time, defendant severely beat Angie and later placed her in the front seat of his car bound at the wrists, drove around for several hours, then left her for dead after strangling her. The motorist who discovered Angie lying on the road in Chateau Fresno testified that when responding officers arrived at 3:30 a.m. and tried to question Angie, she "really wasn't there" and seemed as if she had been drugged. Dr. Fisher testified that when Angie first arrived in the emergency room at 4:50 a.m., she alternated between sleepiness and agitation. For instance, she would lie quietly for a time and then, with minimal stimulus, would become anxious and move around on the gurney. Dr. Fisher also observed that Angie's responses to her questions were not "normal conversation-type answers" and that if left alone, she frequently drifted off to sleep.

This evidence, coupled with Angie's testimony that the only questioning she vaguely recalled was that in the ambulance, amply supports the conclusion that she was still under the influence of the stress and shock of the night's events when she told Dr. Fisher that defendant threatened to kill her and Laurie. Although Angie's statement came two to seven hours after the shocking and disturbing events, it retained its spontaneity because, as the evidence showed, her mental and physical condition prevented her from reflecting on and fabricating her account of what had happened. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 709 [the determination that the victim's statement about the robbery occurred while under the stress of that event was supported in part by testimony that he seemed nervous and scared]; *People v. Raley, supra*, 2 Cal.4th at pp. 893-894 [concluding that, notwithstanding the lapse of time, the declarant who suffered a traumatic head injury, 18 hours of blood loss, and periods of unconsciousness was in no condition to fabricate the statement that she had been raped].) We are not persuaded by defendant's further assertion that the serious nature of Angie's injuries, which

included transient global amnesia and temporary deficits in brain function, raise questions about the reliability of her statement to Dr. Fisher. This argument is one that goes to the weight, not the admissibility, of the evidence. The court did not abuse its discretion in allowing Angie's statement.[17]

Defendant also claims error under the United States Supreme Court's decision in *Crawford v. Washington* (2005) 541 U.S. 36 (*Crawford*), which held that the admission of a testimonial out-of-court statement violates a defendant's confrontation clause rights unless the declarant is unavailable at trial and the defendant has had a prior opportunity for cross-examination. (*Id.* at p. 59.)

We need not decide whether statements collected as mandated by California law as part of a sexual assault investigation are testimonial, because even if they were, there would be no confrontation clause violation here. *Crawford* makes clear that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. . . . The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." (*Crawford, supra,* 541 U.S. at p. 59, fn. 9.) In this case, Angie appeared as a witness at trial and was subjected to extensive cross-examination. No more was constitutionally required.

Defendant acknowledges Angie's presence at trial, but points out that she could not remember the interview with Dr. Fisher. In *United States v. Owens* (1988) 484 U.S. 554, however, the high court held that the admission of a prior out-of-court statement does not violate the confrontation clause even when the

---

**17** Because we conclude that Angie's statement to Dr. Fisher was properly admitted as a spontaneous utterance under Evidence Code section 1240, we do not discuss defendant's argument that the court erred in admitting it as a past recollection recorded under Evidence Code section 1237.

witness is unable to remember making the prior statement or the circumstances the statement described so long as the declarant is present at trial and the defense is provided an opportunity for effective cross-examination.  As the *Owens* court explained, " 'The Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." ' [Citations.]" (*United States v. Owens*, *supra*, at p. 559.)  In the present case, defense counsel cross-examined Angie extensively and elicited from her that she could not remember various details of the crimes.  Her inability to recall making the statement to Dr. Fisher was a factor for the jury to consider in determining the weight to give that evidence, but did not render its admission a violation of the confrontation clause.  (*People v. Cowan* (2010) 50 Cal.4th 401, 463.)  For similar reasons, we reject defendant's further argument that admission of evidence that he threatened to kill Laurie and Angie deprived him of a fundamentally fair trial.  (See *ibid.*)

### 4.  *Request for a psychiatric consultation*

Angie's treating physician, Jack Sharon, M.D., testified concerning the cause and extent of her injuries.  He also indicated he requested that Angie be provided a follow-up psychiatric consultation.  When the prosecutor asked Dr. Sharon what his purpose was in requesting such a consultation, defense counsel objected on relevance grounds.  The court overruled the objection without comment.  Dr. Sharon explained that, given Angie's injuries, he felt she would be at risk for posttraumatic stress disorder and that psychiatric involvement would benefit her in the long run.

Characterizing Dr. Sharon's testimony about the request for a psychiatric consultation as "victim impact testimony," defendant complains it was irrelevant to the charged crimes and their related sentencing allegations and therefore

81

inadmissible.  We need not decide whether the court erred in allowing

Dr. Sharon's testimony on this point because even if the evidence should not have

been permitted, its admission was harmless.  (*People v. Redd* (2010) 48 Cal.4th

691, 731-732; *People v. Watson, supra*, 46 Cal.2d at p. 836.)  Dr. Sharon's

testimony regarding his request for a psychiatric consultation involved only a few

brief questions, and the prosecutor did not argue the point during closing remarks.

Furthermore, given what the jurors already knew about the extent of Angie's

physical injuries and the ordeal she endured, they reasonably would have expected

her to have sustained psychological trauma as well.  There is no reasonable

probability that defendant would have obtained a more favorable result had the

challenged evidence been excluded.

### 5.  *Defendant's poverty*

Defendant contends the court erred in allowing the prosecutor to present

evidence of his poverty to show a motive for the robberies.  We agree, but

conclude that the error was harmless.

During the prosecution's case-in-chief, the prosecutor asked Donna Kellogg

whether defendant was employed at the time of the crimes.  She answered that he

was not.  When the prosecutor then inquired into defendant's means of support,

defense counsel objected on relevance grounds and the court sustained the

objection.

At the prosecutor's request, the court excused the jury to consider the point

further.  The prosecutor argued that defendant's employment status and means of

support at the time of the crimes were relevant to the robbery charges and the

robbery-murder special-circumstance allegation, but defense counsel contended

that Kellogg's disclosure that the family lived on Aid to Families with Dependent

Children (AFDC) would be highly prejudicial.  The court ruled it would allow the

82

prosecutor to elicit evidence that defendant and Kellogg were both unemployed and lived solely on her income and the amount of that income, but not its source. When questioning resumed, Kellogg testified that at the time of the crimes, she had a monthly income of approximately $700 and that defendant had no income other than what she gave him.

Ordinarily, "[e]vidence of a defendant's poverty or indebtedness, without more, is inadmissible to establish motive for robbery or theft because it is unfair to make poverty alone a ground of suspicion and the probative value of the evidence is deemed to be outweighed by the risk of prejudice." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1023-1024; accord, *People v. Cornwell, supra,* 37 Cal.4th at pp. 95-98.)

We conclude the court erred in allowing the prosecution to present evidence during its case-in-chief that defendant was unemployed and living on Kellogg's monthly income of $700. Although this court has recognized circumstances under which evidence of a defendant's unemployment or financial status is relevant and admissible to a charge of robbery, none of those scenarios is shown here. For instance, the prosecutor elicited the testimony in question *before* defendant testified in his own behalf. The evidence of defendant's poverty thus was not admitted for the limited purpose of rebutting an assertion that he did not commit the charged robberies because he did not need money.[18] (See *People v. Harris* (2005) 37 Cal.4th 310, 345-346; *People v. Koontz* (2002) 27 Cal.4th 1041, 1076-1077.) Nor was there any evidence that defendant suddenly had come into possession of a greater than usual sum of money after the crimes. (See *People v.*

---

[18] Defendant later testified that he and Kellogg and their children were living on AFDC, Kellogg handled all their finances, and he did not have a need for money.

*Cornwell, supra,* 37 Cal.4th at pp. 95-98 [evidence of the defendant's depleted bank balance and modest income was relevant circumstantial evidence properly admitted to eliminate legitimate explanations for his sudden possession of an unusually larger amount of money after the robbery].)

Respondent argues that the purpose of the challenged evidence was not to establish a motive for taking the girls' money. Rather, it was presented to show defendant had little or no money when he picked up Laurie and Angie and needed cash for gas in order to drive them to remote areas to commit the crimes and dispose of the bodies. We fail to see the distinction respondent attempts to draw. (See *People v. Wilson* (1992) 3 Cal.4th 926, 938-939.) We conclude, however, that the error did not prejudice defendant. The improper evidence of defendant's employment status and dependence upon Kellogg's limited monthly income was presented for proper purposes later at trial, first, when defendant testified that he was living on general assistance and had no other means of support and then again during rebuttal to support the prosecution experts' testimony that defendant suffered from antisocial personality disorder. (See *post*, pt. II.D.8.) Notably, the prosecutor did not refer to defendant's unemployment or poverty during closing remarks when urging the jury to convict him of robbery. Finally, as discussed in part II.F.1., *post*, there was ample evidence other than defendant's limited financial means to establish his guilt of robbing Laurie and Angie.

### 6. *Impeachment with prior felony convictions, misdemeanor offenses, and other misconduct*

Defendant argues the trial court violated state law and constitutional principles by permitting the prosecutor to impeach him with assertedly irrelevant, prejudicial evidence of two prior robbery convictions, two misdemeanor offenses, and his out-of-court admissions of deceitful conduct. We disagree.

At the close of the prosecution's case-in-chief, the court conducted an extensive hearing on the admissibility of certain evidence for impeachment purposes in the event defendant testified in his own behalf. Over defense objection, the court ruled that it would allow the prosecutor to impeach defendant with a 1985 California robbery conviction and a 1981 Texas robbery conviction. The court acknowledged that the prior convictions were for the same crime as two of the charged offenses, presenting a risk that the jury would infer defendant is the type of person who robs. But it found that the prior convictions' probative value in showing dishonesty and moral turpitude substantially outweighed the prejudicial effect of that evidence.

The court also ruled it would allow evidence demonstrating that defendant (1) acknowledged feigning a suicide attempt in a juvenile detention facility, (2) admitted traveling around the country without paying for transportation, sometimes by robbing people, and (3) made false statements to gain admission to the psychiatric unit at LAC+USC. In the court's view, the evidence of wrongdoing was probative of untruthfulness, was neither remote nor similar to any of the charges, and would not confuse the issues. Finally, the court permitted evidence that defendant committed a vehicle theft and an act of burglary involving an intention to steal. Finding both acts were theft-related offenses showing dishonesty and neither was remote in time, the court concluded that the probative value of the evidence exceeded any prejudicial effect.[19]

---

[19] The court ruled that the prosecutor could not impeach defendant with any crimes he committed as a juvenile or with two acts of misdemeanor battery committed in 1985, because admission of such evidence would be more prejudicial than probative.

In anticipation of the prosecutor's cross-examination, defendant admitted on direct examination that he pleaded guilty to robbery in 1981 and 1985, and that in 1984 he pleaded guilty to joyriding and took tools from someone's garage to sell for food. He also admitted that while in juvenile lockup, he once cut his wrists but not for the purpose of killing himself, and testified that he "may have told" a prison doctor that he had begged and robbed for food while in Texas.

A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352.[20] (*People v. Wheeler* (1992) 4 Cal.4th 284, 290-296 [Proposition 8 allows impeachment with conduct amounting to a misdemeanor offense]; see also *People v. Mickle* (1991) 54 Cal.3d 140, 168 [jailhouse informant could be impeached with evidence he had threatened witnesses in his own case].)

"[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude. Beyond this, the latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad." (*People v. Wheeler, supra*, 4 Cal.4th at p. 296; see also *People v. Castro* (1985) 38 Cal.3d 301, 316.) When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged

---

[20]     The passage of Proposition 8 in 1982 led to the enactment of article I, section 28 of the California Constitution. Article I, section 28, subdivision (f)(2) provides in pertinent part that "relevant evidence shall not be excluded in any criminal proceeding." Subdivision (f)(4) allows prior felony convictions to "be used without limitation for purposes of impeachment." (Cal. Const., art. I, § 28, subd. (f)(4).)

offense, and what effect its admission would have on the defendant's decision to testify. (*People v. Beagle* (1972) 6 Cal.3d 441, 453; *People v. Green* (1995) 34 Cal.App.4th 165, 183.) Additional considerations apply when the proffered impeachment evidence is misconduct other than a prior conviction. This is because such misconduct generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude. (*People v. Wheeler, supra*, at p. 296.) As we have advised, "courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Id*. at pp. 296-297.)

Because the court's discretion to admit or exclude impeachment evidence "is as broad as necessary to deal with the great variety of factual situations in which the issue arises" (*People v. Collins* (1986) 42 Cal.3d 378, 389), a reviewing court ordinarily will uphold the trial court's exercise of discretion. (*Ibid*.; see *People v. Hinton* (2006) 37 Cal.4th 839, 888 (*Hinton*), *People v. Stewart* (1985) 171 Cal.App.3d 59, 65.)

Defendant does not dispute that the evidence at issue here involved moral turpitude suggesting "a willingness to lie." (*People v. Wheeler, supra*, 4 Cal.4th at p. 295; *People v. Mendoza* (2000) 78 Cal.App.4th 918, 925 [prior convictions for burglary, robbery, and other theft-related crimes are probative of credibility].) He argues, however, that the court abused its discretion in permitting the prosecutor to impeach him with prior convictions that were identical to the charged offenses. His argument does not succeed. Although the similarities between the prior convictions and the charged offenses is a factor for the court to consider when balancing probative value against prejudice, it is not dispositive. (*Hinton, supra*, 37 Cal.4th at p. 888; see *People v. Green, supra*, 34 Cal.App.4th at p. 183.) In the present case, the court found the robbery convictions highly probative of

defendant's credibility. The court also weighed the prejudicial impact that admission of the robbery convictions might have on the jury's consideration of the robbery counts and determined that its potential for prejudice did not outweigh its probative value. As in *Hinton*, there were no other prior felony convictions involving moral turpitude that could have been admitted for impeachment purposes. (*Hinton, supra*, at p. 888.) Thus, to exclude the robbery priors would have clothed defendant in a " ' "false aura of veracity." ' " (*Ibid.*) Defendant counters that the availability of the misdemeanor burglary and misdemeanor vehicle theft convictions supports his argument that the court abused its discretion when it allowed impeachment with the robbery convictions. We have observed, however, that a misdemeanor offense or other misconduct not amounting to a felony is less probative of moral turpitude or dishonesty than is a felony. (*People v. Wheeler, supra*, 4 Cal.4th at p. 296.)

Defendant suggests that the court should have admitted only one, but not both, of the robbery convictions. But as this court has recognized, a series of crimes may be more probative of credibility than a single crime. (*Hinton, supra*, 37 Cal.4th at p. 888; *People v. Holt* (1984) 37 Cal.3d 436, 452-453; see also *People v. Stewart, supra,* 171 Cal.App.3d at p. 66 [probative value of the defendant's four prior robbery convictions was high].) " '[W]hether or not more than one prior felony should be admitted is simply one of the factors which must be weighed against the danger of prejudice. [Citation.]' " (*People v. Green, supra*, 34 Cal.App.4th at p. 183.)

Defendant argues that the admission of the misdemeanor misconduct and his statements admitting robberies, theft, and untruthfulness was unnecessary, and thus prejudicial, because adequate impeachment could have been accomplished using one or both of his prior felony convictions. For the reason defendant suggests, the admissibility of this evidence presents a somewhat closer question.

88

As noted above, this court has recognized that evidence of misconduct not amounting to a felony is less probative of immoral character than is a prior felony conviction. (*People v. Wheeler, supra*, 4 Cal.4th at pp. 296-297 & fn. 7.) We also have observed that impeachment evidence other than a felony conviction might entail problems of proof, require undue time, or create confusion. (*Id*. at pp. 296-297.) Indeed, the record here shows there was protracted questioning concerning several collateral points raised by the nonfelony impeachment evidence. For example, during both direct and cross-examination, defendant was questioned extensively about his feigned suicide attempt while in a juvenile detention facility, and the defense expert, Dr. Berg, testified at length about the incident. Nonetheless, we cannot say that the court exceeded the bounds of reason in admitting the evidence of defendant's misdemeanors and uncharged misconduct. First, as previously discussed, evidence that a defendant committed a series of crimes is more probative of his credibility than a "single lapse." (*Hinton, supra*, 37 Cal.4th at p. 888.) Likewise, defendant's admissions of uncharged misconduct showed a history of untruthfulness and manipulation. The court was aware of, and presumably took into consideration, the potential for undue consumption of time and problems of proof when making its admissibility determination. Although the record shows several points at which defendant's admissions of wrongdoing were probed in depth, none of the questioning was excessive. Nor does defendant now argue that the impeachment evidence was inadmissible for lack of proof. Defendant fails to show the court abused its discretion in admitting evidence of the misdemeanor offenses and other misconduct.

Defendant argues finally that because the jurors were instructed only on the limited use of the prior *felony* conviction evidence, they would have viewed the instances of his misdemeanor convictions and other dishonest conduct as evidence of his bad character and predisposition to commit the charged crimes. We

89

disagree.  The record shows the court instructed with CALJIC No. 2.23, which informed the jury that it could consider evidence of a felony conviction only for the purpose of determining believability and not as proof that the defendant is predisposed to commit crimes.  The court also gave CALJIC No. 2.20, which provided a list of certain factors that the jury could consider in determining the credibility of witnesses generally.  Among the specific factors the court included in the instruction were "admission by the witness of untruthfulness,"  a "witness's prior conviction of a felony," and "[p]ast conduct of a witness having a logical bearing upon the witness' honesty or veracity."  Reading these instructions in light of one another as they were instructed to do (CALJIC No. 1.01), the jurors would have understood the limited purpose of all of the impeachment evidence.  We thus see no basis on which to conclude they would have considered the impeachment evidence other than the felony convictions in the manner defendant suggests.  If defendant believed the jury needed additional guidance, it was incumbent on him to request that CALJIC No. 2.23 be modified to include the other categories of evidence admitted for impeachment purposes.  (*Hinton, supra*, 37 Cal.4th at p. 875 [a trial court has no duty to instruct on its own motion concerning the limited admissibility of evidence of past criminal conduct].)

### 7.  *Defendant's infidelity*

Defendant contends the court abused its discretion and violated his right to a fundamentally fair trial by allowing the prosecutor to cross-examine him on the subject of sexual infidelity.  We disagree because defendant subjected himself to questioning on this issue.

The record shows that during direct examination, defense counsel sought to elicit from defendant his life history prior to the charged crimes.  In relevant part, defendant chronicled his relationship with Donna Kellogg, telling the jury that he

90

and Kellogg had a "common law marriage." Counsel asked defendant, "When you moved to Fresno with [Kellogg], how did you feel about her? What were your feelings towards her?" Defendant replied, "I loved her." He answered, "Yes" when asked whether he believed they had a good relationship.

The prosecutor's cross-examination of defendant was interrupted by the testimony of the defense experts. Psychologist Paul Berg, Ph.D., likewise testified about defendant's life history, including his relationship with Kellogg. He mentioned that defendant and Kellogg raised children together and that defendant considered himself married.

When defendant's cross-examination resumed, he confirmed that he thought of himself and Kellogg as husband and wife. Over relevance and Evidence Code section 352 objections by the defense, the prosecutor was permitted to elicit from defendant that Kellogg was not the only woman he "went out with" during their relationship. Defendant explained, however, that he and Kellogg devoted their lives to one another and that although he "slept around on her before," they had "discussed" that issue. After the court called a recess, the defense renewed its Evidence Code section 352 objection to the prosecutor's line of questioning, arguing that defendant's sexual conduct with other women was irrelevant to his relationship with Kellogg and highly prejudicial. The court found the prosecutor was entitled to rebut defendant's assertions that he was a good father and "husband." However, after further argument, the court ruled the prosecutor was prohibited from further pursuing the subject of defendant's infidelity because the probative value of such evidence at that point had become "de minimis compared to undue consumption of court time." Later, on redirect examination, defense counsel elicited from defendant that he had been unfaithful to Kellogg only once and that they had resolved the matter. On recross-examination, however, and over defense objection, defendant admitted sexual relations with two other women.

91

Defendant contends that evidence of his promiscuity was highly prejudicial and made it likely the jury reached its verdicts based on his bad character rather than the admissible evidence. Testimony by defendant and his expert, however, had placed in issue his feelings about Kellogg, including his belief that they maintained a good relationship and family life. Evidence that defendant had sexual contact with women other than Kellogg during their relationship had some tendency in reason to undermine those assertions and, more generally, to call his credibility into question. (See *People v. Houston* (2005) 130 Cal.App.4th 279, 307 [evidence of the defendant's extramarital affairs was relevant to rebut his testimony that his relations with his wife were good in the month before her murder].) We cannot conclude on the record presented here that the court abused its discretion in allowing the prosecutor's limited cross-examination on the subject of defendant's infidelity.

### 8. *Defendant's lack of a work ethic*

Defendant claims the court erred in permitting lay witnesses to testify regarding his work ethic. We disagree.

Defendant's guilt phase defense was diminished actuality and unconsciousness. To support those theories, the defense called psychologist Paul Berg, Ph.D., who diagnosed defendant as suffering from organic personality syndrome. According to Dr. Berg, defendant likely experienced a brain damage-induced rage reaction, and possibly seizure-induced unconsciousness, at the time of the crimes.

During rebuttal, the prosecutor called several experts who testified that defendant suffered, not from OPS or epileptic seizures, but from antisocial personality disorder. In explaining the basis of his diagnostic impression, psychologist Michael Thackrey, Ph.D., outlined the various diagnostic criteria for

APD, which included being unemployed for a significant amount of time when able to seek work, and failing to provide financial support for one's children or planning ahead for one's life. Psychiatrist James Missett, M.D., cited defendant's "failure to adequately support his wife and children" as one of the criteria supporting his diagnosis.

The opinions of the prosecution experts were based largely on their review of defendant's medical records and social history, including statements by family members. Later during rebuttal, over an Evidence Code section 352 objection by the defense , the prosecutor called several lay witnesses to establish the factual bases for the experts' diagnoses of APD. Donna Kellogg testified in relevant part that defendant had no income of his own and that he never sought employment or expressed dissatisfaction with not having a job. Similarly, Kellogg's sister, Tina Edmonds, testified that defendant never expressed a desire to look for work and that he was out late and usually slept until noon. Their observations were echoed by defendant's friend Michael Hall, who testified that he never saw defendant work and that defendant rarely awoke before noon.

Defendant argues the lay testimony about his lack of a work ethic was improper rebuttal because the APD diagnosis was not disputed by the defense or defense experts. As defendant points out, Dr. Berg acknowledged during cross-examination that defendant previously had been diagnosed with APD and agreed that he met many of the diagnostic criteria. Further, he notes, the prosecution's own expert acknowledged that a diagnosis of APD can coexist with organic personality syndrome.

Rebuttal evidence is relevant and thus admissible if it "tend[s] to disprove a fact of consequence on which the defendant has introduced evidence." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1088.) The trial court is vested with broad

discretion in determining the admissibility of evidence in rebuttal. (*People v. Harris, supra,* 37 Cal.4th at p. 335.)

The rebuttal testimony regarding defendant's lack of a work ethic was admissible because it properly refuted Dr. Berg's testimony regarding defendant's assertedly dominant psychiatric disorder, OPS. "When, as here, a mental health expert offers a diagnosis, this opens the door to rebuttal testimony questioning that diagnosis or suggesting an alternative diagnosis." (*People v. Smith* (2005) 35 Cal.4th 334, 359.)

Defendant asserts that admitting the lay evidence was error because defense counsel offered to stipulate defendant suffered from APD. However, counsel's offer to stipulate did not change the thrust of Dr. Berg's psychological testimony, which attributed the crimes to rage reaction and seizure. Thus, the offer to stipulate did not cause the evidence of APD, and its supporting lay testimony, to be outside the scope of proper rebuttal. (*People v. Edelbacher, supra,* 47 Cal.3d at p. 1007 [the prosecution need not accept a stipulation that deprives the state's case of its force].)

We also reject defendant's argument that, even if relevant, the lay testimony should have been excluded under Evidence Code section 352 as cumulative and unduly prejudicial. Although defendant testified extensively about his lack of consistent employment, the lay testimony concerned not simply defendant's lack of employment but his irresponsibility and lack of motivation to seek work. Because the rebuttal testimony differed from defendant's, it was not cumulative. Nor was it unduly prejudicial. Contrary to defendant's contention, nothing in the record suggests the jury would have drawn from evidence of his lack of a work ethic the impermissible inference that he was predisposed to commit the charged crimes. The court did not abuse its discretion in admitting the evidence.

94

**E. Court-ordered Mental Examination by Prosecution Experts**

In supplemental briefing, defendant argues the court violated his statutory rights by ordering him to submit to mental examination by three prosecution experts who testified at the guilt phase during the prosecution's case in rebuttal. He also asserts it was improper for the jury to learn that he refused to be interviewed by one of the experts. As explained below, the court erred when, in November and December 1993, it ordered defendant to submit to mental examination by the prosecution's experts. The court also erred when it admitted testimony by two of the experts that was based on their interviews with defendant and permitted the third expert to comment on defendant's refusal to meet with him. We conclude, however, that these errors were harmless.

*1. Background*

As previously noted, defendant raised guilt phase defenses of unconsciousness and diminished actuality. The record shows that immediately after defendant's testimony, the prosecutor asked the court to order defendant to submit to mental evaluation by the prosecution's experts. In support, he cited *People v. McPeters* (1992) 2 Cal.4th 1148, which held that a defendant who places his mental conditions in issue has "waived his Fifth and Sixth Amendment rights to the extent necessary to permit a proper examination of that condition." (*Id.* at p. 1190.) Defense counsel voiced no objection, but reminded the court that the defense team had a right to be present during the examinations and asked to be informed of "when, where, and by whom" any examination would take place. The court granted the prosecutor's request and directed him to provide the defense with the pertinent information as soon as possible. Five days later, Psychologist Michael Thackrey, Ph.D., interviewed defendant for approximately three hours. Defendant was questioned by Neuropsychologist Bradley Schuyler, Ph.D., two days after that. One week after Dr. Schuyler's interview, however, counsel

95

informed the court and the prosecutor that defendant refused to be questioned by Psychiatrist James Missett, M.D., or any other prosecution expert. Defendant had explained to counsel, "Look, they're trying to kill me, and want me to sit there with them for two or three hours and answer their questions. I just can't do it." Counsel offered to stipulate at trial that defendant refused to speak with Dr. Missett.[21]

Drs. Thackrey, Schuyler, Missett, and two others testified as experts in the prosecution's case in rebuttal.

Dr. Thackrey testified that in forming his opinion in the case, he reviewed numerous documents including defendant's medical and psychiatric records, the testing results and reports of the other experts who had examined him, and defendant's social and criminal history records, including his prior convictions in California and Texas. He also reviewed transcripts of Angie's testimony, defendant's testimony, and the testimony of defense experts Drs. Apte and McKinsey. As for his evaluation of defendant, Dr. Thackrey told the jury that his attempt to interview defendant about his family and social history was "largely nonproductive," but he did obtain defendant's version of the facts of the case and successfully conducted diagnostic questioning and testing. Relying on all of these sources, Dr. Thackrey's diagnostic impression of defendant was of antisocial personality disorder (APD), possibly with a mild form of organic personality syndrome (OPS). Based on his review of the trial testimony by Angie and defendant describing the night's events, he disagreed with the defense experts that defendant's behavior inside the restroom could be explained by an OPS-related

---

[21]     Before commencement of the sanity phase, the court granted the prosecutor's renewed request for a court-ordered mental examination by Dr. Missett, which defendant again refused. (See discussion *post*, pt. II.J.4.)

rage reaction and/or seizure activity. In Dr. Thackrey's view, the accounts showed a sustained, complex, purposeful and goal-directed sequence of behaviors extending over a period of time, which was inconsistent with either condition.

Dr. Schuyler testified that during his 90-minute interview with defendant he took a medical and psychiatric history, observed him for signs of cognitive or physical impairment, and heard his account of the night in question. Based on the interview, and his review of Angie's and defendant's trial testimony and the professional literature, he likewise concluded that defendant's conduct could not be explained by an OPS-related rage reaction or a seizure, and he echoed Dr. Thackrey's view that defendant's complex goal-oriented behaviors were inconsistent with a rage reaction. Dr. Schuyler also questioned both the utility and results of the Luria-Nebraska Neuropsychological Battery administered by the defense experts. In his opinion, the scores could reflect defendant's sociological background, not brain injury.

At the outset of Dr. Missett's testimony, defense counsel stipulated that although defendant was willing to take any physical or qEEG examinations or written tests administered by Dr. Missett, he declined to be "interviewed further by people trying to kill him." Like the other prosecution experts, Dr. Missett had reviewed defendant's psychiatric and medical records as well as Angie's and defendant's trial testimony and concluded that defendant's behavior on the night of the crimes was inconsistent with OPS and seizure activity. Based on the same sources, and with the proviso that he had not personally interviewed defendant, Dr. Missett believed APD "would be the best description" of defendant's personality.

## 2. Discussion

At the time of defendant's trial in 1993, decisional law authorized trial courts to order a defendant who placed his or her mental state in issue to submit to mental examination by prosecution experts. (See, e.g., *People v. McPeters, supra*, 2 Cal.4th at p. 1190.) This court later held that after the 1990 passage of Proposition 115 (the Crime Victims Justice Reform Act), which resulted in the enactment of the criminal discovery statutes, the courts "are no longer free to create such a rule of criminal procedure, untethered to a statutory or constitutional base." (*Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1116 (*Verdin*).)[22] We have applied *Verdin* retroactively. (See *People v. Wallace, supra,* 44 Cal.4th at pp. 1087-1088.)[23]

Although our decision in *Verdin* was issued after trial in this case, its holding is based upon a plain reading of the statutory language that was in effect at the time of defendant's trial. There was a valid argument at that time that the trial court was not authorized to order defendant to submit to mental examination by the prosecution's experts. Because defendant failed to challenge the court's

---

[22]  Section 1054, subdivision (e), provides that "no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the United States." *Verdin* concluded that an order to submit to a mental examination is a form of discovery that is neither authorized in the criminal discovery statutes or any other express statutory provision nor mandated by the federal Constitution. (*Verdin, supra*, 43 Cal.4th at pp. 1103-1116.)

[23]  Although the Legislature's recent enactment of section 1054.3, subdivision (b) now provides the requisite statutory authority for courts to order a defendant to submit to a mental examination, that statute became effective in January 2010. (See § 1054.3, subd. (b)(1), added by Stats. 2009, ch. 297, § 1.)

examination order below, he has forfeited his claim of *Verdin* error on appeal. (*People v. Gonzales* (June 2, 2011, S072316) 51 Cal.4th 894. )

But even had defendant's claim been preserved for appeal, he is not entitled to reversal. We agree with defendant that the court was not authorized under section 1054 to order him to submit to mental examination by the prosecutor's three experts. The court further erred by admitting testimony by the experts based on their interviews and by permitting comment on defendant's refusal to be questioned by Dr. Missett. (*People v. Wallace*, *supra*, 44 Cal.4th at p. 1087.) We conclude, however, that these errors were harmless.

Preliminarily, we reject defendant's argument that because the errors assertedly implicated his federal constitutional rights, they must be subjected to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24.) Defendant supports his claim by quoting this court's observation in *Verdin* that "the use of evidence from an undesired psychiatric examination to convict a criminal defendant may have constitutional implications." (*Verdin, supra*, 43 Cal.4th at p. 1102.) *Verdin* relied on *Estelle v. Smith* (1981) 451 U.S. 454, for that proposition, but the constitutional concern addressed in that case is absent here. *Estelle v. Smith* establishes that when the defendant has introduced no psychiatric evidence, the Fifth Amendment prohibits the prosecution from presenting information obtained from the defendant's own statements in a court-ordered competency examination as evidence against him at the penalty phase of a capital trial. (*Id*. at pp. 465-466, 468.) Defendant cites no decision, and we are aware of none, holding that the Fifth Amendment or any other *federal constitutional* provision prohibits a court from ordering a defendant who has placed his or her mental state in issue to submit to a mental examination by a prosecution expert. On the contrary, in *People v. McPeters, supra*, 2 Cal.4th at page 1190, we concluded that neither the court-ordered mental examination nor admission of

99

evidence that the defendant refused to participate in the examination infringed upon the defendant's Fifth or Sixth Amendment rights. (See also *Buchanan v. Kentucky* (1987) 483 U.S. 402, 421-424.) We thus assess the errors for prejudice under the standard for state law error, inquiring whether there is a reasonable probability that the outcome of trial would have been more favorable to defendant had the court not ordered him to submit to examinations by Drs. Schuyler, Thackrey, and Missett. (Cal. Const., art. VI, § 13; *People v . Watson, supra,* 46 Cal.2d at pp. 836-837.)[24]

During the mental examinations, Drs. Schuyler and Thackrey each obtained statements from defendant concerning the charged crimes and they based their opinions, in part, on his accounts of the night's events. Among the materials the experts reviewed in preparation for their testimony, however, were the transcripts of defendant's guilt phase testimony, in which he likewise described his version of events. There were no differences between the two accounts. Thus, defendant's statements during the examinations could not have led Drs. Schuyler and Thackrey to conclusions that differed from those they would have reached had they not been permitted to interview him.

As for the evidence that defendant refused to be interviewed by Dr. Missett, defense counsel's stipulation to that effect arguably forfeited his claim of error. (Evid. Code, § 353, subd. (a).) In any event, the evidence did not harm and may have benefitted the defense. Dr. Missett tempered his opinion that antisocial personality disorder was "the best description" of defendant with the proviso that

---

[24] We applied the higher "reasonable possibility" standard in *People v. Wallace, supra*, 44 Cal.4th at pages 1087 through 1088 because the error in that case occurred at the *penalty* phase of a capital trial when the more exacting standard applies.

100

he had not personally examined him, and he did not suggest the fact that defendant refused to be interviewed had any bearing on his diagnosis. Indeed, nothing in the record shows Dr. Missett found any significance in defendant's refusal to submit to an examination.

Even without the testimony of the two experts who interviewed defendant and admission of evidence that he refused to meet with Dr. Missett, the prosecution presented a strong case in rebuttal that undermined the opinions of the defense experts. The testimony of Drs. Schuyler and Thackrey was cumulative in many respects to that of the other prosecution experts. For instance, both Dr. Schuyler and Neurologist Harvey Edmonds, M.D., disputed the defense claim that a blow to defendant's head with a baseball bat resulted in a serious brain injury that led to OPS and posttraumatic epilepsy. The prosecution lay witnesses' testimony concerning defendant's lifestyle and behavior further undercut the defense experts' diagnoses. Donna Kellogg and Tina Edmonds indicated they had never seen defendant react violently when provoked, nor had they ever witnessed any seizure activity. Based on our examination of the entire record, we conclude there is no reasonable probability that the jury would have reached a result more favorable to defendant had the court not issued an order requiring him to submit to mental examination by prosecution experts and had not permitted these experts to testify against defendant.

In a related claim, defendant asserts the court erred by not instructing the jury that it could consider his statements to Drs. Schuyler and Thackrey for purposes of evaluating the experts' opinions but not for the statements' truth. (CALJIC No. 2.10; see *In re Spencer* (1965) 63 Cal.2d 400, 412-413.) Because defendant failed to request a limiting instruction below, he has forfeited his claim that it was error for the court not to so instruct. (*People v. Ledesma, supra,* 39 Cal.4th at pp. 697-698; *People v. Boyer, supra,* 38 Cal.4th at p. 465.) His assertion lacks

101

merit in any event. First, it is unclear whether such an instruction is required in the setting presented here, in which the defendant's statements were obtained during a prosecution expert's mental examination that was conducted in the presence of defense counsel. (Cf. *People v. Ledesma, supra*, at pp. 698-700 [limiting instruction need not be given when the constitutional right to the assistance of counsel is not implicated].) Even were such a limiting instruction ordinarily required in that setting, however, it might have been inappropriate here. As previously discussed, the experts' testimony about defendant's statements to them during the mental examinations was duplicative of defendant's testimony in his own behalf, which *was* presented for its truth. Instructing with CALJIC No. 2.10 under these circumstances might have interfered with defense attempts to show defendant committed the crimes during an OPS-related rage reaction and/or seizure. A limiting instruction was not required here.

### F. Sufficiency of the Evidence

Prior to trial, defendant moved to dismiss the attempted murder count, one of the robbery counts, and the robbery-murder, rape-murder, and witness-murder special-circumstance allegations for insufficient evidence. (§ 995.) The court denied the motion.[25] At the close of the prosecution's case-in-chief, defendant again challenged the sufficiency of the evidence supporting the special circumstance allegations, but the court found the evidence sufficient to submit the allegations to the jury. (§ 1118.1.)

Here, defendant argues the convictions for robbery and attempted rape must be reversed and the robbery-murder, rape-murder, and witness-murder special-

---

[25] Defendant was initially charged with the forcible rape of Laurie, but the court dismissed that count for insufficient evidence.

circumstance findings vacated because they are not supported by sufficient evidence.

When a defendant challenges the sufficiency of the evidence, " '[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 509, quoting *People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 161, fn. 19 [we apply the same standard of review in assessing the sufficiency of the evidence supporting special circumstance findings].) "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]" (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126.) We " ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.]" (*People v. Davis, supra*, at p. 509.)

Applying these principles, we conclude the evidence is sufficient to support the convictions for the robbery of Angie, the robbery and attempted rape of Laurie, and the true findings on the robbery-murder, rape-murder, and witness-murder special-circumstance allegations.[26]

---

[26] Noting that the jury was instructed pursuant to section 190.3, factor (a) that it must consider the circumstances of the crime and the existence of special circumstance findings when making its penalty determination, defendant argues that if any single conviction or special circumstance finding is reversed or vacated, the death judgment also must be reversed. Because we uphold all of the convictions and special circumstance findings, we do not address the point.

103

*1. Robbery and robbery-murder special circumstance*

We reject defendant's contention that his convictions for the robbery of Angie and Laurie must be reversed and the robbery-murder special-circumstance finding stricken because there was insufficient evidence establishing each of the essential elements of those crimes.

"Robbery is the taking of 'personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property.' [Citation.]" (*People v. Lewis, supra,* 43 Cal.4th at p. 464; see § 211.) "If the other elements are satisfied, the crime of robbery is complete without regard to the value of the property taken." (*People v. Tafoya* (2007) 42 Cal.4th 147, 170.)

Defendant acknowledges Angie's testimony that he took money from her pocket, but argues there was no showing that the taking was accomplished by force or fear or with the requisite intent to steal, because the evidence established Angie offered the money to him when they stopped at a pay telephone. We reject the argument. The record contains substantial evidence from which the jury reasonably could infer that defendant's actions caused Angie to fear him and that her offer of change and failure to protest when he took her dollar bills were prompted by that fear. In the restroom at Lost Lake, defendant beat and choked Angie when she tried to interfere with his assault on Laurie. After binding Angie to the plumbing, defendant took Laurie to the women's restroom next door, from where Angie heard scuffling, then her friend's protests and cries, and finally, silence. Telling Angie that Laurie had run away, defendant then directed her to the front passenger seat of his car and drove off. At one point during the drive, while Angie's hands were still bound together behind her back, defendant stopped at a pay telephone. He said he wanted to call Laurie's mother but did not have any

104

change. When Angie told defendant that she had change in her pocket, defendant reached in and took not only the coins, but all of her dollar bills, which he placed in the coin compartment of the car. Defendant exited the car and dialed a telephone number but hung up without speaking to anyone and collected the change. Later, he pulled into a service station, retrieved the dollar bills from the coin compartment, and left the car. At the time of defendant's arrest the following morning, there was no money in his car or wallet, or on his person. This evidence, and the reasonable inferences arising from it, suffices to show that Angie did not protest defendant's taking the dollar bills from her pocket because she feared him, that defendant intended to permanently deprive her of her money, and that he accomplished his intent by means of fear. (See *People v. Holt* (1997) 15 Cal.4th 619, 690 [fear may be inferred from the circumstances in which property is taken]; *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1319.)

Contrary to defendant's argument, evidence that Angie offered him the change in her pocket to make a telephone call to Laurie's mother does not undermine the jury's guilty verdict. Defendant emphasizes the evidence that he did not take the money from Angie until one hour or more after assaulting her in the restroom. But the jury reasonably could infer that Angie's offer of change was the product of her continuing fear while she rode with defendant along an isolated stretch of highway with her hands bound behind her back. And even if it could be shown that Angie had a reason other than fright to offer defendant her coins, perhaps because she hoped a telephone call might lead to her rescue, the jury was not required to find that Angie's offer to help pay for a telephone call constituted willingness to hand over all of her money. The jury properly could infer from all of the events preceding defendant's stop at the pay telephone that Angie relinquished the dollar bills from her pocket out of fear, not by her own free will.

Whether the evidence sufficed to support defendant's conviction for the robbery of Laurie presents a somewhat closer question. Under applicable principles of appellate review, however, we conclude the record discloses reasonable, credible evidence of solid value from which a reasonable trier of fact could find every element of that crime.

First, substantial evidence supported the inference that a taking occurred. Angie testified that Laurie put the change from her McDonald's purchase into the front right pocket of her jeans. Further, the evidence showed that at the time Laurie's body was discovered, her right front jeans pocket contained a bus token but no money. Although this evidence is not conclusive, it sufficed to raise a strong inference that at some point after defendant's initial use of force against Laurie, he took money from her pocket. (See *People v. Hubler* (1951) 102 Cal.App.2d 689, 691-692, 695-696 [the jury reasonably could infer that the defendant took the victim's purse based on evidence that the victim was in possession of a purse and wallet when she was assaulted by defendant and rendered unconscious and that, when she regained consciousness, her purse was missing]; *People v. Dodson* (1946) 77 Cal.App.2d 389, 393-395 [evidence that the victim had money when he left a café, that he was rendered unconscious by the defendants' assault, and that when he regained consciousness his money was missing sufficed to permit the inference that the defendants took the victim's money].) Defendant suggests that Laurie's money may have been inside her coat pocket and then fallen out with her other belongings during their struggle. We note, however, that in closing remarks defense counsel made a similar argument, which the jury necessarily rejected. That other inferences might be drawn from the evidence at trial is not to say insufficient evidence supports the verdict. As we have explained, " ' "if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also

106

reasonably be reconciled with a contrary finding." [Citation.]' " (*People v. Solomon, supra,* 49 Cal.4th at p. 816.)

Second, substantial evidence supports the inference that defendant formed the intent to steal from Laurie before, rather than after, he used force against her. (See *People v. Marshall* (1997) 15 Cal.4th 1, 34 [requisite intent to steal must arise before or during the act of force].) There was evidence from which the jury could infer defendant knew that Laurie had money. Defendant had asked Laurie to buy him something at McDonald's and would have been aware Laurie had money remaining from her purchase there because he likely would have known that the milkshake and french fries she brought back to the car cost less than a movie ticket. The jury reasonably could infer also that defendant needed money for enough gasoline to drive the girls to a remote location in order to have a sexual encounter with Laurie, and that little remained of his own money when they arrived at Lost Lake. According to defendant's testimony, he had $5 in his possession at the beginning of the evening and spent most of that amount playing an arcade game and putting gasoline in his car. Finally, Angie testified that after defendant's initial assaults on both girls, she noticed Laurie's coat lying in the corner of the restroom and the contents of her coat pockets scattered on the floor nearby. This evidence supported the reasonable inference that defendant looked for Laurie's money or valuables by forcibly reaching inside her coat pocket and removing its contents. Angie also testified that before entering the restroom she heard the sound of a scuffle and Laurie yelling at defendant to leave her alone. The evidence thus permitted the reasonable inference that defendant's intent to take Laurie's money arose before, rather than as an afterthought to, his use of force. (Cf. *People v. Morris* (1988) 46 Cal.3d 1, 19 [if the intent to steal arose after the use of force, the taking amounts to a theft, not a robbery].)

107

The same evidence supporting the jury's finding that defendant's intent to steal arose before his application of force also supports the inference that his intent to steal was concurrent with his use of force against Laurie. (*People v. Marshall, supra*, 15 Cal.4th at p. 34 [robbery verdict cannot be sustained in the absence of evidence showing a concurrence of the wrongful intent and the act of force].) That is, because the jury reasonably could have inferred from the evidence that defendant knew Laurie had money, that he had little or no money with which to buy gasoline, and that he forcibly removed Laurie's coat and the contents of its pockets looking for her money, it could infer further that defendant's use of force was concurrent with his intent to take Laurie's money. We explain *post*, in part II.F.2., that substantial evidence also supports the jury's finding that defendant's use of force against Laurie was motivated by an intent to rape. In this case, the jury properly could infer that force was used to accomplish both a sexual assault *and* a taking. "Where a defendant begins a sexual assault, aware that the victim has property and takes it, the jury may infer the defendant intended to commit both rape and robbery. [Citation.] Or it may infer that the force used for the sexual offense was also force for robbery. [Citations.]" (*People v. Shadden* (2001) 93 Cal.App.4th 164, 170; accord, *People v. Holt, supra,* 15 Cal.4th at p. 671 [the evidence supported the reasonable inference that the defendant's assault on the victim was to facilitate both a taking and rape and/or sodomy].)

In arguing there was insufficient evidence supporting either of the robbery convictions, defendant points out that both Angie and Laurie possessed less than $10 apiece, "hardly enough to furnish a motive for robbery." As noted above, however, if the elements of robbery are proved, the value of the taken property is irrelevant. (*People v. Tafoya, supra*, 42 Cal.4th at p. 170; *People v. Simmons* (1946) 28 Cal.2d 699, 705 [so long as the victim's property has some value, the amount is immaterial].) Furthermore, although the absence of evidence of motive

may tend to show a defendant is not guilty, motive itself is not a necessary element of robbery. (*People v. Wilson* (2008) 43 Cal.4th 1, 21-22.) Defendant also points out that at the beginning of the evening, he had slightly less money than did the victims and there was no evidence he possessed more money after the crimes. Indeed, he observes, the evidence showed he had only 8 cents on his person and no money in his car or wallet at the time of his arrest. The evidence supports the inference he *spent* the girls' money on gasoline, however. Thus, evidence that defendant had little or no money in his possession on the morning after the crimes does not necessarily negate a conviction for robbery. (See *People v. Marks* (2003) 31 Cal.4th 197, 206, 231.) Defendant complains finally that the robbery convictions were inconsistent with the prosecutor's theory of the case, which was that defendant took the girls to a remote area in order to rape Laurie and that when Angie intervened, he beat and restrained her and then murdered Laurie and attempted to murder Angie to prevent them from reporting his crimes. His argument fails because theories suggested by the prosecutor are not the sole theories the jury may consider in making its determination of guilt. (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.)

We further conclude substantial evidence supports the robbery-murder special-circumstance finding. To establish the truth of that allegation, the evidence must show that "[t]he murder was committed while the defendant was engaged in . . . the commission of, attempted commission of, or the immediate flight after committing, or attempt to commit . . . : [¶] . . . Robbery in violation of Section 211." (§ 190.2, subd. (a)(17)(A).) The robbery must not be "merely incidental" to the commission of the murder. (*People v. Green* (1980) 27 Cal.3d 1, 61; *People v. Marshall, supra*, 15 Cal.4th at p. 41.) Here, the jury reasonably could have concluded that Laurie was killed while defendant was engaged in the commission of a robbery. As explained above, the evidence

109

supported the inference that, before the fatal assault, defendant forcibly removed Laurie's coat and the contents of its inside pocket for the purpose of taking her money. The jury thus necessarily would have inferred that defendant's intent to rob preceded the killing. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1263.) Contrary to defendant's assertion, that he may have succeeded in taking Laurie's money only after her death does not undermine the special circumstance finding. (*People v. Frye* (1998) 18 Cal.4th 894, 956 [upholding the robbery conviction and robbery-murder special-circumstance finding where the evidence showed the defendant intended to steal from the victims before killing them but actually took their property after the shooting].) Nor does evidence that defendant harbored concurrent intents to rape *and* kill render the robbery merely incidental to the murder. (*People v. Davis* (2009) 46 Cal.4th 539, 609 ["even if a defendant harbored the intent to kill at the outset, a concurrent intent to commit an eligible felony will support the [felony-murder] special-circumstance allegation"]; accord, *People v. Abilez, supra,* 41 Cal.4th at p. 511 [evidence of the defendant's concurrent intent to take the victim's money and humiliate her established the requisite independent felonious purpose for the robbery-murder, burglary-murder and sodomy-murder special-circumstance findings].)

### 2. *Attempted rape and rape-murder special circumstance*

Defendant claims there was insufficient evidence to support his conviction for the attempted rape of Laurie and the jury's finding that the murder occurred during the attempted commission of a rape. We conclude the evidence suffices.

"Forcible rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator against the person's will by means of force or violence." (*People v. Marshall, supra*, 15 Cal.4th at p. 36; § 261, subd. (a)(2).) The crime of attempted rape has two elements: (1) the specific intent to commit

110

the crime of rape and (2) a direct, although ineffectual, act toward its commission. (§ 21a; *People v. Rundle* (2008) 43 Cal.4th 76, 138; *People v. Carpenter* (1997) 15 Cal.4th 312, 387.) A defendant's specific intent to commit rape may be inferred from the facts and circumstances shown by the evidence. (*People v. Guerra* (2006) 37 Cal.4th 1067.) As for the requisite act, the evidence must establish that the defendant's activities went "beyond mere preparation" and that they show the defendant was "putting his or her plan into action." (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 8 (*Decker*).) "When, by reason of the defendant's conduct, the situation is 'without any equivocality,' and it appears the design will be carried out if not interrupted, the defendant's conduct satisfies the test for an overt act." (*Id.* at p. 13; see also *People v. Carpenter*, *supra*, at p. 387 [to establish the act element of an attempted crime, the evidence must show "a direct movement after the preparation that would have accomplished the crime if not frustrated by extraneous circumstances"].)

We conclude there was ample evidence from which the jury reasonably could infer that defendant intended to rape Laurie. Prior to the crimes, defendant exhibited a sexual interest in Laurie. For example, he complimented her on her tight-fitting clothes, inquired about her virginity, and once recommended she consider an older, more experienced boyfriend like him. When defendant's friend cautioned him regarding his growing interest in Laurie, defendant rebuffed the warning, saying, "She wants me." Defendant's conduct on the night in question, which evidenced his plan to get Laurie alone so that he could have intercourse with her, supports the inference he intended to commit rape. On learning that Laurie and Angie had departed for the movies, defendant hurriedly left the Farkases' home and drove to a bowling alley located near the movie theater, where he stayed only 20 minutes. After returning to his car and driving off, he spotted the girls walking on the opposite side of the street, made a U-turn, and pulled up

111

alongside them, directing them to get inside. Defendant drove to Roeding Park and then to Lost Lake, which by then was deserted. Saying he needed to use the restroom, defendant stopped at one that was vacant and dark.

Evidence of the events inside the restroom further supports the strong inference that defendant intended to rape Laurie. When Angie responded to Laurie's cries for help and entered the restroom, she saw Laurie prone on the floor and defendant sitting on the back of his legs with Laurie's head between his knees. After defendant had assaulted Angie and bound her hands behind her back to prevent her further interference, he pulled Laurie to the side, placed his hand around her neck, and attempted to kiss her. Laurie twice tried to pull away, saying, "I can't. I'm on the rag." Later, when Laurie refused defendant's order to accompany him to find water with which to clean the blood off of Angie, defendant protested, "You don't trust me." Laurie acquiesced, and defendant led her next door to the women's restroom where he attacked her again. According to Angie's testimony, she heard Laurie pleading, "Roy, don't" and calling out for Angie to help her, then the sound of scuffling.

The jury also reasonably could infer from the evidence presented at trial that even before the assault on Angie, defendant had undertaken direct but ineffectual acts toward committing a rape. First, the jury could infer that after luring Laurie inside the darkened restroom with repeated requests for toilet paper, defendant immediately made sexual advances toward her and, when Laurie resisted his efforts, he applied force to carry out his intention to engage in sexual intercourse. The evidence suggested application of force because within moments of entering the restroom, Laurie began yelling, "Stop," and "Leave me alone," and then started calling for Angie. The evidence also disclosed that defendant removed Laurie's coat and rendered her temporarily unconscious. From such evidence the jury reasonably could infer that defendant's forcible efforts to overcome Laurie's

112

resistance would have resulted in rape had Angie not intervened. (*Decker, supra*, 41 Cal.4th at p. 13; *People v. Carpenter, supra*, 15 Cal.4th at p. 387; see *People v. Thomas* (1958) 164 Cal.App.2d 571, 573-575 [the jury reasonably could have inferred that the defendant's assault on the victim and struggle to push her down in the car seat would have resulted in sexual intercourse had it not been for the victim's resistance and his companion's insistence that they leave the scene].)

Evidence of the events occurring after the assault on Angie also supports the inference that defendant took direct but ineffectual actions to further his intention to rape Laurie. When Angie responded to Laurie's cries for help and entered the restroom, defendant jumped up, knocked Angie to the ground, and started choking her. After several trips in and out of the restroom, defendant returned with a small rope and tied Angie to the plumbing. He then took Laurie next door to the women's restroom. The jury reasonably could have inferred that once in that location, defendant resumed his efforts to rape Laurie. That defendant again forcibly removed Laurie's coat could be inferred from the evidence that Angie heard scuffling sounds coming from the women's restroom and that defendant later covered Angie with Laurie's coat when he placed her in his car. Further, the jury reasonably could infer that, while in the women's restroom, defendant pushed his hand underneath Laurie's blouse and forced her bra upward over her breasts. Testimony by the responding officers and forensic experts showed that (1) when Laurie's body was discovered, her blouse was pulled up and her bra was above her breasts, (2) blood smears originating on the inside of Laurie's blouse were consistent with Angie's blood, and Laurie's bra was in a folded configuration when blood was smeared on it, and (3) defendant likely had Angie's blood on his hands following the assault. That defendant abandoned his efforts and strangled Laurie without having accomplished the rape does not alter the reasonable

113

inference that he undertook direct but ineffectual actions furthering his design to force her to engage in sexual intercourse.

Similarly, there was substantial evidence supporting the jury's true finding on the rape-murder special-circumstance allegation. To establish the truth of that allegation, it must be proved that "[t]he murder was committed while the defendant was engaged in . . . the commission of, attempted commission of, or the immediate flight after committing, or attempt to commit . . . : [¶] . . . [¶] . . . Rape in violation of Section 261." (§ 190.2, subd. (a)(17)(C).) As recounted above, the evidence provided an ample basis on which the jury could find defendant killed Laurie while he was engaged in the commission of the attempted rape. (*People v. Marshall, supra*, 15 Cal.4th at pp. 37, 41 [inference of an ineffectual attack to accomplish sexual intercourse combined with evidence of the victim's screams and testimony she was strangled provided an ample basis on which the trier of fact could conclude the defendant killed the victim while engaged in an attempted rape].) Furthermore, Angie testified that when Laurie informed defendant about how they would explain to their parents what had happened to them, defendant replied, "No, I don't trust you. You'll tell like you did last time."[27] The jury reasonably could have inferred from this evidence that defendant strangled Laurie in order to prevent her from reporting the attempted rape and could reasonably find, therefore, that the killing occurred while defendant was engaged in attempted rape. (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 163 [the evidence raised the inference that the murder was committed for purposes of preventing the victim from reporting the attempted rape to the police and thus had occurred while the defendants were engaged in the commission of the attempted rape].)

---

[27] According to Angie's testimony, defendant was referring to an incident in which Laurie apparently reported a transgression by her cousin.

Defendant points to various asserted ambiguities and inconsistencies in the evidence to argue that the jury's attempted rape verdict and related special circumstance finding were based not on solid, credible evidence, but on mere speculation. None of his arguments is persuasive, however. For example, defendant asserts there was no physical evidence consistent with sexual assault on Laurie's body, including her internal and external genitalia. Indeed, defendant notes, Laurie's sanitary napkin was still in place during the autopsy. But evidence of seminal traces, or penetration or trauma to the genitals, is not required to establish an *attempted* rape. (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 163; *People v. Guerra, supra,* 37 Cal.4th at p. 1138; *People v. Johnson* (1993) 6 Cal.4th 1, 39.) For purposes of an attempt, the requisite " 'act need not be the ultimate step toward the consummation of the design.' " (*People v. Memro* (1985) 38 Cal.3d 658, 698.)

Defendant further argues that the evidence adduced at trial did not permit the inferences necessary to a finding of attempted rape. As demonstrated by our discussion above, we reject his contention that no reasonable juror could infer from the evidence that he had pushed Laurie's bra over her breasts. Merely because the serology expert could not conclusively determine how the blood smears were transferred to the inside of Laurie's blouse, and merely because there was evidence suggesting that Laurie's bra may have been displaced while she was dragged across the gravel, thrown into the trunk, or dumped out of the vehicle onto the roadway does not mean that the jury could not reasonably infer that defendant pushed Laurie's bra over her breasts in an effort to carry out his intention to rape her. (*People v. Thompson* (2010) 49 Cal.4th 79, 114 [" '[I]f the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding' "].) We also reject defendant's assertion that the evidence that

Laurie screamed, "Roy, stop," and "Roy, leave me alone," is equally consistent with the inference that she was resisting a mere physical assault as it is with the inference that she was repelling a sexual assault. The record shows that at one point when Laurie was resisting defendant's advances, she told him, "I can't. I'm on the rag." A reasonable trier of fact could have deduced that, were defendant committing a physical assault, Laurie would have had no reason to inform him she was menstruating. In addition, there was overwhelming evidence defendant long harbored sexual interest in Laurie and had announced his intention to have sexual intercourse with her.

We conclude that substantial evidence supports the jury's finding beyond a reasonable doubt that defendant intended to commit rape, that he undertook direct, albeit ineffectual, acts toward its commission, and that he killed Laurie while engaged in the attempt to rape her. We therefore reject defendant's claim that his conviction of attempted rape and the jury's true finding on the rape-murder special-circumstance allegation were unsupported by sufficient evidence.

### 3. Witness-murder special circumstance

Defendant argues there was insufficient evidence to support the jury's true finding on the witness-murder special-circumstance allegation that defendant murdered Laurie to prevent her from testifying regarding his assault on Angie. We disagree.

The witness-murder special circumstance applies when "the victim was a witness to a crime who was intentionally killed for the purpose of preventing his or her testimony in any criminal . . . proceeding, and the killing was not committed during the commission, or attempted commission, of the crime to which he or she was a witness." (§ 190.2, subd. (a)(10); see *People v. Silva* (1988) 45 Cal.3d 604, 631.) Thus, the elements of the witness-murder special circumstance are: " '(1) a

116

victim who has witnessed a crime prior to, and separate from, the killing; (2) the killing was intentional; and (3) the purpose of the killing was to prevent the victim from testifying about the crime he or she had witnessed.' [Citations.]" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 654, quoting *People v. Stanley, supra,* 10 Cal.4th at p. 801.) The murder victim need not have been an eyewitness to the crime for the special circumstance to apply, so long as the defendant believed he was exposed to criminal prosecution and intentionally killed the victim to prevent him or her from testifying in an anticipated criminal proceeding. (*People v. Jones* (1996) 13 Cal.4th 535, 550; *People v. Weidert* (1985) 39 Cal.3d 836, 853.)

Here, the record contains ample evidence supporting the witness-murder special-circumstance finding. As previously discussed, *ante,* in part II.F.2., the jury reasonably could infer that defendant drove Laurie and Angie to Lost Lake intending to get Laurie alone and have sexual intercourse with her. Laurie's resistance thwarted defendant's plan for consensual intercourse, and he then used force against her, rendering her temporarily unconscious. But his plan derailed again when Angie came to Laurie's aid and attempted to pull her friend out of the restroom by her feet. Defendant immediately lunged at Angie and brutally assaulted her for interfering. When the attack ended and defendant left the restroom, Angie crawled over to Laurie and shook her back to consciousness. The girls were frightened and decided they would tell their parents they had gotten into a fight at the movie theater. Meanwhile, defendant came and went from the restroom several times, first surveying the area with a flashlight and then bringing in a small container that he filled with water to wash off the blood from the floor. When Laurie informed defendant about how they planned to explain to their parents what happened, defendant responded, "No, I don't trust you. You'll tell like you did last time." Defendant again exited the restroom, but this time he returned with a small rope that he used to bind Angie's hands and then resumed

117

his sexual advances toward Laurie, which she again resisted.  Defendant left the restroom again.  When he returned, he used another rope to tie Angie to the plumbing and took Laurie next door to the women's restroom, where he again attempted to rape her and then strangled her.  From this evidence, the jury reasonably could find (1) the assault against Angie was separate from, and prior to, defendant's killing of Laurie, (2) defendant intended to kill Laurie and (3) his purpose in killing Laurie, in part, was to prevent her from reporting the crimes or subsequently testifying against him.

Defendant's claim of insufficiency focuses on the first element, which requires a showing that the murder victim has witnessed "a crime prior to, and separate from, the killing."  As defendant correctly points out, a witnessed crime is not "prior to, and separate from" the killing if both the crime that was witnessed and the killing were part of "the same continuous criminal transaction."  (*People v. Silva*, *supra*, 45 Cal.3d at p. 631.)  The decision in *People v. Benson* (1990) 52 Cal.3d 754, illustrates application of the rule.  In *Benson*, the defendant murdered the victim and her young son, molested the victim's two young daughters over the course of the next two days, and then murdered them as well.  (*Id*. at pp. 767-768.)  This court invalidated the witness-murder special-circumstance findings after concluding that the facts of the case showed all of the murders were "integral parts of a single continuous criminal transaction against the entire family."  (*Id*. at p. 785; see also *People v. Beardslee* (1991) 53 Cal.3d 68, 95-96 [murders of two drug dealers, although occurring in different locations two days apart, were part of the same continuous criminal transaction against both victims].)

In arguing that the crimes against Laurie and Angie were part of "the same continuous criminal transaction," defendant emphasizes that the entire "crime spree" lasted only five hours, from sometime after 9:00 p.m. on January 26, 1991, until just after 2:00 a.m. the following morning.  As this court has explained,

118

however, the significant inquiry in determining whether there was one continuous criminal transaction is not the duration between the underlying crime and the killing of the witness. Rather, it is "whether the defendant shows a common criminal intent toward all the victims upon the initiation of the first criminal act." (*People v. San Nicolas, supra,* 34 Cal.4th at p. 655.) In *Benson,* which involved a single continuous criminal transaction, the defendant admitted that he went to the victim's home " 'with the intention of doing something to the kids.' " (*People v. Benson, supra*, 52 Cal.3d at p. 767.) Here, by contrast, there is sufficient evidence from which to infer that defendant did not initially harbor a common criminal intent toward both Laurie and Angie. The evidence showed defendant drove the girls to Lost Lake with the intention of getting *Laurie* alone and engaging in sexual intercourse. Nothing in the record suggests he considered any criminal conduct against Angie until she interfered with his plans for Laurie. After the assault, defendant returned to the restroom and attempted to wash away the blood on the floor. He then assessed his situation and the girls' proposal to make up a story to tell their parents, which he rejected, saying, "No. I don't trust you." At this point defendant left the restroom again and returned with a rope. From this evidence the jury reasonably could have inferred that with defendant's assault on Angie, he initiated a new criminal transaction in which he decided that the girls could not be trusted and formed the intent to kill them. (See *People v. San Nicolas, supra*, 34 Cal.4th at p. 656 [after the defendant killed his wife, he initiated a second criminal transaction when he noticed his wife's nine-year-old niece had seen him covered in blood and then decided to kill her].)

Defendant complains that there is an inherent contradiction in concluding both that he killed Laurie during the commission of an attempted rape and that Laurie "witnessed a crime prior to, and separate from, the killing." We understand defendant's argument as an assertion that if the killing occurred during the

119

commission of the attempted rape, which was part of a "continuous transaction" beginning with defendant's preexisting plan to force Laurie to have sex with him, the killing cannot also have occurred in a criminal transaction separate from the assault. That assertion lacks merit on the facts presented here. As this court has recognized, a defendant may be motivated by multiple purposes in killing the victim. For this reason, the witness-murder special circumstance can apply "even when only one of those motives was to prevent the witness's testimony." (*People v. San Nicolas, supra*, 34 Cal.4th at p. 656; *People v. Stanley, supra*, 10 Cal.4th at p. 800; *People v. Sanders* (1990) 51 Cal.3d 471, 519.) That defendant's plan to engage in sexual intercourse with Laurie preceded his decision to silence her as a witness to Angie's assault by killing her meant only that he had more than one reason for killing her. There is no inconsistency in the application of both special circumstances here.

### G. Asserted Instructional Error at the Guilt Phase

#### 1. *Asserted failure to adequately admonish jurors to avoid media accounts of the trial*

Before the presentation of evidence at the guilt phase, the court gave the newly sworn jurors a lengthy admonition concerning their duty to "decide all questions of fact in this case *from the evidence received here in the trial and not from any other source*." The court also directed the jurors never to discuss the case with anyone. In connection with that point, the court recommended a strategy for avoiding the subject with friends and family members. The court suggested jurors tell their loved ones, " 'Well look. I'm under oath not to say anything about the case until it's over with. I'll tell you what, as soon as it's over with I will tell you everything about it. I promise I will. I'll tell you what. *If you see anything in the newspaper or anything, can you clip it for me? I can't read anything during the case.*' " In response to one juror's question, the court

120

explained to the entire panel that they could divulge the name of the case but warned them to avoid follow-up questions because "before you know it, you're in the midst of something because they've read this and they've read that."

During the guilt phase proceedings, the court gave jurors a short admonition before excusing them each day. Typically, the court would remind them not to discuss the matter among themselves or form any opinion in the case. On occasion, the court directed jurors to immediately report to the bailiff "anything you hear about the case."

Defendant argues that by failing to explicitly direct the jury at each adjournment not to read, view, or listen to media coverage of the trial, the court violated section 1122 and his state and federal constitutional rights to due process, fair trial, an impartial jury, and a reliable death judgment.

The claim is forfeited because defense counsel did not object to the advisements that were delivered by the court. (*People v. Gray* (2005) 37 Cal.4th 168, 230; *People v. Weaver, supra,* 26 Cal.4th at p. 909.)

Defendant's claim also fails on the merits. In accordance with section 1122 as it existed at the time of trial,[28] the court generally advised the jurors "that it is their duty not to converse among themselves or with anyone else on any subject connected with the trial, or to form or express any opinion thereon until the case is finally submitted to them." (Stats. 1969, ch. 520, § 2, p. 1131.) Although an admonition to refrain from reading, viewing, or listening to media coverage of the

---

[28] After defendant's trial, section 1122 was amended to require additional admonitions to prevent juror misconduct. The court must now direct jurors to "not read or listen to any accounts or discussions of the case reported by newspapers or other news media." (§ 1122, subd. (a), as amended by Stats. 1994, ch. 869, § 4, p. 4404; see *People v. Engelman* (2002) 28 Cal.4th 436, 448.)

case would have been permissible, the failure to give such a directive did not violate section 1122. (Cf. *People v. Terry* (1970) 2 Cal.3d 362, 397 [the court fully admonished the jury pursuant to § 1122 not to discuss the case, and also instructed jurors not to read newspaper stories about the case or the trial].)

Defendant's constitutional claims based upon *People v. Lambright* (1964) 61 Cal.2d 482 also fail. In that case, the court specifically informed the jury that it had a *right* to read about the case in the newspaper or to hear about it on a radio or television broadcast. Because of this instruction, this court concluded it was reasonably probable that some jurors did consult media reports, affecting the outcome of the trial. (*Id*. at pp. 484-487.)

In the present case, by contrast, there was no instruction or suggestion that it was proper to consult media reports concerning the case. On the contrary, at the outset of trial, the court instructed jurors that they must rely solely on the evidence at trial and "can't read anything during the case." The court's closing instructions likewise reminded the jury of its obligation to consider only the evidence admitted at trial. Absent a showing that any juror was exposed to media coverage of the case, we presume the jury followed the court's express directives. (*People v. Terry, supra,* 2 Cal.3d at p. 397 [presuming that no juror read the inaccurate news coverage of the defendant's trial]; *People v. Ladd* (1982) 129 Cal.App.3d 257, 263-264.)

### 2. *Failure to instruct on preoffense statements*

Defendant contends the court erred by not instructing on its own motion with CALJIC No. 2.71.7, which would have directed the jury to view with caution the evidence of his preoffense statements of intent, plan, motive, or design.[29] He

---

[29] CALJIC No. 2.71.7 states, "Evidence has been received from which you may find that an oral statement of [intent] [plan] [motive] [design] was made by

*(footnote continued on next page)*

asserts the instruction was warranted by the testimony of numerous witnesses. For example, Laurie's sister testified that defendant asked her and Laurie whether they were virgins and suggested they consider an older, more experienced boyfriend like him. Defendant's friend testified that six months before the crimes, when he warned defendant to stay away from Laurie, defendant remarked, "I know she wants me."

Defendant is correct that CALJIC No. 2.71.7 must be given when supported by the evidence. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1157; *People v. Lang* (1989) 49 Cal.3d 991, 1021.) Here, the above cited statements appear to be the type of evidence of intent and motive that, when admitted, triggers a court's duty to instruct. But even if the court erred by not giving CALJIC No. 2.71.7 on its own motion, any error was harmless. The record reveals that the court did instruct with CALJIC No. 2.71, which directed the jury to view with caution any statement by defendant that was offered to establish his guilt.[30] We have long recognized that this cautionary instruction is sufficiently broad to cover all of a

---

*(footnote continued from previous page)*

the defendant before the offense with which [he] [she] is charged was committed. [¶] It is for you to decide whether the statement was made by [a] [the] defendant. [¶] Evidence of an oral statement ought to be viewed with caution."

[30]    The jury was instructed, "An admission is a statement made by the defendant other than at his trial which does not by itself acknowledge his guilt of the crimes for which such defendant is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made an admission, and if so, whether such statement is true in whole or in part. If you should find that the defendant did not make the statement, you must reject it. If you find that it is true in whole or in part, you may consider that part which you find to be true. [¶] Evidence of an oral admission of the defendant should be viewed with caution." (See CALJIC No. 2.71.)

123

defendant's out-of-court statements. (*People v. Zambrano, supra*, at p. 1157; *People v. Lang, supra*, at p. 1021.) Defendant fails to show prejudice.

### 3. Adequacy of definition of "sexual intercourse"

In connection with the charge of attempted rape and the rape-murder special-circumstance allegation, the court provided the definition of rape based on CALJIC No. 10.00, which refers to an act of sexual intercourse with a female who is not the wife of the defendant. The jury thus was instructed in relevant part that "[a]ny sexual penetration, however slight, constitutes engaging in an act of sexual intercourse. Proof of ejaculation is not required."

Defendant contends the standard instruction fails to provide an adequate definition of rape in violation of state law and his due process right to trial on all elements of the charged crime and allegation. Specifically, he asserts the jury should have been informed that the term "sexual intercourse" refers only to vaginal intercourse, that is to "penetration, however slight, of the victim's vagina by the defendant's penis."[31]

As defendant acknowledges, we have rejected the identical claim that the standard instruction is inadequate because it fails to more fully define "sexual intercourse." (*People v. Holt, supra,* 15 Cal.4th at p. 676; see also *People v. Stitely, supra,* 35 Cal.4th at pp. 554-555; *People v. Geier* (2007) 41 Cal.4th 555,

---

[31] The Attorney General argues that defendant has forfeited his claim of error because he neither objected to, nor sought modification of, CALJIC No. 10.00 in the trial court. We will address his claim despite the apparent forfeiture. (§ 1259 [an appellate court may review an instruction, even in the absence of an objection below, if the defendant's substantial rights were affected]; *People v. Rundle, supra,* 43 Cal.4th at pp. 151-152 [concluding that the defendant's failure to request further definition of the term "sexual intercourse" forfeited his claim on appeal challenging the adequacy of CALJIC No. 10.00, but reaching the merits of the claim nonetheless].)

593.) Defendant argues that *Holt* was wrongly decided, but presents no new arguments calling into question our previous holding. We therefore decline to revisit the issue. Defendant also attempts to distinguish the present matter from *Holt* on the ground that his case involved "just attempted rape." But he fails to explain why this distinction requires a different conclusion. Although the attempt charge required proof of intent to rape, whether the charged crime is rape or attempted rape, the term "sexual intercourse" is commonly understood as vaginal penetration and needs no elaboration. (*People v. Holt, supra*, at p. 676.) Nothing in the record supports defendant's further assertion that, without additional instruction, the jury would have convicted him of attempted rape based on evidence he intended only to put Laurie's breast in his mouth or penetrate any orifice with his finger. (Cf. *People v. Stitely, supra*, 35 Cal.4th at pp. 554-555 [rejecting the defendant's argument that absent a definition of sexual intercourse the jury would have used evidence of anal penetration to convict him of rape-murder].) The court did not err in failing to further define "sexual intercourse."

## H. Comment on Defendant's Postarrest Silence

Defendant asserts the trial court erred in refusing to grant a mistrial after the prosecutor elicited improper testimony that used defendant's invocation of the right to remain silent against him. We disagree.

Officer John Souza testified that when he and his partner interviewed defendant after his arrest, they informed him that they were conducting an investigation involving Laurie and Angie. Defendant indicated he knew the girls. He was then advised pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, and invoked his rights. Souza testified further that he then informed defendant he was under arrest for murder and attempted murder. The prosecutor asked Souza whether he noticed any change in defendant's demeanor after being advised of the

charges. Souza replied, "There was no reaction and no inquiry who he allegedly murdered."

As respondent concedes and the trial court found when defense counsel moved for mistrial, the officer's testimony that defendant failed to react to accusations of murder and attempted murder was an improper reference to defendant's invocation of his right to silence. Under *Doyle v. Ohio* (1976) 426 U.S. 610, a prosecutor is prohibited from using a defendant's postarrest silence following *Miranda* warnings to impeach his testimony at trial. (*Doyle*, at pp. 617-618.) The basis of the rule is that "it is fundamentally unfair, and a deprivation of due process, to promise an arrested person that his silence will not be used against him, and then to breach that promise by using silence to impeach his trial testimony." (*People v. Hughes* (2002) 27 Cal.4th 287, 332.) Applying that rationale, we have concluded that *Doyle* also prohibits a prosecutor from using a defendant's silence against him during direct examination of an interrogating officer, before the defendant testifies in his own behalf. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 118; see also *United States v. Elkins* (1st Cir. 1985) 774 F.2d 530, 538 [officer's testimony that the defendants expressed no surprise when they were placed under arrest and read their *Miranda* rights was improper comment on their right to remain silent].)

Testimony that a defendant has invoked his or her right to silence during an interrogation typically poses the risk that the jury will infer the defendant's guilt from such evidence. (*People v. Lucero* (2000) 23 Cal.4th 692, 714.) Here, however, there was little risk the jurors would draw that impermissible inference because before Officer Souza resumed his testimony, the court admonished them as follows: "[Y]ou may recall that Detective Souza had responded that . . . when [defendant] was advised of the charges involved, not the name of the victims but the charges involved, there was no verbal . . . response by him, the inference being

126

that maybe there should have been had you not already known, right? [¶] And I want to say to you that that evidence of no verbal response is . . . now stricken by the Court, and that any such inference such as the one I mentioned is not to be made. In other words, his silence is appropriate at that point."

The United States Supreme Court has explained that a *Doyle* violation does not occur unless the prosecutor is *permitted* to use a defendant's postarrest silence against him at trial, and an objection and appropriate instruction to the jury ordinarily ensures that the defendant's silence will not be used for an impermissible purpose. (*Greer v. Miller* (1987) 483 U.S. 756, 764-765.) The trial court did not abuse its discretion when it determined that any potential prejudice from Officer Souza's testimony would be cured by its prompt admonition to the jury to disregard the stricken evidence and the inferences adverse to defendant that could be drawn from it. The court thus did not err in denying defendant's motion for mistrial. (See *People v. Lucero, supra*, 23 Cal.4th at pp. 713-714 [trial court did not abuse its discretion by concluding the prejudicial effect arising from the officer's testimony could be cured by directing the jury to disregard it].)

## I. Asserted Prosecutorial Misconduct

Defendant contends the prosecutor committed reversible misconduct during closing argument by mounting an improper attack on the integrity of defense counsel and the defense witnesses.

As a preliminary matter, we agree with respondent that defendant has forfeited his claim of prosecutorial misconduct. To preserve such a claim for appeal, "a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety. [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1201.) The failure to timely object and request an admonition will be excused if doing either would have been futile, or if

127

an admonition would not have cured the harm. (*Ibid*.; *People v. Hill* (1998) 17 Cal.4th 800, 820.) Defendant acknowledges that no objection was made but argues the omission should be excused as futile and because an objection ran the risk of antagonizing the jury. We are not persuaded. Contrary to defendant's assertion, this is not a case like *People v. Hill, supra*, at page 821, in which we excused counsel's failure to continually object to the numerous instances of prosecutorial misconduct. Under the unusual circumstances presented there, we concluded that were counsel to continue to object, he risked further provoking the court's wrath over "meritless objections," which would have been "counterproductive to his client." In contrast, here, at the time of the complained-of remark, counsel had not yet interjected a single objection to the prosecutor's closing argument. Although defendant asserts the court intimated during other portions of the trial that the defense was making frivolous motions, the two instances cited would not have suggested to the jury that the defense was being obstructionistic and they do not excuse defendant from the requirement that he object to the prosecutor's asserted misconduct to preserve his claim for appeal.

Even were we to conclude defendant's claim was properly before us, however, it fails on the merits. "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (*People v. Cole, supra,* 33 Cal.4th at p. 1202; accord, *People v. Redd, supra,* 48 Cal.4th at pp. 733-734.)

128

The complained-of remarks occurred during the prosecutor's discussion of the defense evidence of unconsciousness and mental defect.  The prosecutor argued to the jury that the question was not whether defendant suffered from brain dysfunction or seizures but rather what was in his mind at the time of the crimes. He then stated, "As you were jurors in this case you saw that the case went on for some time with two lawyers representing the defendant, and then as the case progressed there was a third lawyer.  And I'd submit to you that there may be a dramatic effect from your seeing that there's a third lawyer that enters the trial what might seem to you to be at the last minute and bringing with him three witnesses who say that they can see the truth about the defendant where no one else has ever been able to see it before."  Later, in concluding this line of argument, the prosecutor appealed to the jury, "So please, don't get the impression what they've been urging at you was sort of like a dramatic 11th hour discovery. Really what it is, I'd submit to you, [is] an 11th hour packaging of a not uncommon defense by doctors from out of town which are what the defendant had been asking for."

Contrary to defendant's assertion, the quoted language did not amount to a due process violation.  (Cf. *People v. Stewart, supra,* 33 Cal.4th at p. 503 [that the prosecutor occasionally disdainfully glared at the defendant did not establish a pattern of egregious conduct that rendered the defendant's trial fundamentally unfair].)

Nor are we persuaded that the prosecutor committed misconduct under state law.  A prosecutor is not permitted to make false or unsubstantiated accusations that counsel is fabricating a defense or deceiving the jury.  (*People v. Bemore* (2000) 22 Cal.4th 809, 846.)  However, an "argumentative reminder" that defense counsel selected expert witnesses whose opinions were favorable to the defendant's case is not an insinuation of deceit.  (*People v. Arias* (1996)

129

13 Cal.4th 92, 182.)  Defendant asserts that the "unmistakable import" of the challenged remarks was "to imply that the defense had at the last minute procured a third attorney to manufacture a fraudulent mental health defense using doctors from out of town because the attorneys from the public defender's office had been unable, or perhaps unwilling, to produce local expert witnesses willing to bend the truth."  Contrary to defendant's interpretation, the prosecutor's argument did not imply counsel had "hoodwinked" the jury by procuring the favorable opinions of three expert witnesses.  (*People v. Parson* (2008) 44 Cal.4th 332, 363 [the prosecutor did not impugn defense counsel's integrity by commenting on their hiring of a defense mental health expert who gave "offhanded, glib opinions" about the defendant's mental defects].)  The thrust of the prosecutor's argument was to dissuade the jury from being dazzled or impressed by the "dramatic" midtrial arrival of a third defense attorney and the results of his recently retained expert witnesses.  We conclude the complained-of remarks were little more than a reminder to the jury to consider the substance of the experts' testimony rather than the spectacle surrounding its presentation, and thus amounted to fair comment on the defense mental-state evidence.  (*People v. Stanley* (2006) 39 Cal.4th 913, 951-952 [a prosecutor's argument may be vigorous so long as it constitutes "fair comment on the evidence"].)

As for defendant's assertion that the prosecutor's remarks were an improper personal attack on the integrity of the defense *experts*, our decisions make clear that "harsh and colorful attacks on the credibility of opposing witnesses are permissible.  [Citations.]"  (*People v. Arias, supra*, 13 Cal.4th at p. 162 [prosecutor's argument that the defense expert "stretched" a principle "for a buck" was a permissible comment suggesting a paid witness may be biased]; *People v. Cook* (2006) 39 Cal.4th 566, 613 [applying similar reasoning to reject the assertion that the prosecutor's comment on fees paid to an expert witness who " 'comes up

130

with something that excuses this man's responsibility' " improperly implied that the witness gave false evidence for a fee].)  No misconduct appears on this record.

### J.  Sanity Phase Claims

#### 1.  *Allowing defendant to enter insanity plea against counsel's advice*

Defendant asserts the court erred in allowing him to plead not guilty by reason of insanity over defense counsel's objection.  We disagree and find to the contrary that the court properly permitted defendant to enter a plea notwithstanding defense counsel's advice not to do so.

#### a.  *Background*

At a pretrial hearing in May 1993, approximately three months before the guilt phase commenced, defense counsel informed the court that defendant desired to add a plea of not guilty by reason of insanity (NGI) to his existing plea of not guilty.  Counsel acknowledged that she had advised him against it.

The following month, in June 1993, the court conducted an in camera hearing concerning defendant's request to plead NGI.  Counsel reiterated her view that an NGI plea was contrary to defendant's best interests and reported that the defense had no evidence to present at a sanity hearing.  The court noted counsel's assessment that there was no basis for such a plea, and remarked that defendant "appears to be pretty normal."  Nonetheless, after advising defendant of the consequences of an NGI plea and ascertaining his wishes, the court permitted him to enter such a plea.  Defendant clarified, "I'm not saying I'm insane now, I'm talking about as far as the time of the crime . . . ."

#### b.  *Discussion*

With certain exceptions not relevant here, section 1018 provides that "every plea shall be entered or withdrawn by the defendant himself or herself in open court."  The statute codifies the general rule requiring courts and counsel " 'to

131

respect the defendant's personal choice on the most "fundamental" decisions in a criminal case.' " (*People v. Bloom* (1989) 48 Cal.3d 1194, 1221.) This court has recognized that the decision to enter or withdraw a plea of not guilty by reason of insanity is one for the defendant, not counsel, to make even if doing so may be tactically unwise. *People v. Gauze* (1975) 15 Cal.3d 709, held that neither the court nor counsel may override a defendant's decision to plead not guilty by reason of insanity when such a decision is made freely and voluntarily and with knowledge of the consequences. (*Id.* at pp. 717-1718.) Similarly, *People v. Medina, supra,* 51 Cal.3d 870, held that a defendant cannot be compelled by counsel to forego such a plea because counsel opposes it on tactical grounds. (*Id.* at p. 900; see also *People v. Henning* (2009) 178 Cal.App.4th 388, 396-398 [the court erred in refusing to allow the defendant to plead NGI over defense counsel's objection]; *People v. Clemons* (2008) 160 Cal.App.4th 1243, 1251-1253 [same].)

In the present case, defendant was advised repeatedly by counsel and the court regarding the adverse consequences of pleading NGI but he unequivocally expressed his desire to pursue such a plea nonetheless. Further, as the court observed, defendant "appear[ed] to be pretty normal" and he articulated a proper understanding of the sanity issue when he clarified he was claiming insanity "as far as the time of the crime," and not that he was presently insane.[32] The record

---

[32] To establish the defense of NGI, a defendant must prove "by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." (§ 25, subd. (b); *People v. Lawley* (2002) 27 Cal.4th 102, 170 ["Despite the use of the conjunctive 'and' instead of *M'Naghten's* disjunctive 'or,' this court has interpreted the statute as recognizing two distinct and independent bases on which a verdict of [NGI] might be returned"].)

demonstrates that defendant freely, voluntarily, and with knowledge of its consequences chose to enter a plea of NGI despite counsel's disagreement. The court did not err in permitting him to do so.

Defendant acknowledges the decisions in *Gauze* and *Medina*. He argues, however, that his case falls outside the general rule because at the time he was allowed to plead NGI, there was no evidence supporting such a defense. As defendant points out, counsel informed the court that none of the defense experts who had examined him concluded he had a viable insanity defense. Defendant urges this court to hold that a defendant has no fundamental right to plead NGI when there is no credible evidence supporting such a plea, relying upon *People v. Frierson* (1985) 39 Cal.3d 803, which left open the question "whether a defendant has a constitutional right to insist on the presentation of a defense which has no credible evidentiary support . . . ." (*Id.* at p. 815, fn. 3.)

We need not decide this issue because we disagree with defendant that such evidence was lacking in his case. Although counsel represented to the court that none of the defense experts found defendant had a viable sanity defense, she also acknowledged that all but one of them evaluated defendant for a purpose other than his sanity at the time of the crimes. Further, in support of evidence for such a plea, the reports of the defense experts undoubtedly cataloged defendant's history of numerous admissions to psychiatric facilities as well as his claimed loss of memory of the events surrounding the crimes. In *People v. Clemons, supra*, 160 Cal.App.4th 1243, the Court of Appeal articulated similar reasoning in rejecting respondent's argument that counsel need not have acquiesced to the defendant's request to plead NGI because there was assertedly no evidence supporting such a plea. (*Id.* at pp. 1252-1253.) On this record, notwithstanding counsel's representation at the time defendant wished to plead NGI, as in *Clemons*, we are

133

"not convinced that the NGI defense was necessarily a 'futile line of defense' "
(*id*. at p. 1253) lacking supportive evidence.

### 2. *Denial of motions to impanel a new jury and to question jurors about exposure to media coverage*

Defendant argues that the sanity and penalty verdicts cannot stand because the court erroneously denied defense motions to impanel a new jury to decide the issues of sanity and penalty or, alternately, to question the jurors regarding their possible exposure to "inflammatory media coverage" during the guilt phase. As we shall explain, the court's rulings were proper.

The record discloses the following relevant facts. The jury announced its guilty verdicts on January 4, 1994. After ordering the verdicts entered by the clerk, the court directed the jurors to return to court the following week for trial on defendant's plea of not guilty by reason of insanity. Before adjourning, the court admonished the jurors not to discuss the matter among themselves or anyone else or to form or express any opinion. It then instructed, "There will be probably a fair amount of publicity concerning your verdicts. I will specifically order you not to read anything about this case in the newspaper. If you're watching your favorite news program at night and this matter comes on, I just ask you to leave the room during that particular time. No doubt there will be some commenting about the case and that's really not for your ears at this time, please."

Three days later, on January 7, 1994, defense counsel expressed to the court her grave doubts that defendant could receive a fair trial in the sanity and penalty phases. According to counsel, it "was the worst time in the world for a case like this to be tried" because of the near-daily barrage of newspaper articles on the Polly Klaas and Kimber Reynolds murders and coverage of the statewide and local efforts to enact the "Three Strikes" sentencing law. Counsel moved the court to impanel a new jury "that hasn't been biased and prejudiced by the unfortunate

134

incident to Polly Klaas, for one thing." In counsel's view, if the jurors were questioned that day "there would be a significant number of them . . . who have decided what the penalty is without hearing the evidence, because it's a sign of the times and the climate . . . ." In support of the motion for a new jury, counsel lodged with the court four then-recent newspaper articles from the Fresno Bee. [33] One was a lengthy article published the same day as the verdicts, headlined, "The Killers," which reported on Fresno's record homicide rate. Another was an article covering the verdicts in defendant's case, which included a photograph of Laurie's mother and aunt celebrating the verdicts by dancing at her gravesite.

The court denied the motion. It empathized with counsel's concern about some of the publicity generated by defendant's case, characterizing as "macabre" the media coverage of family members dancing at the victim's gravesite. But the court discerned no evidence suggesting the jurors could not be fair and impartial with regard to the remaining issues in the case or that they were influenced by the anticrime climate.

Counsel then requested, in the alternative, that the court "poll" the jurors "to see if anyone has already decided what the verdict is going to be in the other two

---

[33] One of the articles lodged by the defense reported that the fathers of three young murder victims had been in Sacramento the previous day to push for a variety of anticrime measures. The report mentioned that Marc Klaas's 12-year-old daughter Polly was "kidnapped and murdered three months ago by a paroled felon" and that Kimber Reynolds, the 18-year old daughter of Mike Reynolds, "was slain by a paroled felon in June 1992 as she was coming out of a Fresno restaurant." (*Anti-Crime Measures Dominate Capitol*, Fresno Bee (Jan. 5, 1994) p. A1, cols. 2-3.) The three other newspaper articles marked for identification as defense exhibit No. 1 were *The Killers*, Fresno Bee (Jan. 4, 1994) pages A1, A6-A7; *Clark guilty of murdering girl, 14*, Fresno Bee (Jan. 5, 1994) pages B1, B3; and *3-strikes a step closer to June vote*, Fresno Bee (Jan. 7, 1994) page A1.

phases." The court denied that motion as well, finding no reason to question the jury again on that subject.

As a preliminary matter, we disagree with respondent that defendant's challenge to the court's refusal to question the jurors is not preserved for appeal. The defense moved for a new jury to decide sanity and penalty on the ground that defendant could not receive a fair trial given the media-fueled anticrime climate that pervaded the community during the guilt phase. After the court denied that motion, counsel immediately asked the court to question the jurors to determine whether they had predetermined views on sanity and penalty. Counsel described the requested inquiry as whether "anyone has already decided" the penalty verdict. But there can be no question that counsel's doubts regarding the jury's impartiality arose from the same concerns underlying the motion for a new jury, that is, the possibility that the jury had been influenced by frequent media accounts of murder cases that bore similarities to defendant's case and coverage of the push for passage of Three Strikes. On this record, we conclude the court understood that the defense motion to question the jurors included a request to inquire into their exposure to such coverage. (*People v. Scott* (1978) 21 Cal.3d 284, 290 ["In a criminal case, the objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented"].)

Although defendant's claims are properly before us, they fail on the merits. Section 190.2, subdivision (c), provides that, absent good cause, the same jury decides guilt and penalty at a capital trial. " 'Good cause to discharge the guilt phase jury and to impanel a new one must be based on facts that appear " ' "in the record as a demonstrable reality," ' " showing the jury's " ' "inability to perform" ' " its function.' [Citations.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1281; accord, *People v. Bennett* (2009) 45 Cal.4th 577, 599.) The same good cause showing is required for reopening voir dire of seated jurors. (*People v.*

136

*Bradford* (1997) 15 Cal.4th 1229, 1354.) "Mere speculation" does not establish good cause to reopen voir dire or impanel a new jury. (*Ibid.*; *People v. Hart* (1999) 20 Cal.4th 546, 639; *People v. Fauber* (1992) 2 Cal.4th 792, 846 ["Voir dire is not to be reopened on speculation that good cause to impanel a new jury may thereby be discovered; rather, a showing of good cause is a prerequisite to reopening"].) On appeal, we review for abuse of discretion a trial court's decision not to impanel a second jury or to reopen voir dire of seated jurors. (*People v. Bradford, supra*, at p. 1353.)

This court has considered and rejected similar challenges to a trial judge's refusal to impanel a new jury or question jurors about midtrial exposure to newspaper articles. Our decision in *People v. Gates* (1987) 43 Cal.3d 1168 (*Gates*), is particularly instructive. In *Gates*, as here, the defense moved for a new jury after the jury rendered its guilt phase verdicts. When the court denied that motion, the defense asked that it reopen voir dire. In support of both motions, counsel argued that during the guilt phase there had been prejudicial publicity relating to other crimes and criticism of the criminal justice system generally. (*Id.* at p. 1198.) We concluded that the court had no duty to question the jurors because the publicity at issue presented no cause for concern and the defendant's attempt to show otherwise was entirely speculative. (*Id.* at p. 1199; see also *People v. Marshall* (1996) 13 Cal.4th 799, 864 [the court did not err in failing to question jurors about their possible exposure to an article about the case that appeared after the guilt phase verdicts when, but for defense counsel's supposition, nothing in the record indicated any juror read the article]; *People v. Lanphear* (1980) 26 Cal.3d 814, 835-836 [absent evidence that any juror failed to heed the court's directives not to read newspapers, there was no error in the court's refusal to question jurors about their possible exposure to a midtrial article on the case].) Likewise here, the defense request to impanel a new jury or

137

question the jurors regarding adverse midtrial publicity was based on pure speculation. There was no showing of good cause.

Defendant argues that *Gates* is distinguishable because he asked to "poll" the jurors, not to "re-voir dire" them. (*Gates, supra*, 43 Cal.3d at pp. 1198-1199.) Specifically, counsel requested that the jurors be "polled" for the limited purpose of determining whether any of them had become prejudiced by the midtrial media coverage of other murder cases, the push for the Three Strikes sentencing law, and the postverdict article about defendant's case. We see no distinction between the two requests. Regardless of terminology, counsel's purpose in each case was the same—to show that, due to media exposure, the guilt phase jurors were no longer impartial and unbiased and thus could not fairly decide penalty. (See also *People v. Hart, supra,* 20 Cal.4th at pp. 639-640.) In *Gates*, as here, counsel's showing was "entirely speculative" and thus failed to establish good cause. (*Gates, supra,* at p. 1199.) Contrary to defendant's assertion, the present case is indistinguishable from *Gates* and warrants a similar outcome.

Defendant further argues that under the analytical framework used in the federal appellate courts, the trial court had an affirmative duty to question jurors to determine whether they had been exposed to adverse midtrial publicity. This court is not bound by decisions of the lower federal courts. (*People v. Gray, supra,* 37 Cal.4th at p. 226.) Even were we inclined to adopt their approach, however, we conclude it does not assist defendant. The decision in *United States v. Aragon* (5th Cir. 1992) 962 F.2d 439 is illustrative. *Aragon* explains that the determination whether voir dire is required due to midtrial publicity raising " 'serious questions of possible prejudice' " is a two-part inquiry focusing on (1) the nature of the news material and (2) the probability that the material has in fact reached the jury. (*Id.* at p. 443, see also *id*. at pp. 443-444.) The court of appeals found the news material in that case inherently prejudicial because it referred to the defendant's

138

prior convictions and his connection to a notorious crime family, information that was not part of the evidence presented at trial. (*Id*. at pp. 444-445.) In the present case, by contrast, the news coverage referred to by counsel that prompted the defense request for jury questioning did not contain anything innately prejudicial to defendant. Indeed, the only news item that concerned defendant in any respect was the article reporting that the victim's family members danced at her gravesite after the guilty verdicts. (See *United States v. Crowell* (4th Cir. 1978) 586 F.2d 1020, 1024 [prejudicial publicity is information about the defendant that would not be admissible at trial or was not in fact adduced at trial].) Because the complained-of media coverage disclosed no information concerning *defendant* that had not been adduced at trial, none of the federal decisions he cites advances his argument that the court erred by refusing to inquire into possible prejudice. (See, e.g., *Mares v. United States* (10th Cir. 1967) 383 F.2d 805, 807-808 [midtrial article concerning a confession that had been excluded from trial]; *United States v. Thompson* (10th Cir. 1990) 908 F.2d 648, 649 [midtrial news report concerning the defendant's previous agreement to plead guilty]; *Silverthorne v. United States* (9th Cir. 1968) 400 F.2d 627, 641-642 [midtrial news article declaring the defendant's defense strategy a failure].)

Defendant argues that the record establishes as a "demonstrable reality" that the unrelenting, adverse midtrial publicity so tainted the jury that it no longer could be fair. The record fails to support that assertion, however. As previously discussed *ante*, in part II.G.1., the court's admonitions at the outset of the guilt phase adequately conveyed to the jurors that they were not to read or be influenced by media coverage. The court was even more explicit in this regard when

admonishing the jury subsequent to its guilty verdicts.**34**  There is nothing in the record to suggest that any juror disregarded the court's directive and no facts establishing good cause to impanel a new jury or question the existing jurors.

### 3. *Refusal to conduct further inquiry and preserve evidence of possible juror misconduct*

Defendant contends the court erred by failing to make an adequate inquiry into possible juror misconduct at the sanity phase, and by refusing to preserve evidence of such misconduct, after learning from defense counsel that a juror might have prejudged the sanity issue.

The defense made its opening statement at the sanity phase first, followed by brief opening remarks by the prosecution.  A short recess followed.  Just before the jury was called back into the courtroom for the testimony of the first defense witness, Dr. Berg, defense counsel alerted the court that a juror notebook had been left open on a chair.  When the court remarked that it hoped "no counsel is over there trying to read it," counsel assured the court that "no counsel has, but it came to our attention something that's written in there [that] we want to bring up later."  After the defense expert's testimony, and again outside the jury's presence,

---

**34**　　We therefore find no merit to defendant's related claim that the sanity verdict must be reversed because the court failed to comply adequately with the statutory requirements of section 1122 prior to commencement of the sanity phase. Defendant's claim is largely repetitive of his complaint concerning the adequacy of the court's guilt phase admonitions regarding exposure to media coverage.  We concluded *ante*, in part II.G.1., that the court's admonitions sufficed.  Defendant's challenge to the adequacy of the court's sanity phase admonishments has even less force.  Given the court's explicit postguilt verdict directive to avoid articles and broadcasts about the case, and in the absence of affirmative evidence to the contrary, we reject as speculative and unfounded defendant's assertion that it was "more likely than not that jurors understood the prohibition to apply to news coverage and commentary regarding the verdicts, but not future media coverage of other aspects of the case."

140

defense counsel indicated to the court that while walking in the courtroom after opening remarks he had inadvertently observed a notation on the open page in Juror S.S.'s notebook assertedly showing that she had prejudged sanity. According to counsel, the entry said something to the effect of "Was he aware of his crimes?" and "Yes." Pointing out that the notation was made before the presentation of any sanity phase evidence, counsel requested the court examine the notebook and, if necessary, question the juror. Counsel argued that the notation underscored defense concerns that defendant could not receive a fair sanity and/or penalty trial because of the pervasive anticrime climate that had arisen during the guilt phase trial. In the court's view, deriving meaning from the alleged notation was pure speculation. But it took the matter under submission so that the parties could brief the issues.

When the court revisited the matter the following morning, counsel added a motion for mistrial to its earlier requests to preserve the notebook page and question Juror S.S. Although the court found it had no duty of inquiry because the showing of possible jury misconduct was unduly speculative, it decided to question Juror S.S. nonetheless. The following exchange then occurred.

> The Court: "With regard to this insanity phase, do you feel you have a completely open mind on that and you'll listen to both sides and decide based on the evidence?
>
> Juror S.S.: "Yes.
>
> The Court: "Okay. In other words, I just wanted to make sure. Do you feel you would have — that your mind would be closed because of something you've already heard, in other words, or do you feel when it comes to this phase you would have an open mind?

141

Juror S.S.: "Well, I think in trying not to think about it, like you said, not to when I came back, in not thinking about it at home, which you said not to think about it at home, so I didn't think about it at home.

The Court: "Good.

Juror S.S.: "And when I came back in here and we have to start fresh, I don't think it's a terribly easy thing to do to make a separation. I think I've had to make a conscious decision to make it separate.

The Court: "Good for you. [¶] Right. And if we should get to the third phase — and I'm not saying we will because maybe this phase will end it all. If we get to the third phase, I think you would make that same conscious effort to have a totally open mind. Is that correct?

Juror S.S.: "Uh-huh.

The Court: "Good. And so if you were seated, say, in a position of the defendant here and all, you didn't want to win necessarily, but you wanted a fair trial, would people of your state of mind give him a fair trial?

Juror S.S.: "Yes."

After the questioning ended and Juror S.S. left the courtroom, counsel expressed dissatisfaction with the inquiry and renewed the motion for mistrial. The court denied the motion, finding "no reason whatsoever" to suspect that defendant's jury was other than fair and impartial. It also denied the renewed request to copy and preserve the relevant page of the juror's notebook. The court indicated that it had assumed the accuracy of counsel's description of what he saw,

142

but found counsel's understanding of its meaning "very speculative." In the court's view, the notation was "most probably" a summation of the prosecutor's opening remarks.

Defendant asserts he was denied his rights to a fair trial and an impartial jury by the court's failure to more thoroughly question Juror S.S. before it denied the defense motion for mistrial based on juror misconduct. We disagree, as explained below. Assuming for argument that the circumstances presented here triggered a duty of inquiry (*People v. Hayes* (1999) 21 Cal.4th 1211, 1255), we conclude that the court's questioning was sufficient.

A juror's prejudgment of the case without hearing the evidence constitutes good cause to doubt his or her ability to perform the juror's duty and justifies discharge from the jury. (§ 1089; *People v. Avila* (2006) 38 Cal.4th 491, 603; *People v. Nesler* (1997) 16 Cal.4th 561, 583.) When a court has been put on notice that there may be good cause to discharge a juror, it "must conduct a sufficient inquiry to determine facts alleged as juror misconduct." (*People v. Davis, supra,* 10 Cal.4th at p. 547.) The trial judge is afforded broad discretion in deciding whether and how to conduct an inquiry to determine whether a juror should be discharged. (*People v. Cleveland* (2001) 25 Cal.4th 466, 442; *People v. Beeler* (1995) 9 Cal.4th 953, 989.) Our assessment of the adequacy of a court's inquiry into juror misconduct is deferential: We have long recognized that, except when bias is apparent from the record, the trial judge is in the best position to assess the juror's state of mind during questioning. (*People v. McPeters*, *supra*, 2 Cal.4th at p. 1175.) Given the court's firsthand observations of the juror's responses to its questions and the highly speculative nature of counsel's assertion that Juror S.S. may have prejudged the sanity issue, we conclude that the scope of questioning into the possibility of juror misconduct in this case fell well within the proper exercise of the court's discretion. No further inquiry was required.

143

Nor did the court err by refusing defense counsel's request to preserve the page from Juror S.S.'s notebook. Defendant likens the court's refusal to include this document in the trial record to the improper destruction of material, exculpatory evidence. (See *California v. Trombetta* (1984) 467 U.S. 479, 488-489.) Assuming for argument's sake that the due process principles established in *Trombetta* and its progeny are applicable here, they do not assist defendant. The duty imposed on the state to preserve evidence is limited to evidence that is, among other characteristics, "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id*. at p. 489.) Here, in denying the defense motion for mistrial based on juror misconduct, the trial court indicated it had assumed the accuracy of what counsel reported he had seen, that is, notations to the effect of "Was he aware of his crimes?" and "Yes." Defendant fails to explain why *defense counsel's* report of his observations, which the court accepted as an accurate reflection of the juror's notation, was not comparable to the evidence of the page itself. The "destruction" of the latter did not violate due process principles.[35]

### 4. Comment on defendant's refusal to submit to court-ordered mental examination

Defendant contends the court erred when it granted the prosecution's post-guilt phase request to allow its expert to evaluate him for purposes of sanity and then permitted the expert to testify that he refused to submit to such an examination. We concluded *ante*, in part II.E., that defendant had forfeited his

---

[35] We have never had occasion to consider whether juror notes are discoverable. This case does not require us to decide that question because the trial court assumed the accuracy of counsel's observation of the notation. We express no view on when, if ever, a juror's personal notes may be discoverable.

claim of error by failing to object when the court ordered him to submit to mental examination by three prosecution experts for purposes of guilt phase rebuttal and by admitting testimony of defendant's refusal to be interviewed by one of the experts, Dr. Missett. Similarly here, defendant has forfeited his claim by failing to challenge the court's second order to submit to examination by Dr. Missett and the expert's testimony below. But even were we to reach the merits of defendant's claim and assume that error occurred under the reasoning of *Verdin, supra,* 43 Cal.4th 1096, we would conclude that these errors were harmless.

In connection with defendant's entry of a plea of not guilty by reason of insanity, the court appointed three mental health experts to examine him and prepare reports. (§§ 1026, subd. (a), 1027, subd. (a).) Two of the appointed experts, Mark Brooks, Ph.D., and Richard King, Ph.D., evaluated defendant. Dr. Brooks testified for the prosecution at the sanity phase of the trial.

After the guilt phase but prior to the start of the sanity phase of trial, the court granted the prosecutor's request for an order allowing Dr. Missett to examine defendant, which the prosecutor characterized as being "in the nature of a [section] 1026 examination." Defense counsel informed the court that defendant did not wish to be interviewed, which the court duly noted.

The prosecutor announced during his brief opening statement to the jury in the sanity phase that the evidence would show "again the defendant has refused to be examined by Dr. Missett." Dr. Missett confirmed during his testimony that he requested an opportunity to personally examine defendant but was informed that defendant refused to meet with him.

The issue whether a court properly could order a defendant to submit to a mental examination by a prosecution expert for use at the *sanity* phase as opposed to the guilt phase of trial has not been decided by this court. (*Verdin, supra,* 43 Cal.4th at p. 1107, fn. 4 [leaving open the question whether a statutory basis for a

145

court's mental examination order might exist in cases involving a plea of not guilty by reason of insanity].)

We need not address here this issue left open in *Verdin*, however. Here, the record strongly suggests the prosecutor's motion for a court order requiring defendant to submit to evaluation by Dr. Missett was *not* a request for appointment of a third expert pursuant to section 1027. (See § 1027, subd. (a) [after entry of a plea of not guilty by reason of insanity, the court must select and appoint two, and may appoint three, qualified experts to examine the defendant and testify at the sanity trial, if summoned].) Notably, the record shows that at the time of the prosecutor's request, the court already had appointed three experts to examine defendant, one of whom ultimately testified for the prosecution at the sanity trial. Given the prosecutor's opening remarks to the jury, in which he emphasized that "*again* the defendant has refused to be examined by Dr. Missett," it can be inferred that the postguilty verdict, presanity phase request at issue here was simply a renewal of his earlier, guilt phase motion for a court-ordered mental examination by prosecution experts. Although the prosecutor framed the request for Dr. Missett to interview defendant "in the nature of a [section] 1026 examination," that characterization is not controlling. The question we declined to address in *Verdin* is not squarely presented here.

Even assuming the court was not authorized to order defendant to submit to mental examination by Dr. Missett and to permit Dr. Missett to testify at the sanity phase concerning defendant's refusal to do so, these errors were harmless. As with Dr. Missett's testimony at the guilt phase, nothing in the record affirmatively indicates that he found any significance in defendant's refusal to submit to an examination. In addition, Dr. Missett's testimony was essentially the same as that of Dr. Brooks, the court-appointed expert who had examined defendant pursuant to section 1027, subdivision (a). Both experts found no basis on which to

146

conclude defendant was either unconscious or in a psychotic state at the time of the crimes, and each expressed the opinion that defendant was aware of the nature of his acts and appreciated the wrongfulness of his conduct. Indeed, because Dr. Brooks was appointed by the court and had personally examined defendant, his testimony arguably was much more damaging than that of Dr. Missett. On this record, there is no reasonable probability that the outcome of the sanity phase would have been more favorable to defendant had the court not granted the prosecution's request for an order requiring defendant to submit to a mental examination by Dr. Missett.

### 5. *Definition of "mental illness"*

During discussion concerning jury instructions at the sanity phase, defense counsel requested that the court clarify the standard instruction on insanity by instructing that "[t]he terms 'mental disease' and 'mental defect' include all mental conditions which produce the requisite effects." The court denied the request, finding such clarification unnecessary. The jury was ultimately instructed in relevant part that it "may consider evidence of [defendant's] mental condition before, during and after the time of the commission of the crime as tending to show the defendant's mental condition at the time the crime was committed. [¶] Mental illness or mental abnormality, in whatever form either may appear, are not necessarily the same as legal insanity. A person may be mentally ill or mentally abnormal and yet not be legally insane. [¶] A person is legally insane when by reason of mental disease or mental defect he was incapable of knowing or understanding the nature and quality of . . . his acts, or incapable of distinguishing right from wrong at the time of the commission of the crime." (See CALJIC No. 4.00.)

Defendant asserts that the court erred in refusing the special instruction because absent such clarification the jury would not have understood that a constellation of his mental problems, which included momentary rage, seizures, memory blackouts, and brain dysfunction, could combine to produce temporary insanity at the time of the killing. The omission was significant, he explains, because a defendant with an "antisocial personality" is not entitled to an insanity verdict if the only evidence of his mental illness is a series of criminal acts comprising such a diagnosis. (*People v. Fields* (1983) 35 Cal.3d 329, 368-370.)

Contrary to defendant's assertion, the instructions as a whole adequately conveyed to the jury that a "mental illness" included conditions and acts other than those establishing antisocial personality disorder. The instructions placed no limitation on the definition of mental illness. Rather, the jury was told it "may consider evidence of [defendant's] mental condition before, during and after the time of the commission of the crime as tending to show the defendant's mental condition at the time the crime was committed." A reasonable juror would have understood from this instruction that he or she could consider the totality of the evidence presented by the defense expert, Dr. Berg, who described defendant's head injury and resulting brain dysfunction and his history of rage reactions, memory lapses, and seizures. We thus agree with the trial court that it was unnecessary to further explain to the jury that mental illness includes "all mental conditions" leading to a state of insanity. Although the court in *People v. Medina, supra*, 51 Cal.3d 870, would have preferred an instruction that " 'mental illness' includes all mental conditions which produce the requisite effects" (*id*. at p. 901), it did not *require* such clarifying language, at least when there has been no showing of juror confusion. (See *People v. Kelly* (1992) 1 Cal.4th 495, 535-536 [the trial court had no duty to revise CALJIC No. 4.00 to expressly permit jurors

to consider the combined effects of a mental disease and a mental defect in determining sanity].)

Relying on this court's decision in *People v. Gurule* (2002) 28 Cal.4th 557, defendant further argues he was entitled to the requested instruction because it pinpointed his theory of insanity. "A criminal defendant has the right to instructions that pinpoint the theory of the defense case." (*Id*. at p. 660.) The court properly may refuse a proposed instruction, however, when the point is covered in another instruction. (*Ibid*.) As explained above, the court's instructions adequately informed the jury that it could consider the totality of defendant's mental defects and disorders in deciding whether he was insane when he committed the crimes. The requested instruction was unnecessary.

### 6. *"Irresistible impulse"*

Prior to the start of the sanity trial, defense counsel objected to several of the proposed sanity phase instructions, including CALJIC No. 4.05 on "irresistible impulse." As given, CALJIC No. 4.05 explained, "If a person is legally sane, then it is not a defense that he committed the act of which he is accused because of an uncontrollable or irresistible impulse." Counsel renewed the objection after the presentation of the defense case, arguing that CALJIC No. 4.05 was unwarranted because the defense expert testified explicitly that, at the time of the crimes, defendant suffered not an irresistible impulse, but rather an uncontrollable rage reaction that rendered him unable to know right from wrong. Counsel further argued that the instruction was prejudicial because it would effectively remove the defense theory of insanity. The court acknowledged that the instruction was not favorable to the defense but found it justified by evidence from which it could be inferred that defendant's rage reaction led to an irresistible impulse.

149

Defendant argues that the court erred in instructing with CALJIC No. 4.05. Specifically, he asserts that, assuming some jurors would have understood the defense expert's testimony to mean defendant was acting under an irresistible impulse, the instruction effectively told them that such evidence was irrelevant to the question of whether he understood the nature and quality of his acts or knew right from wrong, and thus precluded a defense of insanity.

We reject defendant's claim that the court erred in instructing on "irresistible impulse." CALJIC No. 4.05 reflects California's long-settled rule that an insanity defense is unavailable to a defendant who "knows the nature of his act fully but is unable to prevent it, . . . which is sometimes known as uncontrollable or irresistible impulse." (*People v. Walter* (1936) 7 Cal.2d 438, 440; see 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 18, pp. 349-350.) Notably, the instruction is prefaced with the phrase, "[i]f a person is *legally sane,*" (CALJIC No. 4.05, italics added) and it was given in conjunction with CALJIC No. 4.00, which provided the definition of insanity. Contrary to defendant's assertion, CALJIC No. 4.05 did not suggest to the jury that it should reject his insanity defense on the ground of irresistible impulse even if it found that his uncontrollable rage reaction led to unconsciousness and a partial seizure that rendered him temporarily incapable of appreciating the nature of his acts or distinguishing between right and wrong. By its terms, the irresistible impulse instruction did not apply if the jury found defendant met the definition of insanity. (See also *People v. Coddington* (2000) 23 Cal.4th 529, 603 [irresistible impulse instruction would not have precluded jury from considering evidence suggesting the defendant did not know his acts were wrong].)

## K. Claims Arising During the Hiatus Between the Sanity and Penalty Phases

### *1. Reassignment of lead counsel after resolution of conflict of interest*

Defendant contends the court erred in allowing Deputy Public Defender O'Neill to resume representation after having properly discharged the Fresno County Public Defender for a conflict of interest. Specifically, he argues that the declaration of a conflict, coupled with evidence in the record and the posture of trial, were sufficient as a matter of law to establish that representation by the public defender would compromise defendant's right to conflict-free counsel. To succeed on such a claim, defendant must show the existence of an actual or potential conflict "that adversely affected counsel's performance." (*People v. Lawley, supra,* 27 Cal.4th at p. 146; *People v. Roldan, supra,* 35 Cal.4th at p. 674.) Because neither O'Neill nor any other deputy public defender actively represented defendant while the conflict was pending, defendant fails to show an actual conflict of interest.

The record discloses the following. On January 20, 1994, the jury returned verdicts finding defendant sane at the time he committed the crimes. Thereafter, the court conducted a hearing concerning the prosecution's notice of factors in aggravation. (§ 190.3.) The prosecutor indicated he intended to present evidence at the penalty phase that on October 15, 1992, while awaiting trial in this case, defendant assaulted another inmate in the Fresno County Jail. O'Neill immediately informed the court that her office would declare a conflict of interest if the victim of the assault, Anthony James Scott, were called to testify because Martinez, defendant's other deputy public defender, had represented Scott in a criminal matter that resulted in a conviction. The court determined that O'Neill and Martinez would have an actual conflict requiring their withdrawal from the case if the prosecutor presented *any* evidence relating to the October 15

151

altercation.  At the court's urging, the prosecutor indicated he would not present such evidence.

Four days later, on January 24, 1994, the public defender formally declared a conflict of interest.  At a hearing attended by O'Neill's supervising attorney, Charles Dreiling, the court asked about the nature of the conflict, but Dreiling declined to disclose any information.  At the conclusion of the hearing, the court held Dreiling in contempt for refusing to divulge the requested information.  It also discharged the deputy public defenders from the case and designated independent counsel Kinney as lead counsel.  Later that same day, the prosecutor filed a written motion asking the court to reconsider its order discharging O'Neill and Martinez.  The prosecutor argued that relieving the public defender as counsel of record effectively mooted the contempt and conflict issues, and urged the court to order the public defender's continued representation of defendant.  The court agreed and, with no objection by Kinney, reinstated the public defender as counsel of record.

The conflict of interest remained a live issue for the next two months.  At a court hearing on January 31, 1994, after Dreiling disclosed the reasons for the declaration of a conflict, the court declined to vacate its order reinstating the public defender, finding there was no conflict of interest because defendant had no right to use such confidential information in his own behalf.  The court ordered Dreiling to direct O'Neill and Martinez to resume active representation of defendant, but Dreiling refused to do so.  The court again held Dreiling in contempt.

The Fifth District Court of Appeal subsequently denied Dreiling's petitions for writ of habeas corpus, concluding in relevant part that the court did not abuse its discretion in finding that no conflict of interest existed on the record then before it.  (*In re Dreiling*  (Mar. 21, 1994, F021011, F021025) [nonpub. opn.].)

152

When the parties returned to court on March 25, 1994, the prosecutor confirmed that he would not present any evidence regarding the October 15 jail incident, and the court ruled that the defense could argue its penalty phase case as if the incident had never occurred. A supervising attorney from the public defender's office assured the court that, because a conflict no longer existed, O'Neill would "proceed forthwith to represent [defendant] in this matter."

Martinez resumed her role as cocounsel on April 15, 1994. At a hearing on that date to determine a realistic trial date for the penalty phase, O'Neill explained that although she had been preparing for trial since resuming her representation of defendant three weeks earlier, neither she nor Martinez had performed any work on the case while the conflict of interest issue was pending.

The record leaves no doubt that although the order relieving the public defender as counsel of record was vacated on January 27, 1994, no deputy public defender took any action on defendant's behalf until March 25, after the conflict of interest had been resolved in the Court of Appeal and O'Neill had resumed active representation. Contrary to defendant's argument, the January 27 order reinstating the public defender as counsel of record did not deprive him of his right to the assistance of counsel unaffected by a conflict of interest. "[U]ntil a defendant shows that his counsel *actively* represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." (*Cuyler v. Sullivan, supra,* 446 U.S. 335, 350, italics added.)

### 2. Denial of requests for substitution of counsel and new jury

During the hearing on March 25, 1994, after O'Neill had resumed her role as lead counsel in the case with Kinney as second counsel, defendant asked the court for new attorneys and a new jury. At the *Marsden* hearing, defendant explained that he felt his deputy public defenders had abandoned him. He also complained

153

that Kinney could not provide effective assistance because he had joined the defense team in the middle of the guilt phase, adding that the now two-month recess required a new jury.

After soliciting comment from Kinney, the court denied defendant's requests. The court disagreed with defendant that the deputy public defenders had abandoned him, explaining that attorneys have an obligation to declare a conflict if they believe one exists. The court also found no basis for discharging Kinney, noting that Kinney would be able to review complete transcripts of anything he missed at the beginning of the guilt phase. As for the request for a new jury, the court remarked that the conflict of interest issue had been resolved in the appellate courts more expeditiously than expected and thus it found no prejudicial delay.

We find no basis on which to conclude that the court abused its discretion in refusing to replace defendant's attorneys. As the court correctly explained to defendant, there was no abandonment. An attorney who has had an attorney-client relationship with a witness against his or her present client is under an ethical obligation to seek permission to withdraw from representation. (*People v. Bonin* (1989) 47 Cal.3d 808, 835; *Leversen v. Superior Court* (1983) 34 Cal.3d 530, 536-540.) Here, once that conflict was resolved, O'Neill immediately resumed an active role as lead counsel. On this record, the court properly found that counsel had not abandoned defendant.

The court likewise did not err in rejecting defendant's request to replace Kinney on the ground that he was not present for the initial portion of the guilt phase. Defendant points out that Kinney was absent during the testimony of the first 29 prosecution witnesses and that he was merely a communications facilitator, not cocounsel, during the testimony of 16 more witnesses. The record shows, however, that during the guilt trial, when Kinney sought appointment as a member of the defense team, he informed the court he had "read the whole trial

154

transcript" and had followed all of Angie's testimony "in depth." On this record, the court reasonably could find Kinney's absence from the beginning of the guilt phase did not justify his discharge. Defendant observes that when Kinney objected to being appointed second counsel for the penalty phase, he argued that his limited participation in the guilt trial rendered him "as useful as a potted plant." The remark does not support defendant's claim of error, however. The record shows that Kinney's objection was based on concerns that his pending commitments to other clients would require additional time for him to prepare for his new role as second counsel. Those concerns were resolved the following month when Martinez returned to the defense team.

Defendant insists that the declaration of a conflict and the ensuing "two months of legal bickering" caused him to lose confidence in his attorneys because, by opposing the discharge of the public defender, Kinney took positions on issues that were contrary to those advanced by his deputy public defenders. That defendant "lost confidence" is not determinative, particularly because his loss of confidence flowed from ignorance concerning the legal issues. Moreover, as discussed *ante*, in part II.K.1., defendant's case did not proceed while the conflict issue was being litigated. Defendant fails to explain how Kinney's opposition to the short-lived absence of O'Neill and Martinez led to an irreconcilable conflict or otherwise impaired his right to counsel.

Nor did the court abuse its discretion when it denied defendant's request for a new jury because of the two-month delay in the proceedings.[36] As explained more

---

[36] To the extent defendant asserts the court should have ordered a new *trial* based on an impermissible interruption in the continuity of representation that was caused by his deputy public defender's two-month absence from the case, we agree with respondent that his claim is not properly before us because no such motion was presented to the trial court. (*People v. Masotti* (2008) 163

*(footnote continued on next page)*

155

fully *ante*, in part II.J.2., the court may impanel a new jury only when there are facts that appear " ' " ' "in the record as a demonstrable reality," ' " showing the jury's " ' "inability to perform" ' " its function.' [Citations.]" (*People v. Prince, supra,* 40 Cal.4th at p. 1281.) Defendant failed to make the requisite showing below. Mere delay in commencing the penalty phase, without more, is an insufficient basis for impaneling a new jury. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1170.)

### 3. The prosecutor's failure to disclose evidence of its witness's misdemeanor welfare fraud conviction

Before the penalty phase, Deputy Public Defender Martinez belatedly discovered that the Fresno County Public Defender had represented one of the

---

*(footnote continued from previous page)*

Cal.App.4th 504, 508 [a court has no authority to grant a new trial on its own motion.) The record shows that at the March 25, 1994, hearing, after O'Neill had resumed her role as lead counsel, Kinney advised the court that were *he* still lead counsel he *would have* moved for mistrial and sought extraordinary relief in the appellate courts based on the long delay in proceeding to the penalty phase and his late entry into the case. When the court sought to clarify that Kinney was not actually making such a motion, he acknowledged that as "second counsel," he had no right to move for mistrial but simply wanted to "protect" himself.

We note that the defense *did* move for mistrial on May 25, 1994, on the ground that defendant was incurably prejudiced by the long hiatus between the sanity and penalty phases of trial. As to this motion, defendant argues the court erred in denying mistrial because the now four-month delay amounted to an "irreversible disruption in the structure of the trial process" and a "breakdown in a relationship between the accused and his counsel frustrating the realization of a fair trial." (*People v. Manson* (1976) 61 Cal.App.3d 102, 201, 202.) Defendant fails to explain why an additional two months of delay had now become unacceptable. As discussed elsewhere in this opinion, length of the delay, without more, does not establish incurable prejudice. We also reject as unsupported by the record defendant's further argument that the delay created the risk that jurors would be exposed to outside influences or suffer fading memories. (See discussion, *post*, pt. II.L.4.)

prosecution's guilt phase witnesses in a criminal matter that resulted in a misdemeanor welfare fraud conviction. The court rejected Martinez's declaration of a conflict of interest and denied a related motion for mistrial on the ground that the prosecution had improperly failed to disclose this information before the guilt trial. On appeal, defendant contends the prosecutor's failure to disclose its witness's conviction violated his federal constitutional rights to due process and confrontation, and that the court erred in finding no actual conflict of interest. We disagree, as explained below.

### a. Background

At a hearing on October 19, 1994, approximately one month before commencement of the penalty trial, Martinez declared a second conflict of interest, advising the court that she had recently discovered that the Fresno County Public Defender previously represented Venus Farkas, mother of the murder victim, in a welfare fraud case and complaining that the prosecutor had failed to disclose to the defense that Mrs. Farkas had been convicted of misdemeanor welfare fraud. The defense then filed a motion for mistrial, asserting that the prosecutor actively concealed impeachment evidence from the defense. According to the record of the hearing, on June 16, 1991, Mrs. Farkas was arraigned on charges that she continued to accept welfare benefits for Laurie after her death in January 1991. On July 17, Mrs. Farkas appeared in court represented by a deputy public defender, pleaded guilty to a violation of Welfare and Institutions Code sections 11483 and 10980, and was granted three years' probation. Mrs. Farkas testified as a prosecution witness in defendant's case on October 12, 1993.

The court conducted an evidentiary hearing on the mistrial motion. Mrs. Farkas testified that she never discussed the welfare fraud conviction with the

prosecutor and that, to her knowledge, he knew nothing about it until the present time. Defense investigator David Schiavon testified, however, that in an interview after the guilt verdicts, Mrs. Farkas told him and Martinez that when she discussed her welfare fraud case with the prosecutor before defendant's preliminary hearing, he assured her the matter would not be brought out in the proceedings in defendant's case. Martinez stated that she would have corroborated Schiavon's testimony had she been called to the witness stand. The prosecutor testified finally that he first heard about the welfare fraud conviction when Mrs. Farkas called him about her postverdict interview with Schiavon. Previously, he had found no criminal record for Mrs. Farkas on the computerized system available to the criminal division of his office, and he denied having access to documents maintained by the division of the Fresno County District Attorney's Office that handles welfare fraud.

The court found no duty on the prosecutor's part to gather information from a different division, and no willful suppression of evidence of Mrs. Farkas's misdemeanor welfare fraud conviction either by the prosecutor or the district attorney's office. It thus concluded there was no basis on which to grant a mistrial. After hearing defense argument concerning the conflict of interest, it further found that no conflict existed. As the court explained, in the event the defense wanted to call Mrs. Farkas as a witness in the penalty phase in order to impeach her with the misdemeanor conviction, Kinney could conduct an adequate examination without involving Martinez. The defense did not call Mrs. Farkas to testify.

### b. Discussion

Defendant first argues that the prosecutor's failure to disclose Mrs. Farkas's misdemeanor welfare fraud conviction prior to the guilt phase of trial violated his

158

due process rights within the meaning of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

The due process clause requires a prosecutor to disclose to the defense all substantial material evidence known to the prosecution team that is favorable to the defendant, even in the absence of a request. (*Kyles v. Whitley* (1995) 514 U.S. 419, 432-441; *Brady, supra*, 373 U.S. at p. 87; *In re Steele* (2004) 32 Cal.4th 682, 696-697.) Evidence is "material" if there is a reasonable probability that the outcome of trial would have been different had the evidence been disclosed to the defense. (*People v. Zambrano, supra,* 41 Cal.4th at p. 1132.) Evidence is "favorable" to the defense "if it helps the defense or hurts the prosecution." (*Ibid*.) The prosecution's duty to disclose thus extends to impeachment evidence. (*Ibid*.; *United States v. Bagley* (1985) 473 U.S. 667, 682-683.)

To the extent there is any question whether the welfare fraud unit in the district attorney's office, which possessed the information regarding Mrs. Farkas's conviction, is part of the prosecution team for *Brady* purposes, we need not decide that issue. Although information regarding Mrs. Farkas's misdemeanor welfare fraud conviction was favorable to defendant as impeachment evidence, it was not material. Mrs. Farkas was not a primary prosecution witness. Moreover, her testimony "was not the only evidence linking [defendant] to the crime[s]." (*People v. Salazar* (2005) 35 Cal.4th 1031, 1050; see *id*. at pp. 1049-1052 [undisclosed impeachment evidence showing that one of the prosecution's experts in the defendant's child-murder case had altered his opinion on the timing of the child victim's death in another murder prosecution was not material for *Brady* purposes because other expert witnesses supplied testimony equivalent to the unimpeached testimony].) Mrs. Farkas testified about defendant's growing interest in Laurie and his abrupt departure from the Farkases' home on the night of the crimes after learning that Mr. Farkas had driven the girls to the movie theater.

But this was not the only evidence establishing those points. For example, other family members testified that defendant paid particular attention to Laurie in the year before the crimes, and the surviving victim, Angie, testified that defendant pulled up alongside her and Laurie in his car shortly after they had left the movie theater to wait for the next showing. Given that other witnesses provided testimony similar to that of Mrs. Farkas, and the strong evidence of defendant's guilt, we conclude there is no reasonable probability that the outcome of trial would have been different had the defense impeached Mrs. Farkas with her misdemeanor welfare fraud conviction. The prosecutor's failure to disclose this information to the defense did not violate defendant's right to due process.

Defendant further contends the prosecution's nondisclosure of Mrs. Farkas's conviction prior to the guilt phase, followed by the court's denial of the mistrial motion, deprived him of his Sixth Amendment rights to compulsory process and confrontation. Specifically, he asserts the prosecutor's failure to disclose the evidence deprived the defense of an opportunity to impeach the credibility of a significant prosecution witness. There is no support for the argument that those Sixth Amendment rights are implicated here, however. As we have observed, invocation of the confrontation or compulsory process clauses in a claim involving pretrial discovery "is on weak footing" because it is unclear whether or to what extent those constitutional guarantees grant pretrial discovery rights to a defendant. (*People v. Prince, supra,* 40 Cal.4th at p. 1234, fn. 10; see generally *People v. Hammon* (1997) 15 Cal.4th 1117, 1124-1127 [summarizing the high court's divided views on the issue].) In *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, the defendant unsuccessfully subpoenaed the confidential files of a child protective services agency that had investigated reports of abuse by the defendant's 13-year-old daughter, the alleged victim in the case. When the issue reached the United States Supreme Court, the defendant argued as defendant does

now that the Sixth Amendment's confrontation and compulsory process clauses guaranteed him the right to pretrial discovery of information necessary for effective cross-examination at trial. (*Richie*, *supra*, at p. 51.) Noting that the applicability of Sixth Amendment principles to the prosecution's production of exculpatory evidence was an unsettled question, the high court declined to address that issue and decided the case "under the broader protections" of the due process clause. (*Ritchie, supra*, at p. 56.) Likewise here, we have examined defendant's claim of error under the "clear framework for review" provided by *Brady* and its progeny (*Ritchie, supra*, at p. 56), and conclude that no constitutional violation occurred. Defendant invites this court to recognize a Sixth Amendment violation when a defendant is denied discovery that results in a significant impairment of his ability to investigate and cross-examine a witness. "We do not, however, see an adequate justification for taking such a long step in a direction the United States Supreme Court has not gone." (*People v. Hammon, supra*, 15 Cal.4th at p. 1127.)

Defendant contends finally that a "prejudicial byproduct" of the prosecutor's failure to disclose evidence of Mrs. Farkas's welfare fraud conviction was the belated discovery of a conflict of interest based on the public defender's representation of Mrs. Farkas in that matter. He contends the prior representation amounted to an actual conflict that rendered the court's denial of his motion for mistrial a violation of his Sixth Amendment right to conflict-free representation. Because we conclude that the public defender's prior representation of Mrs. Farkas created no actual or potential conflict that had any adverse effect on counsel's performance, we reject defendant's contention.

To succeed on a claim that the court erred in permitting representation by counsel operating under a conflict of interest, defendant must show the existence of an actual or potential conflict "that adversely affected counsel's performance." (*People v. Lawley, supra,* 27 Cal.4th at p. 146; *People v. Roldan, supra,* 35 Cal.4th

161

at p. 674.)  A conflict of interest may arise if counsel's former client is a prosecution witness in the case against the defendant.  (*People v. Bonin, supra,* 47 Cal.3d at p. 835; *Leversen v. Superior Court*, *supra*, 34 Cal.3d at pp. 536-540.) This is because counsel's duty not to reveal confidential information acquired during the attorney-client relationship creates conflicting obligations to multiple clients that "effectively seal[s] his lips on crucial matters."  (*Holloway v. Arkansas* (1977) 435 U.S. 475, 490.)  As we recognized in *People v. Cox* (2003) 30 Cal.4th 916 at page 949, however, courts have held that no actual or potential conflict of interest arises when the attorney does not possess such confidential information. (See, e.g., *People v. Lawley, supra,* 27 Cal.4th at pp. 145-146; *People v. Belmontes* (1988) 45 Cal.3d 744, 774-776.)  Defendant attempts to distinguish these decisions on the ground that counsel in those cases denied the existence of a conflict whereas here, Martinez indicated she felt "personally conflicted."  That Martinez declared a conflict is not dispositive of its existence, however.  Although the high court has endorsed the view that counsel " 'is in the best position professionally and ethically to determine when a conflict of interest exists,' " it also has recognized that it is the trial court that determines whether counsel's representations regarding a conflict of interest are adequate.  (*Holloway v. Arkansas, supra*, 435 U.S. at p. 485.)  Here, Martinez affirmatively stated to the court that she did not personally represent Mrs. Farkas, and nothing in the record suggests she was in possession of information obtained during that attorney-client relationship.  There is no showing of an actual or potential conflict of interest. (See *Rhaburn v. Superior Court* (2006) 140 Cal.App.4th 1566, 1581 [courts should look to the totality of circumstances rather than presume that deputy public defenders acquired confidential information about a witness collected by others in their office].)

162

Nor does defendant establish that the prior representation of Mrs. Farkas by the public defender's office adversely affected his counsel's performance. In determining the effect of an asserted conflict of interest on counsel's performance, we consider whether " 'the record shows that counsel "pulled [her] punches," i.e., failed to represent defendant as vigorously as [she] might have had there been no conflict.' [Citation.]" (*People v. Rundle, supra,* 43 Cal.4th at p. 169.) When, as here, it is asserted that the conflict leads counsel not to act, we inquire whether there may have been tactical reasons other than the conflict that would explain the omission and whether the omitted action is one that likely would have been taken by unconflicted counsel. (*Id*. at pp. 169-170; *People v. Cox, supra,* 30 Cal.4th at p. 949.)

Defendant argues Martinez "pulled her punches" by not testifying at the hearing on the mistrial motion. We disagree. The defense investigator Schiavon testified that Mrs. Farkas admitted to him and Martinez that she discussed the welfare fraud conviction with the prosecutor before the guilt phase of trial. When Kinney indicated he next wanted to call Martinez to the witness stand, the court expressed its reluctance to permit an attorney to testify unless it was "absolutely essential," and inquired whether Martinez would offer anything new or different from Schiavon's testimony. Kinney responded that Martinez would simply corroborate the testimony already given, and he did not object to foregoing her testimony so long as the record showed what her testimony would have been. The record thus shows Martinez's failure to testify at the hearing was not due to any perceived conflict of interest on her part but rather because the court was strongly—and properly—disposed not to allow testimony by counsel. (See *Comden v. Superior Court* (1978) 20 Cal.3d 906, 912 ["An attorney who attempts to be both advocate and witness impairs his credibility as witness and diminishes his effectiveness as advocate"].) The record also shows that had Martinez been

163

called as a witness, her testimony would have added nothing to the information already before the court.  Defendant's assertion that the conflict of interest interfered with Kinney's ability to present credible evidence at the hearing is untenable.

We likewise reject defendant's argument that the asserted conflict of interest adversely affected his counsel's performance at the penalty phase.  In ruling that the prior representation of Mrs. Farkas would not present a conflict at the penalty phase in the event the defense wanted to call her as a witness for impeachment purposes, the court observed that she could be examined by Kinney, who was not conflicted.  (See *People v. Clark* (1993) 5 Cal.4th 950, 1002.)  Defendant argues, however, that the conflict caused Kinney to decide *not* to call Mrs. Farkas as a witness because he would have had to examine her without Martinez's assistance. Martinez's lack of involvement was significant, he contends, because she had observed Mrs. Farkas's guilt phase testimony but Kinney had not.  Defendant's assertion of an adverse effect notwithstanding, there was a sound tactical reason for the defense to refrain from calling the murder victim's mother as a witness during the penalty phase:  Such testimony presented a substantial risk of interjecting unwanted victim impact evidence into the defense case when no such evidence had been admitted in the case in aggravation.  We conclude that counsel's failure to call Mrs. Farkas can be explained for reasons other than the conflict and that the decision to proceed without her testimony was what reasonable and unconflicted counsel likely would have done.  Defendant fails to show that an actual conflict adversely affected his counsel's performance.

### 4. *Court's ex parte communication with jurors*

Defendant contends the court's denial of his motion for mistrial based on the court's assertedly improper ex parte communications with jurors deprived him of

his federal and state constitutional right to be personally present with counsel at all critical stages of the proceedings. Although we agree with defendant that the court should not have communicated with one juror outside the presence of defense counsel, the court did not abuse its discretion when it denied defendant's motion for mistrial.

On January 20, 1994, the jury returned verdicts finding defendant sane at the time he committed the crimes. When the jurors returned to the courtroom on January 27, the court informed them that appellate review of some of the court's rulings meant an unavoidable delay in the penalty phase proceedings. The court also advised that the delay could last from several weeks to several months, but that it expected trial to commence no later than May 1. After thanking the jurors for their sacrifices and assuring them that the court would accommodate their scheduling problems, the court informed the jurors that its clerk would telephone them personally in the event trial would not begin in the near future. The court also explained that it (that is, the trial judge) was prohibited from communicating with jurors.

With prior notice to counsel, on March 16, 1994, the court sent the jurors a letter reminding them that the case was still pending and that their services were still needed.[37] The court sent a second letter to jurors on May 16, 1994, this time informing them that the penalty phase was scheduled to start on June 27, 1994,

---

[37] The letter stated as follows: "I wanted to let you know that you are very much needed as a juror in our case—which is still pending. [¶] The matter which is causing delay is still in the appeal courts, and everyday I am hopeful that we will have a resolution of the issue quickly. Of course, I will contact you immediately when a decision is received. Our case is still my number one priority."

and asking them to contact the court's clerk in the event that date was unsatisfactory.

On May 24, 1994, lead counsel O'Neill wrote to the court, expressing her concern after learning that the court had spoken personally with a juror. The court responded by letter to the parties the same day, explaining that it conversed with Juror P.G. because she called during the lunch hour on May 17 when no one else was available to answer the telephone. P.G. informed the court that the trial date was satisfactory and that she had two conflicting appointments she would try to "work around." The court thanked her for the information and advised her that she would be contacted again. The court further explained in its letter to the parties that on May 17, Juror S.S. informed a temporary court clerk that she had a vacation conflict with the scheduled trial date. Thereafter, the court called S.S. and asked whether there was any possibility she could rearrange her vacation. She indicated, however, that it would be inconvenient and costly to change her plans. As it had done with P.G., the court thanked S.S. for the information and advised her that she would be contacted further.

On May 27, 1994, the court sent a second letter to the parties informing them it had answered a telephone call earlier that day from Juror R.D., who stated he had a problem he wanted to discuss. The court told R.D. it could not speak with him but mentioned that the trial date had changed to July 6, 1994, and suggested he call back later to speak with the court clerk.

Thereafter, the defense filed a motion for mistrial based on improper communication between judge and jury. At a hearing on June 17, 1994, the court explained that its conversations with the three jurors were extremely brief, in the case of Juror P.G. lasting only 10 to 15 seconds. The court also explained that its practice was to answer the telephone when the clerk and bailiff were otherwise occupied, and it characterized the conversation with two of the three jurors as little

166

more than taking a message for administrative purposes. Although the court agreed that ex parte communication between a judge and the jury should not take place, it found that if error occurred, defendant's right to a fair trial was not prejudiced and it denied the motion for mistrial.

"[A] trial court should not entertain, let alone initiate, communications with individual jurors except in open court, with prior notification to counsel. [Citation.]" (*People v. Wright* (1990) 52 Cal.3d 367, 402.) The prohibition against ex parte communications is designed to ensure that the defendant has " 'an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection . . . .' " (*Ibid.*) "Although such communications violate a defendant's right to be present, and represented by counsel, at all critical stages of his trial, and thus constitute federal constitutional error, reversal is not required where the error can be demonstrated harmless beyond a reasonable doubt." (*Id.* at p. 403.)

Preliminarily, we note that "[n]ot every communication between the judge and jury constitutes a critical stage of trial." (*Key v. People* (Colo. 1994) 865 P.2d 822, 825.) Specifically, a trial court properly may engage in ex parte communications for " 'scheduling, administrative purposes, or emergencies that do not deal with substantive matters . . . .' " (*People v. Seaton* (2001) 26 Cal.4th 598, 696, quoting Cal. Code Jud. Ethics, canon 3B(7)(d); *People v. Beeler*, *supra*, 9 Cal.4th at p. 991.) Such was the case when the court answered telephone calls from Jurors P.G. and R.D. responding to its letter about the scheduling of the penalty phase. The court characterized those ex parte communications as brief and nonsubstantive. As the court explained, "[i]t was just taking a message for administrative purposes." Notably, counsel expressed "no doubt that what the Court is saying occurred." We conclude on this record that the trial judge did not

err when he spoke briefly to these jurors outside the presence of defendant and his counsel.

The same cannot be said of the court's ex parte communication with Juror S.S., however. When the court spoke with S.S., it did not simply pick up a ringing telephone and take a message. Rather, it initiated contact with S.S. after she left word with a temporary court clerk that she had a scheduling conflict. In the conversation with S.S. that followed, the court asked whether she could rearrange her vacation. Under these circumstances, the presence of defendant and counsel arguably would have provided the opportunity for gauging whether the juror felt pressured by the court's request. We conclude that the conversation with S.S. was improper.

Although the court's ex parte communication with Juror S.S. violated defendant's rights to personal presence and counsel at a critical stage of the proceedings, the error was harmless beyond a reasonable doubt. (*People v. Wright, supra*, 52 Cal.3d at p. 403.) The court's conversation concerned only scheduling, and nothing of substance bearing on the penalty determination. (*Rushen v. Spain* (1983) 464 U.S. 114, 121 [court's ex parte communication with a juror was harmless because they did not discuss any fact or law applicable to the case].) Further, and as defendant acknowledges, the penalty phase eventually began in the last week of October and thus did not interfere with the juror's scheduled trip. Finally, we may infer from the court's description of the juror's apparent reluctance to change her vacation plans that she did not feel pressured to make personal and financial sacrifices to accommodate defendant's penalty trial.

Defendant posits that even the slightest pressure by the court could have had a coercive effect on the deliberative process. Contrary to defendant's argument, however, this is not a case like *Key v. People, supra*, 865 P.2d 822. In that case, the court held an ex parte conference with jurors three hours after deliberations

168

began on Friday, December 21, 1990, to discuss whether they could continue deliberating the following Monday, December 24. The conflicting plans of two jurors meant that the only available day to reconvene for deliberations was December 31, the day before one juror's wedding ceremony. By the end of the day on Friday, however, the jury returned verdicts of guilt. (*Id*. at pp. 823-824.) The Colorado Supreme Court held that the court's ex parte communication was reversible error. Because counsel was absent from the conference, the state supreme court explained, there was no solid basis on which it could assess whether the court's decision to reconvene deliberations on New Year's Eve caused a rush to judgment. (*Id*. at p. 827.) In the present case, by contrast, the ex parte communication occurred long before the jurors heard evidence or engaged in deliberations in the penalty phase. We need not speculate whether the court's conversation with S.S. interfered with the deliberative process. On this record, we conclude it did not and the error was harmless beyond a reasonable doubt. The court's improper ex parte communication with Juror S.S. does not require reversal.

## L. Penalty Phase Issues

### 1. *Asserted ineffective assistance at the penalty phase*

Defendant contends that the court's denial of two mid-penalty-phase mistrial motions claiming that lead counsel Kinney was unable to provide competent representation deprived him of his Sixth Amendment right to the effective assistance of counsel. We conclude on the record before us that the court's rulings were proper.[38]

---

[38] Briefly reprising his earlier claims of breakdowns in the attorney-client relationship, conflicts of interest, and disruptions in the continuity of counsel, defendant asserts that the cumulative prejudicial effect of these errors deprived him of his constitutional rights to a fair trial and a reliable death verdict. Because we have concluded that there were no errors with respect to counsel's

*(footnote continued on next page)*

169

### a. Background

On May 25, 1994, four months after the conclusion of the sanity phase, the defense filed two motions for mistrial, arguing that the court should have granted defendant's earlier *Marsden* motions instead of appointing Kinney as facilitator of communications and that defendant was prejudiced by the lengthy, ongoing delay in commencing the penalty phase.

Before the court could rule on the mistrial motions, it received a series of letters from defense counsel that further complicated matters. First, in a letter dated June 6, 1994, lead counsel O'Neill informed the court she had been diagnosed with cancer. Then, in a letter dated June 9, Kinney indicated he was unable to assume the role of lead counsel in O'Neill's place. According to Kinney, he could not vigorously represent defendant at the penalty phase because he had been absent from some of the guilt phase. He also informed the court that he was precluded from carrying out the duties of lead counsel at that time because he recently had been prescribed new medication for hypertension and his physician had ordered him to avoid high-stress situations. Finally, in a letter dated June 14, O'Neill updated the court on her prognosis and explained that she would be unable to work for two to three months. O'Neill indicated she could not proceed with defendant's case "for a significant amount of time, if at all," and asked the court to declare a mistrial.

At a hearing on June 17, 1994, the court denied the May 25 mistrial motions. It also relieved O'Neill and, over objections, appointed Kinney lead counsel conditioned on the status of his health. Kinney and the prosecutor had urged the

---

*(footnote continued from previous page)*

representation of defendant, we reject his contention that their cumulative effect requires reversal.

170

court to appoint Martinez lead counsel and allow Kinney to continue as second counsel. But although the court did not rule out the possibility that it might have to switch their roles, it concluded that, at that time, defendant was better served by having the more experienced of the two attorneys as his lead counsel.

The prosecution's case in aggravation began on October 25, 1994, and extended for two court days. The defense case in mitigation began on November 1 with Kinney's direct examination of Gretchen White, Ph.D. On November 3, trial was continued until November 9 after Kinney reported to the court that his physician was gravely concerned about his blood pressure. On November 7, Kinney informed the court he could not proceed with trial until November 16, and the court granted a further continuance. Kinney then moved for mistrial, arguing defendant was prejudiced by the now 10-month delay between the sanity and penalty phases of trial and that he could not receive effective assistance because Kinney had not observed firsthand the demeanor of a number of guilt phase witnesses. Kinney also complained he was "exhausted and tired." The court denied the mistrial motion, finding in relevant part that defendant was not prejudiced by Kinney's representation but rather that he was benefitted "in every conceivable way" by Kinney's exuberance, energy, and expertise. Kinney renewed his mistrial motion before closing remarks, arguing he was hindered by not having observed the demeanor of some of the guilt phase witnesses whose testimony formed the basis of the prosecutor's summation of the circumstances of the crime. The court denied the motion without comment.

### b. Discussion

Defendant asserts the court's refusal to grant a mistrial violated his Sixth Amendment right to the effective assistance of counsel because it left him with a

"depressed and exhausted lead attorney who had not even been present for the lion's share of the guilt phase proceedings."

The trial court did not err. "A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court's ruling denying a mistrial." (*People v. Bolden* (2002) 29 Cal.4th 515, 555; accord, *People v. Cowan, supra,* 50 Cal.4th at p. 459.)

In this case, the evidence before the trial court when it ruled on the mistrial motions provided no basis on which to conclude that defendant's chance of receiving a fair trial had been irreparably damaged by Kinney's performance as lead counsel.[39] Although Kinney was absent from a portion of the guilt phase, he observed most of the prosecution's case, including all of Angie's testimony. Further, Martinez was present for all of the guilt phase testimony. Thus, to the extent the live testimony of the prosecution's guilt phase witnesses had any significance to the defense case at the penalty phase, Martinez could provide to Kinney what he had not observed firsthand.

Defendant argues that Martinez's presence at the guilt phase could not have ameliorated Kinney's absence because she exercised little or no control over how the defense should be conducted. He points to nothing in the record, however, that would have suggested to the court that Martinez had no role to play in the defense case. Defendant further argues that Martinez's ability to elucidate for Kinney the portions of the guilt phase testimony he had not observed was questionable in light of the tension between them. Again, however, defendant fails to show anything in

---

[39]    We express no opinion as to whether the trial court had the authority to designate which of defendant's two attorneys would serve as lead counsel at the penalty phase.

172

the record from which the court could have determined that tension between the two attorneys might have prevented Martinez from conveying information to Kinney.

Defendant likens his case to *People v. Manson, supra*, 61 Cal.App.3d 102, in which the appellate court held that the trial court should have granted the mistrial motion of an attorney appointed to represent the codefendant Van Houten when her former counsel abruptly disappeared during the fifth month of a seven-month trial, after the parties had rested but before closing arguments. As the *Manson* court explained, substitute counsel's summation was constitutionally inadequate because, having had no opportunity to observe the demeanor of the many witnesses at trial, he could not effectively argue the significant issue of credibility during closing remarks. (*Id.* at pp. 198-201.)

We conclude that the extreme circumstances presented in *Manson* are easily distinguishable from this case. In *Manson*, the timing of counsel's substitution after the presentation of evidence was "truly crucial." (*People v. Manson, supra*, 61 Cal.App.3d at p. 203, fn. 102.) By contrast here, Kinney joined the defense team shortly after commencement of the prosecution's case-in-chief and observed the testimony of most of the prosecution witness, including Angie. Further, he was assisted by Martinez, who was present for all of the guilt phase testimony. The trial court did not abuse its discretion in denying the mistrial motions in the present case.

Defendant further argues that Kinney's questionable examination of several witnesses demonstrates that he was too exhausted to proceed as lead counsel. To the extent defendant asks this court to conclude that Kinney actually provided ineffective assistance at the penalty phase, such an assertion is more appropriately addressed in a petition for writ of habeas corpus, as defendant acknowledges. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) On this record we are

173

unable to say there was no satisfactory explanation for Kinney's line of questioning short of exhaustion-induced incompetence.

Defendant asserts in his reply brief that Kinney's objections to being appointed lead counsel also establish an impermissible conflict of interest. He posits that the stress likely to result from Kinney's involvement in the case posed a danger to his health. According to defendant, an actual conflict of interest existed when Kinney was forced to assume the role of lead counsel against the advice of his own physician.

Defendant's claim of an actual conflict of interest is unsupported by the record. During the hearing on the May 25 mistrial motions, the court sought further information from Kinney as to the effect that serving as lead counsel would have on his health. Kinney explained that his blood pressure was abnormally high and unstable due to an adverse interaction between two of his medications. He also presented to the court a letter from his physician stating that he should refrain from trial work until August 1 so that his medication dosage could be fine-tuned. Citing Kinney's years of experience and high level of competence in the matter to that point, the court designated him lead counsel "if his health permits." The court indicated it would determine that question sometime in August. Thereafter, in a hearing on July 29, Kinney reported that his blood pressure remained high but was no longer fluctuating and that his physician had advised him that he could resume trial work. Kinney represented to the court that he would not request a continuance based on his medical condition. At the outset of the penalty trial, the court indicated it believed the defense was ready to proceed to trial and observed that if Kinney felt he was not ready, he would say so. Later during the defense case, Kinney informed the court on two occasions that his physician was concerned about new fluctuations in his blood pressure and he asked for a brief continuance, which the court granted. When trial resumed after the continuances,

174

Kinney made no further mention of any medical concerns. Contrary to defendant's characterization of the record, there is no showing that Kinney was forced to assume the role of lead counsel against the advice of his physician and while suffering dangerous fluctuations in his blood pressure and drug interaction side effects. Although we agree with defendant's assertion that death penalty trials are stressful under the best of circumstances, there is no basis on this record to conclude that Kinney's loyalty to defendant, or his efforts on defendant's behalf, were compromised by his own interest in protecting his health.

Defendant asserts finally that, at a minimum, the court should have continued the proceedings to await the outcome of O'Neill's surgery and cancer treatment instead of designating Kinney lead counsel. The record shows that at the June 17 hearing defendant objected to having either Kinney or Martinez as lead counsel, preferring to wait for O'Neill to return to the case in that role.[40] There is no support for a conclusion that the court erred by not acceding to defendant's wishes, however. A court may remove appointed counsel " 'to prevent substantial impairment of court proceedings,' " and its decision in this regard is reviewed for abuse of discretion. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1119.) We likewise review for abuse of discretion a court's denial of a request for a continuance. (*Id.* at p. 1118.) Here, the court did not abuse its discretion by replacing O'Neill. Three days before the June 17 hearing, O'Neill had updated the court on her prognosis and explained she would be away from work for two to three months. Specifically, as observed earlier, she indicated she could not proceed with defendant's case "for a significant amount of time, if at all." Given

---

[40]    In an implicit reference to defendant's earlier attempts to discharge O'Neill, the court curtly observed, "He wants Ms. O'Neill? That's a rather substantial change of position."

O'Neill's representations, the court reasonably could conclude that her continued involvement in the case would interfere with the timely commencement of the penalty phase. It thus did not abuse its discretion in replacing her. (See *id*. at pp. 1119-1125 [the court properly removed the deputy public defender who had been assigned to represent the defendant after his first attorney suffered a heart attack when it found the amount of time new counsel needed to prepare for trial was excessive].)

Nor did the court abuse its discretion by refusing defendant's request to postpone the proceedings pending O'Neill's recovery from surgery and subsequent treatment. In *People v. Mungia, supra*, 44 Cal.4th 1101, the court denied the defendant's request for a one-month continuance in order to obtain from counsel's physician a more accurate prognosis of when his counsel, who had suffered a heart attack, might be able to proceed to trial. The ruling was not an abuse of discretion, we concluded, because the court had little reason to believe that the issue of counsel's ability to resume representation would be resolved any time soon. (*Id*. at pp. 1117-1119.) Likewise in the present case, the court reasonably could find that postponing the proceedings and its decision whether to replace O'Neill until after her surgery and recovery would have served little purpose. As noted above, O'Neill suggested she might not be able to proceed with defendant's case "at all." Thus, the court could find it unlikely that O'Neill would ever return to the case, regardless of the outcome of her upcoming surgery. At the time of its ruling, the court had a sufficient basis on which to determine that O'Neill "would not bring defendant's case to trial within a reasonable time." (*Id.*

at p. 1125.) No abuse of discretion occurred in the court's refusal to further delay the proceedings pending the outcome of her surgery.[41]

### 2. *Failure to admonish jurors to avoid media exposure*

As noted earlier, the jury returned its sanity verdicts on January 20, 1994. Before releasing the jurors, the court reminded them not to discuss the case amongst themselves or anybody else, or to form or express any opinion. The court then added, "Watch out for news. [T]here will be something in the newspaper about your verdict and also on TV. Please avoid reading or watching it." When the jurors returned to the courtroom one week later, the court informed them that the penalty trial would be delayed while the appellate courts reviewed some of its rulings. After giving the jurors the "usual admonishments" not to discuss the matter or form any opinion on the case, the court excused them until further notice. Immediately after the jury's departure from the courtroom, defense counsel suggested, "for whatever it's worth," that if the jury was still present in the courthouse the court might remind them to avoid media coverage. The court declined the suggestion because it already had "told them so many times about not watching the TV and the press."

Defendant contends his death sentence cannot stand because the court's failure to admonish the jury to avoid all media coverage about the case during the

---

[41]     Defendant claims the court's refusal to grant a mistrial or further postpone proceedings violated his substantive due process rights. These circumstances do not establish a due process violation, however. Defendant's complaint in essence is that the court's rulings deprived him of the lead attorney of his choice. But a defendant has no right to appointed counsel of choice, under the due process clause, the Sixth Amendment, or any other constitutional guarantee. (*People v. Noriega* (2010) 48 Cal.4th 517, 521-522; *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 151.)

long recess between the sanity and penalty phases of trial did not comply with statutory requirements. For the reasons that follow, we find no error.

As discussed *ante*, in part II.G.1., the trial court did not violate the requirements of section 1122 by failing explicitly to admonish the jurors at the outset of trial not to view, read, or listen to news accounts of the proceedings. The same conclusion is warranted here. Although the court would have acted well within its discretion had it called back the jurors to admonish them to avoid media coverage of the case, its failure to do so did not violate section 1122. The record reveals that the court fully complied with the dictates of that provision as it read at the time of defendant's trial.

For a similar reason, we find no merit to defendant's contention that the court's admonitions also violated section 1121. Under that statute, if the court in its discretion allows separation, rather than sequestration, of the jury, it must "properly admonish them." (*Ibid.*, see *People v. Gallego* (1990) 52 Cal.3d 115, 198.) Here, as discussed above, the jury had been properly admonished numerous times. Defendant thus fails to show a violation of section 1121.

### 3. Asserted failure to adequately inquire into jurors' pre-penalty-phase exposure to media coverage

Defendant contends his death sentence must be reversed because the court conducted an assertedly inadequate inquiry into jurors' exposure to prejudicial media coverage during the nine-month hiatus between the sanity and penalty phases of trial. We disagree. The court's questioning provided an ample basis on which to determine that defendant's right to a fair and impartial jury remained intact.

The record discloses the following: The court first set the already postponed penalty trial for June 27, 1994. Due to a conflict with one juror's vacation plans, trial was rescheduled for July 6. On June 3, defense counsel filed a written motion

178

asking the court to question the jurors individually about whether the passage of time, and media coverage about the case, the Three Strikes legislation, and other murder cases involving young female victims, had interfered with their ability to fairly consider a sentence of life without the possibility of parole. The court deferred ruling on the motion until such time as the jurors returned to court.

As explained *ante*, in part II.L.1., the subsequent replacement of lead counsel O'Neill and new lead counsel Kinney's scheduling conflicts and medical issues required postponement of trial for several more months. The jury finally reconvened on October 4, 1994. The court asked jurors collectively whether there was "anything that you've seen or read in any media coverage concerning I guess anything that would make it difficult for you to be a fair and impartial juror in this upcoming penalty phase?" When there was no audible response, the court stated for the record that it had made eye contact with all of the jurors and that they indicated by a shake of their heads the answer was "No." Before excusing the jury for the day, the court asked that any jurors with individual concerns "about anything pertaining to this case" remain in the courtroom so that the court and counsel could speak with them privately. Two jurors had personal concerns, one regarding jury service verification for his employer and the other regarding a vacation conflict.

On October 25, 1994, immediately after opening statements by both sides, defense counsel reminded the court that it had not yet heard argument and ruled on the defense motion to individually question the jurors. Counsel acknowledged the court's group inquiry on October 4, but noted that a newspaper article appearing the very morning of the penalty trial reported that defendant killed Laurie because he "wanted to have sex and various other factors." The court denied the motion, concluding that the group questioning on October 4 was "adequate and served the necessary function."

179

Defendant contends the court's questioning of jurors collectively was too general to protect his federal constitutional right to an impartial jury. He emphasizes that there was a nine-month hiatus between the sanity and penalty phases and, he argues, an absence of "clear admonitions" by the court to avoid exposure to news coverage of the case. According to defendant, these circumstances, coupled with the prominent news coverage of defendant's case, the Three Strikes legislation, and the Polly Klaas murder, required the court to conduct a more thorough, individualized inquiry into whether the jurors were exposed to, and influenced by, prejudicial midtrial publicity.

We reject defendant's claim that the court conducted an inadequate inquiry into the jurors' continued impartiality. First, for reasons similar to those discussed *ante*, in part II.J.2., the court had no duty to question the jurors individually. Contrary to defendant's assertion, and as previously explained, the court repeatedly and clearly cautioned the jurors to avoid media coverage of the case. As with defendant's unsuccessful request to ask jurors about their exposure to "unrelenting, adverse midtrial publicity" during the guilt phase, defendant's motion for individualized questioning prior to the penalty trial made no showing that any juror had read or viewed the assertedly prejudicial news material. Defendant notes that nearly all of the jurors wrote on their questionnaire that they regularly read the Fresno Bee. We decline, however, to infer from these questionnaire responses, or from the fact of the nine-month hiatus between the sanity and penalty phases, that any juror was exposed to improper influences or otherwise disregarded the court's admonitions to avoid media coverage. (See *People v. Stanley, supra,* 10 Cal.4th at pp. 836-837.) In *People v. Gray, supra,* 37 Cal.4th 168, this court declined to draw an inference similar to the one defendant urges here. The defendant in *Gray* argued that in light of the " 'media climate' " that existed during the 338-day hiatus between his guilt and penalty trials, it was

" 'reasonable to infer that the jurors . . . were exposed to tremendous improper influences.' " (*Id*. at p. 229.) We concluded, however, that absent any proof that such exposure occurred and given the court's admonitions to avoid media coverage of the case, it was not reasonable to infer the jury's impartiality was compromised. (*Ibid*.) The same reasoning applies here.

Further, we see no abuse of discretion in the inquiry the court did undertake. There was no evidence that one or more jurors actually read or viewed any of the complained-of news material. The court thus properly could decide that questioning the jurors collectively, and in general terms, about their exposure to media coverage would adequately inform its determination concerning whether any juror's continued impartiality in the case had been compromised. We are satisfied on this record that there was no deficiency in the court's questioning. Indeed, a more specific inquiry arguably ran the risk of exposing the jurors to the assertedly prejudicial material. (See, e.g., *People v. Sanchez* (1995) 12 Cal.4th 1, 61-62.) Notably, although the court refused to conduct individualized questioning on exposure to media, it invited jurors to speak privately with the court and counsel about "anything pertaining to the case." On this record, no more was required.

### 4. *Lengthy hiatus between sanity and penalty phases*

Defendant contends his death sentence must be reversed because the nine-month hiatus between the end of the sanity phase and commencement of the penalty phase infringed his constitutional rights to an impartial jury and a reliable death verdict. Specifically, he argues the lengthy delay created an unacceptable risk that the jurors' recall of the guilt phase evidence would be impaired, that their displeasure with the extended disruption of their lives would lead to a coercive

181

deliberative process, and that they invariably would be exposed to inflammatory and prejudicial media coverage and pervasive anticrime sentiment.

This court's decision in *People v. Gray, supra*, 37 Cal.4th 168, is dispositive of defendant's arguments. In *Gray*, the defendant's pursuit of writ relief in the Court of Appeal ultimately led to a 338-day hiatus between the guilt and penalty phases of trial. (*Id*. at pp. 196, 225-226.) We acknowledged the possibility that the long delay may have caused jurors to forget guilt phase evidence. (*Id*. at p. 227.) We explained that such concerns were ameliorated, however, first, by the fact that the jury had returned a verdict of guilt and thus necessarily had reviewed the evidence in full at that time and second, by the court's offer to read back testimony on request. (*Ibid*.) Here, the court likewise reminded the jury of its right to ask questions and request a readback of testimony, and it confirmed with the jurors that the bailiff had returned their notebooks to them.

In *Gray*, as in the present case, the defendant asserted that the extended period of jury service resulting from the delay caused jurors to be " 'unfavorably disposed' " toward him. Rejecting that contention, we noted the jurors were admonished not to speculate on the reason for the delay and we presumed they followed the court's directive. (*People v. Gray, supra*, 37 Cal.4th at p. 231.) Similarly here, the court emphasized to the jury that the delay was "not something the attorneys are creating" but rather that it involved appellate court review of the trial judge's rulings and, later, the unforeseen illness of lead counsel O'Neill. On the record before us, nothing suggests that jurors resented defendant for the ongoing delays or that the court's insistence on continued service despite financial and familial hardships created a risk their deliberative process was being coerced. (See *ante,* pt. II.K.4.)

Finally, in *Gray* we rejected the defendant's contention, which is nearly identical to defendant's here, that in light of the " 'media climate' that existed at

the time," the long delay presented a risk that the jury would be exposed to " 'tremendous improper influences.' " (*People v. Gray, supra*, 37 Cal.4th at p. 229.)  We concluded it was unreasonable to infer the jurors' impartiality was compromised by the lengthy delay because the court had admonished them to avoid improper influences and there was no showing exposure actually occurred. (*Ibid.*; see *ante,* pt. II.L.3.)  The same conclusion is warranted here.

In a related claim, defendant asserts the court deprived him of his rights to a fair and reliable penalty trial and an impartial jury by refusing a mid-penalty-trial defense request to question jurors individually regarding whether they felt they had sufficient recall of the guilt and sanity phase evidence.  The court doubted the value of soliciting the jurors' opinions concerning that issue and suggested that the jury could rely on the attorneys to summarize the guilt phase evidence during closing remarks, but took the matter under submission.  It later denied the request.

Defendant argues that inquiring into the possibility of the jurors' fading memories would have required little additional court time.  He may be correct. That is not the focus of our review of the court's ruling, however.  We examine instead whether there was a showing of good cause to question the jurors in the manner requested.  (*People v. Bradford, supra*, 15 Cal.4th at p. 1354.)  We conclude no such showing was made here.  As the court observed, asking jurors to assess their own memory recall was problematic.  Defendant points to no case, and we have found none, in which a court called on seated jurors to gauge the extent of their recollection of guilt phase evidence.  Nor was there any need to conduct such an inquiry.  As explained above, even if the lengthy delay caused jurors to forget evidence presented at the guilt or sanity phase, their memories could be restored by referring to their notes, requesting readbacks of testimony, and relying on

183

counsel's review of the guilt and sanity phase evidence during closing arguments.[42] (See *People v. Santamaria* (1991) 229 Cal.App.3d 269, 282 [observing that counsel's summation of the evidence during closing remarks could minimize the effect on the jurors' recall resulting from a delay in the proceedings].)

### 5. *Testimony regarding the 1980 Texas robbery*

Defendant contends the court erred in allowing the prosecutor to present cumulative hearsay testimony to establish defendant's prior use of force or violence and prior felony conviction. (See § 190.3, subds. (b), (c).) We conclude to the contrary that the evidence was properly admitted.

Just before the start of the prosecution's case in aggravation, defense counsel moved to exclude as unnecessary and prejudicial the anticipated evidence regarding defendant's 1980 Texas robbery. Alternatively, counsel offered to stipulate that the crime involved violence and that defendant had pleaded guilty to aggravated robbery. The court denied the motion, finding the evidence highly probative of violence and of little or no prejudicial effect.

Thereafter, retired train conductor Earl Bradley testified that while en route to San Antonio, Texas, in 1980, he discovered an elderly passenger slumped over in

---

[42] We likewise reject defendant's assertion that the entire judgment must be reversed because of the cumulative prejudicial effect of the court's individual errors in failing to adequately admonish the jury to avoid media coverage, refusing counsel's request to question the jurors about their exposure to prejudicial news material and inability to recall the guilt phase evidence, and denying the motions for mistrial based on the long delay before commencement of the penalty phase. Because we have concluded *ante*, in parts II.J.2. through II.J.3. and II.L.2. though II.L.4., that the court did not err in these respects, we also conclude that the asserted errors had no cumulative prejudicial effect on the fairness of trial or the reliability of the death verdict.

his seat with his throat slit. As the witness started to relate what the victim said to him, the defense interjected a hearsay objection, which the court initially sustained. The court later reversed its ruling, however, agreeing with the prosecutor that the victim's statement was admissible as a spontaneous utterance under Evidence Code section 1240.[43] When Bradley's testimony resumed, he informed the jury that the victim stated, "A [B]lack man cut my throat and took my wallet." Bradley further testified that he then unlocked a nearby restroom and a young Black man, later identified as defendant, stepped out. The prosecutor's next witness was former Texas Ranger Robert Steele, who testified that when he arrested defendant for the aggravated robbery, he noticed drops of blood on defendant's shoes.

Defendant first argues the admission of the victim's out-of-court statement infringed his confrontation clause rights under the state and federal Constitutions. He concedes the statement was not "testimonial" and thus falls outside the rule in *Crawford supra*, 541 U.S. 36, which holds that the admission of a testimonial, out-of-court statement violates the confrontation clause unless the declarant is unavailable and the defendant has had a prior opportunity for cross-examination. (*Id*. at p. 59.) Defendant argues, however, that the question remains whether the robbery victim's statement contains "sufficient indicia of reliability" to pass muster under the constitutional framework provided in *Ohio v. Roberts* (1980) 448 U.S. 56, which predated the decision in *Crawford*.

---

[43] Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

We rejected an identical claim in *People v. Cage* (2005) 40 Cal.4th 965, noting that the United States Supreme Court has made clear that *Roberts* and its progeny "retain no relevance to a determination whether a particular hearsay statement is admissible under the confrontation clause. . . . Thus, there is no basis for an inference that, even if a hearsay statement is nontestimonial, it must nonetheless undergo a *Roberts* analysis before it may be admitted under the Constitution." (*People v. Cage, supra*, at p. 981, fn. 10; see also *id*. at p. 984 [observing that the high court has confirmed "the confrontation clause is concerned *solely* with hearsay statements that are testimonial" (italics added)].) Because the victim's out-of-court statement was not testimonial, its admission did not violate defendant's confrontation clause rights.

Nor does defendant persuade us that the court erred when it denied the defense motion to exclude testimony regarding the Texas robbery pursuant to Evidence Code section 352. Defendant asserts the evidence was cumulative because defense counsel offered to stipulate that the crime involved the use of violence and the section 969b prison packet for the robbery conviction, which was admitted into evidence, showed he pleaded guilty to "aggravated robbery." As this court has observed, however, a defendant is not entitled to prevent admission of the " 'sordid details' " of criminal conduct under section 190.3, factor (b) " 'by stipulating to any resulting conviction or to a sanitized version of the facts surrounding the offense.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1017; see also *People v. Jackson* (1996) 13 Cal.4th 1164, 1229-1230.)

Defendant contends that Bradley's and Steele's testimony was too unreliable to be probative due to the risk of faulty recollection and the fact that, because he pleaded guilty, the circumstances of the crime were never adjudicated. Those arguments go the weight of the evidence, however, not its admissibility. (*People v. Stitely*, *supra*, 35 Cal.4th at p. 564 [the trustworthiness of the witness's

186

testimony was a question for the jury to decide].) We conclude that the court did not abuse its discretion in permitting the witnesses to testify about the facts underlying defendant's prior robbery conviction.

### 6. *Denial of motions for new trial and modification of verdict*

After the jury returned its death verdict, the defense filed motions for new trial and to modify the penalty to life without the possibility of parole. Defendant contends the court erred in denying those motions. We disagree, in large part, for reasons discussed previously.

The defense asserted a new trial or modification of the verdict was required pursuant to section 1181, subdivisions 6 and 7, because the evidence was insufficient to support the robbery-murder, rape-murder, and witness-murder special-circumstance findings and the premeditation and deliberation theory of first degree murder.[44] Alternately, the defense argued that a new penalty trial was warranted because defendant was denied a fair trial by the lengthy, assertedly prejudicial delay between the guilt and sanity trials and the penalty phase. By separate motion, the defense asserted the court should grant the automatic motion for modification of the death verdict pursuant to section 190.4, subdivision (e), because the mitigating evidence presented at the penalty trial far outweighed the aggravating circumstances.[45] The motion recounted the defense evidence,

---

[44] Section 1181, subdivisions 6 and 7, authorize a court to grant a new trial, or reduce a verdict or impose a lesser punishment without granting a new trial, on a finding that the jury's "verdict or finding is contrary to law or evidence."

[45] Section 190.4, subdivision (e), provides that when a jury returns a death verdict, the defendant "is deemed to have made an application for modification of such verdict" and requires the court ruling on the application to determine, after a review of the evidence, whether the jury's death verdict is "contrary to law or the evidence presented."

including testimony that defendant eschewed drugs and gangs notwithstanding a disabling childhood in an environment that was rife with violence. It also emphasized defendant's expression of remorse for the killing, his history of extreme mental disturbance, and the probability that he committed the crimes while under the influence of a rage reaction.

The court conducted a hearing and denied the new trial motion in a lengthy ruling. The court indicated that after independently reviewing and reweighing the evidence it found all of the verdicts and sentencing findings supported by sufficient, credible evidence. It also found that defendant was not prejudiced by the court's refusal of a defense request at the outset of the penalty trial to individually voir dire the jurors regarding the possibility of faded memories or exposure to extraneous influences.

The court then conducted the sentencing hearing, at which it considered both the motion for modification of sentence and statements by the victims' family members, defendant's mother, and defendant himself. The court denied the modification motion and imposed the death penalty. The court indicated it had independently reviewed the aggravating and mitigating evidence and found both that it supported the jury's death verdict and that the death penalty was warranted. In its summary of the evidence pertaining to each of the statutory factors, the court noted that it found "substantial significance" in the circumstances of the crime and the escalation of violence and cruelty that characterized defendant's prior violent offenses. The court also recited the mitigating evidence, including defendant's "miserable childhood with a mother who could not protect him," a father who "all but disowned him," and the tragic deaths of his brothers. The court noted, however, that defendant's half siblings were never in trouble with the law and found unconvincing defendant's expression of remorse for the killing.

In ruling on a motion pursuant to section 1181, subdivisions 6 and 7, the court "independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt." (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) A court deciding a modification motion under section 190.4 independently reweighs the aggravating and mitigating evidence to determine whether the jury's death verdict is supported by the weight of the evidence. (*People v. Guerra, supra,* 37 Cal.4th at p. 1161.) In the present case, the record demonstrates that the court applied the proper standards and thoughtfully considered defendant's motions for new trial and modification of sentence. Furthermore, we discern no abuse of discretion in the court's denial of either motion. With the exception of a single contention, defendant's arguments to the contrary simply repeat his other claims on appeal. (See *ante,* pts. II.F.1.-II.F.3.; II.G.1.; II.J.2.-II.J.3. & II.L.1.-II.L.4.) Because we conclude that substantial evidence supported the three special-circumstance findings and that defendant was not prejudiced by the lengthy delay between the guilt and sanity trials and the penalty phase, we likewise conclude that the court properly rejected defendant's motions for new trial and modification of sentence on those grounds. (*People v. Adcox* (1988) 47 Cal.3d 207, 273.)

Defendant also asserts the court erred in determining that sufficient evidence supported the jury's finding of first degree premeditated and deliberated murder. Defendant contends a "significant quantum" of evidence supporting that theory derived from the testimony of Laurie's mother, Mrs. Farkas, whose testimony could have been impeached with evidence of her misdemeanor welfare fraud conviction had the prosecution properly disclosed such information to the defense during the guilt trial. (See *ante*, pt. II.K.3.) We need not determine whether in the absence of Mrs. Farkas's testimony substantial evidence supported a premeditation theory of first degree murder, however, because we " 'can determine from the

189

record that the verdict rested on a theory which is supported by sufficient evidence. [Citation.]' " (*People v. Rundle, supra,* 43 Cal.4th at p. 141.) The jury was instructed both on premeditation and deliberation and on first degree felony murder based on robbery and attempted rape. (CALJIC No. 8.21.) For the reasons discussed *ante*, in parts II.F.1. and II.F.2., substantial evidence supported the jury's unanimous findings that defendant robbed and attempted to rape Laurie and that he killed her during the commission of those crimes. Because we can ascertain from the record that the first degree murder verdict rested on a theory supported by substantial evidence, we need not reach the issue whether there was sufficient evidence supporting the alternate theory of premeditation and deliberation. (*People v. Letner and Tobin, supra,* 50 Cal.4th at pp. 168-169.)

### M. Defendant's Absence from Unreported Proceedings

Citing his absence from more than 180 unreported side bench conferences, defendant contends the entire judgment must be reversed because the court violated his statutory and constitutional rights to personal presence at all critical stages of the proceedings, and deprived him of an adequate record on appeal. As explained below, defendant had no right, constitutional or otherwise, to be present at the discussions between the court and counsel that are at issue here. Although we agree with defendant that the court's practice of conferring with counsel in the absence of a court reporter does not comport with the requirements of section 190.9, he fails to demonstrate prejudice and thus is not entitled to reversal.

The record shows that before jury selection in the case, the court explained to the parties its general policy of permitting counsel to make two- or three-word objections, but not "speaking objections," in front of the jury. The court further explained that counsel should ask the court to hold a "side bench" conference outside in the hallway in the event it disagreed with any of the court's rulings.

190

Observing that it was difficult to "drag a court reporter in and out" of the courtroom, the court indicated that "if we don't reach agreement, then we'll put the matter on the record." The record also reflects that during preparation of the record on appeal, the court conducted a two-day hearing to settle the record. According to the engrossed settled statement, there were more than 180 unreported conferences between court and counsel that defendant did not attend, all of which were held outside the jury's presence. The parties agreed that most of these discussions involved administrative or scheduling matters and that some concerned jury selection issues, exhibits and instructions, and substantive legal matters such as objections to the admission of evidence and examination of witnesses. Neither the parties nor the court could reconstruct what occurred during 10 of the unreported conferences.

"[A] criminal defendant has a right to be personally present at certain pretrial proceedings and at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, the due process clause of the Fourteenth Amendment to the United States Constitution, section 15 of article I of the California Constitution, and sections 977 and 1043. [Citation.]" (*People v. Cole, supra,* 33 Cal.4th at p. 1230.) The right is not absolute, however. Under federal constitutional principles, a defendant is entitled to be present at a certain proceeding only if his or her appearance "is necessary to prevent 'interference with [his] opportunity for effective cross-examination' " or if the proceeding represents a " 'stage . . . that is critical to [the] outcome' and 'his presence would contribute to the fairness of the procedure.' [Citation.]" (*People v. Waidla, supra,* 22 Cal.4th at pp. 741-742.) Our state Constitution's right to personal presence is circumscribed in a similar manner, as

191

are sections 977 and 1043, which codify that right.[46] (*People v. Cole, supra*, at p. 1231; *People v. Waidla, supra*, at p. 742)  Specifically, a defendant has no constitutional or statutory right to attend discussions held outside the jury's presence that involve questions of law unless the matter is reasonably and substantially related to the " ' " 'fullness of his opportunity to defend against the charge.' " ' " (*People v. Bradford, supra,* 15 Cal.4th at p. 1357; accord, *People v. Jennings* (2010) 50 Cal.4th 616, 682.)

Based on our review of the record and the settled statement, we conclude that defendant had no statutory or constitutional right to attend any of the conferences between court and counsel at which he was not present.  All of the proceedings in question were held outside the jury's presence.  The record also demonstrates that each of the numerous proceedings that were capable of settlement involved discussion of either administrative matters or questions of law.  Defendant's absence from those proceedings implicated neither his ability to defend against the charges nor the fairness of his trial.  As for the 10 unreported conferences incapable of settlement, we conclude there is no reasonable basis on which to presume that their substance differed in any respects from the 170 unreported proceedings for which a settled statement was obtained.  (See *People v. Holt, supra,* 15 Cal.4th at p. 708 [refusing to presume that the substance of nine unreported proceedings differed in nature from the 19 unreported proceedings for which a settled statement existed].)

---

[46]    Section 977 provides in relevant part that a felony defendant must be personally present at certain specified portions of trial such as arraignment and imposition of sentence, and "at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present . . . . " (§ 977, subd. (b)(1).)  Section 1043 requires that a felony defendant "be personally present at the trial." (§ 1043, subd. (a).)

Defendant insists that his absence from the off-the-record conferences that proved incapable of settlement impaired his ability to defend against the charges because of the significant breakdown of his relationship with his deputy public defenders and Kinney's late entry into the case as a third member of the defense team. We disagree with the premise of defendant's argument. As explained *ante*, in parts II.C.1. through II.C.2. and II.K.2., defendant fails to establish either an irreconcilable conflict with his deputy public defenders or that Kinney's representation was hindered by his absence from a portion of the guilt phase. Furthermore, defendant's assertion that the 10 unreported conferences for which there is no settled statement may have involved matters of "important legal significance" is unduly speculative. (*People v. Holt, supra*, 15 Cal.4th at p. 708.)

Defendant asserts that the "unprecedented" number of proceedings from which he was absent casts doubt on the fundamental fairness of the trial. The sheer number of such proceedings, without more, provides no basis on which to question the fairness of defendant's trial, however. As we explained above, there is no basis upon which to conclude that any of the proceedings in question were of such a nature that defendant's presence would have " 'contribute[d] to the fairness of the procedure.' " (*People v. Waidla, supra*, 22 Cal.4th at p. 742.) We reach the same conclusion viewing the proceedings collectively. (Cf. *People v. Arias, supra,* 13 Cal.4th at p. 159 [rejecting the defendant's argument that the existence of numerous unreported matters gave rise to "cumulative harm"].)

Defendant argues in a related claim that the entire judgment must be reversed because the off-the-record proceedings amounted to a violation of section 190.9. We agree that the court failed to comply with the statutory requirement that all proceedings in a capital case "be conducted on the record with a court reporter present." (§ 190.9.) He is not entitled to reversal, however.

Reversal for a violation of section 190.9 requires a showing of prejudice, that is, a showing that the missing portions of the record render the record on appeal inadequate " 'to permit meaningful appellate review.' " (*People v. Freeman* (1994) 8 Cal.4th 450, 509.) Defendant fails to establish prejudice. He again emphasizes that a number of unreported proceedings were incapable of settlement. We observe, however, that there is no indication the 10 off-the-record conferences involved anything other than minor matters that would not affect this court's review. (*People v. Harris* (2008) 43 Cal.4th 1269, 1281.) Concerning those unreported proceedings that were made part of the record as settled statements, defendant complains that a settled statement cannot compare to a reporter's transcript, especially given Kinney's late entry into the case. He fails to explain how the lack of a verbatim recitation of the sidebar conferences described in the settled statement interferes with meaningful review by this court. Notably, the trial court's practice was to recite on the record the party's continuing objection in the event either side disagreed with the outcome of an unreported side bench conference. Thus, for example, when the court and counsel returned to open court following one unreported discussion, the court confirmed on the record that the defense had objected to the admission of certain physical evidence on chain of custody grounds. Defendant does not suggest that the court's on-the-record summaries of such matters were inaccurate. (See *People v. Taylor, supra,* 48 Cal.4th at p. 660.) We further note that when an issue could not be resolved during an unreported side bench conference, the trial judge continued the discussion of the matter in open court after excusing the jury. We conclude

defendant has failed to demonstrate that he was prejudiced by the failure to record all of the discussions between court and counsel.[47]

For similar reasons, we reject defendant's argument that the absence of a verbatim transcript of all proceedings violated his federal constitutional rights to due process and reliable verdicts in a capital case. (*People v. Rogers* (2006) 39 Cal.4th 826, 857-858 [to prevail on such constitutional claims, the defendant must establish the record is inadequate to allow for meaningful appellate review].) Defendant's failure to show prejudice likewise defeats his claim that the unrecorded bench conferences between the court and counsel infringed his Sixth Amendment right to the effective assistance of trial and appellate counsel. (*Mickens v. Taylor* (2002) 535 U.S. 162, 174-176; *Strickland v. Washington* (1984) 466 U.S. 668, 691-697; see *People v. Pinholster* (1992) 1 Cal.4th 865, 919-923 [court and counsel's 133 unreported sidebar conferences did not violate the defendant's state or federal rights to due process, effective assistance, or reliable review of capital verdicts].) Finally, we have repeatedly rejected the argument that section 190.9 creates the type of state-created liberty interest protected by the due process clause, and do so again here. (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 195; *People v. Taylor, supra*, 48 Cal.4th at pp. 660-661.)[48]

---

[47] The court's policy of conducting side bench conferences in the hallway resulted in nearly 180 unreported proceedings. Although section 1044 allows the trial judge broad discretion in the manner in which he or she conducts a criminal trial, we emphasize again the importance of complying with the requirements of section 190.9. (*People v. Harris, supra*, 43 Cal.4th at p. 1283; *People v. Freeman, supra*, 8 Cal.4th at p. 511.)

[48] We have concluded that defendant's absence from the unreported conferences between the court and counsel did not deprive him of any state or federal constitutional rights. Further, although the court's failure to have a court reporter present during these sidebar conferences violated section 190.9, we have

*(footnote continued on next page)*

## N. Challenges to California's Death Penalty Scheme

Defendant presents "routine instructional and constitutional challenges" to California's death penalty law that this court has previously considered and rejected. We decline his invitation to reconsider our prior conclusions. (*People v. Schmeck* (2005) 37 Cal.4th 240, 303.)

Section 190.3, factor (a), does not violate the federal Constitution's Fifth, Sixth, Eighth, and Fourteenth Amendments by its asserted application in a " 'wanton and freakishmanner' " that allows almost all features of every murder, even features squarely " 'at odds,' " to be characterized as aggravating. (*People v. Williams* (2010) 49 Cal.4th 405, 470.)

The jury's reliance on unadjudicated criminal activity as a factor in aggravation under section 190.3, factor (b), without unanimously agreeing on its existence beyond a reasonable doubt, does not deprive a defendant of any rights guaranteed by the federal Constitution, including the Sixth Amendment right to jury trial. (*People v. Lomax* (2010) 49 Cal.4th 530, 593; *People v. Taylor, supra,* 48 Cal.4th at pp. 651-652.)

Use of the adjectives "extreme" and "substantial" in section 190.3, factors (d) and (g), does not impose a barrier to the consideration of mitigating evidence in violation of the Fifth, Eighth, and Fourteenth Amendments. (*People v. Williams*, *supra*, 49 Cal.4th at p. 470.)

There is no constitutional requirement that the jury be instructed concerning which of the sentencing factors are aggravating, which are mitigating, and which

---

*(footnote continued from previous page)*

concluded the errors did not prejudice defendant. We reach the same conclusion viewing the errors collectively.

could be either aggravating or mitigating. (*People v. Jennings, supra,* 50 Cal.4th at p. 690.)

The jury need not make written findings unanimously agreeing on the existence of aggravating factors and concluding beyond a reasonable doubt that the aggravating factors exist, that they outweigh the factors in mitigation, and that death is the appropriate penalty. (*People v. Davis* (2005) 36 Cal.4th 510, 571.) The high court's decisions interpreting the Sixth Amendment right to jury trial (*Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) do not require otherwise. (*People v. Davis, supra*, at p. 572; *People v. Prieto* (2003) 30 Cal.4th 226, 262-265.)

"Neither the federal Constitution nor section 520 of the Evidence Code requires that the jury be instructed that the prosecution has the burden of proof with regard to the truth of aggravating circumstances or the appropriateness of the death penalty, and the trial court is not required to explicitly tell the jury that neither party bears the burden of proof." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1429.)

Denying capital defendants many of the same procedural safeguards that apply to sentencing determinations in noncapital trials does not violate equal protection principles. (*People v. Solomon, supra,* 49 Cal.4th at p. 844.)

This court's failure to conduct comparative proportionality review does not violate the equal protection clause or any other constitutional guarantees under the Fifth, Sixth, Eighth or the Fourteenth Amendments to the federal Constitution. (*People v. Jennings, supra,* 50 Cal.4th at p. 691; *People v. Verdugo* (2010) 50 Cal.4th 263, 305.)

California does not employ the death penalty as a " 'regular punishment for substantial numbers of crimes' " (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43, italics omitted), and its imposition does not violate international norms of decency

197

or the Eighth Amendment's prohibition against cruel and unusual punishment. (*People v. Carrington* (2009) 47 Cal.4th 145, 199.)

### O. Cumulative Effect of the Errors

Defendant asserts finally that even if none of the individual errors at the guilt, sanity, and penalty phases requires reversal, the cumulative prejudicial effect of the errors undermined the fairness and reliability of all phases of trial and requires reversal of the entire judgment. We have concluded, or assumed for argument, that six instances of nonprejudicial error occurred during the course of defendant's trial. (See *ante*, pts. II.D.2.; II.D.4.; II.D.5.; II.G.2.; II.K.4. & II.M.) Given the strong evidence of defendant's guilt of first degree murder and the aggravating circumstances attending that crime, we further conclude that none of the trial court's missteps amounted to substantial error and there was no prejudicial cumulative effect warranting reversal. Contrary to defendant's assertion, he received a fair trial and reliable verdicts.

### III. CONCLUSION

The judgment is affirmed.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

BAXTER, J.
CHIN, J.
CORRIGAN, J.
KRIEGLER, J.*

_____

\* Associate Justice, Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING AND DISSENTING OPINION BY KENNARD, J.**

Although I join the majority in affirming the judgment of death, I disagree with the majority's analysis of two of defendant's claims.

Defendant contends that the prosecutor improperly exercised peremptory challenges against certain prospective jurors on the basis of their race. (See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).) The majority rejects that contention. So do I, but for reasons different from the majority's, as explained later.

Defendant also challenges the sufficiency of the evidence supporting the jury's special circumstance finding that he killed a witness to prevent her from testifying against him. Unlike the majority, I agree with defendant that the evidence was insufficient, and I would therefore vacate this particular special circumstance finding. This conclusion does not, however, compel reversal of the judgment of death: Two other special circumstances are valid, so that defendant was eligible for the death penalty. Furthermore, the invalid special circumstance did not prejudice defendant at the penalty phase, because the jury could properly consider, as circumstances of the crime (Pen. Code, § 190.3, factor (a)), all of the evidence pertaining to the invalid witness-killing special circumstance.

1

# I

Defendant was charged with murdering his girlfriend's cousin, 14-year-old Laurie Farkas and with kidnapping, robbing, and attempting to murder Farkas's best friend, 15-year-old Angie Higgins.  Farkas was White, as is Higgins. Defendant is Black.

The jury venire had a total of seven Black prospective jurors.  After two of those jurors were excused for cause, the prosecutor used peremptory challenges to excuse four of the remaining five prospective Black jurors.[1]

After the prosecutor challenged the third Black prospective juror, defendant made a motion for a mistrial, arguing that the challenges were racially based. Defendant renewed the motion after the prosecutor challenged the fourth Black prospective juror.  In each instance, the trial court found the motion meritless because the defense had not made a prima facie showing that the prospective jurors were excused because of their race.  In each instance, the trial court asked the prosecutor to explain the reasons for the challenges.  After hearing the prosecutor's reasons (see pp. 5-7, *post*), the court reiterated its denial of defendant's motion for a mistrial.

The federal and state Constitutions both prohibit a party from exercising peremptory challenges against prospective jurors on the basis of race.  To determine the merits of a defendant's claim that the prosecutor's peremptory challenges were impermissibly based on race, the United States Supreme Court has set forth a three-step process:  "First, the defendant must make out a prima

---

[1] The prosecutor did not challenge the fifth and last of those jurors, and she served as a juror for the guilt phase of trial; during the sanity phase, she asked the trial court to excuse her, citing stress at home and the need to find employment. The court granted her request, and she thus did not participate in the jury's deliberations at the sanity and penalty phases of trial.

facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted (*Johnson*).)

Applying that test, the majority here states that defendant failed to satisfy the first requirement of making a prima facie showing that the prosecutor's challenges were impermissibly based on race. I disagree, for two reasons.

First, as discussed in my dissenting opinion in *People v. Boyette* (2002) 29 Cal.4th 381, and thereafter in my concurring and dissenting opinion in *People v. Howard* (2008) 42 Cal.4th 1000, when, as here, the prosecutor has given reasons for the peremptory challenges, and the trial court has implicitly ruled on the ultimate question of whether the prosecutor acted with discriminatory intent, the preliminary inquiry as to whether the defendant made a prima facie case that the challenges were impermissibly based on group bias " 'becomes moot.' " (*Boyette*, *supra*, 29 Cal.4th at p. 469 (dis. opn. of Kennard, J.), quoting *Hernandez v. New York* (1991) 500 U.S. 352, 359 (plur. opn. of Kennedy, J.); see also *People v. Thomas* (2011) 51 Cal.4th 449, 474; *People v. Mills* (2010) 48 Cal.4th 158, 174; *People v. Lenix* (2008) 44 Cal.4th 602, 613, fn. 8; but see *People v. Taylor* (2010) 48 Cal.4th 574, 612-613.) What remains to be decided is only whether the prosecutor has offered "permissible race-neutral justifications for the strikes." (*Johnson*, *supra*, 545 U.S. at p. 168.) That is what the majority here should have done, instead of focusing on whether the defense made a prima facie showing that

3

the prosecutor's challenges were based on purposeful racial discrimination; that question, as I just explained, had in this case become moot.

Second, even if the prima facie showing of group bias, which needs to be made under *Wheeler*, *supra*, 22 Cal.3d at page 280, and *Batson*, *supra*, 476 U.S. at pages 93-94, were not moot here, the record contains "evidence sufficient to permit the trial judge to draw an inference" (*Johnson*, *supra*, 545 U.S. at p. 170) that the prosecutor's peremptory challenges were on their face impermissibly based on group bias.

In *Wheeler*, this court described how the prima facie showing can be made: "We shall not attempt a compendium of all the ways in which a party may seek to make such a showing. For illustration, however, we mention certain types of evidence that will be relevant for this purpose. Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire . . . . He may also demonstrate that the jurors in question share only this one characteristic — their membership in the group — and that in all other respects they are as heterogeneous as the community as a whole. . . . Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention." (*Wheeler*, *supra*, 22 Cal.3d at pp. 280-281, fn. omitted.)

Each of those three types of evidence mentioned in *Wheeler* is present here. First, the prosecutor struck "most or all of the members of the identified group from the venire" (*Wheeler*, *supra*, 22 Cal.3d at p. 280) when he challenged four of the five prospective Black jurors who remained after two had been excused for cause. Second, the four challenged jurors shared only one characteristic, that of their race, and otherwise were "as heterogeneous as the community as a whole"

4

(*ibid*.): One was an administrative law judge; another was a glass packager; a third was a office assistant for an insurance company; and the fourth worked as a truck driver, a sales representative, and a pastoral counselor. Third, defendant was "a member of the excluded group" (*id*. at p. 281) and the victims appear to have been members of "the group to which the majority of the remaining jurors belong" (*ibid.*).[2]

Of those three types of evidence, none might by itself have been prima facie evidence of racial group bias in the prosecutor's peremptory challenges. But the presence of all three, as occurred here, in my view " 'gives rise to an inference of discriminatory purpose.' " (*Johnson*, *supra*, 545 U.S. at p. 168.) Thus, unlike the majority, I conclude that defendant did make a prima facie showing, the first requirement of the three-step inquiry set forth by the high court in *Johnson* (see p. 2, *ante*). But the prosecutor satisfied *Johnson*'s second step when he gave "permissible race-neutral justifications for the strikes." (*Johnson*, at p. 168.) Remaining is *Johnson*'s step three, examining the prosecutor's reasons for peremptorily challenging the four Black prospective jurors to determine whether the trial court properly found that the defense had not " 'proved purposeful racial discrimination.' " (*Ibid*.) As explained below, substantial evidence supports that finding by the trial court.

The prosecutor gave two reasons for peremptorily challenging Prospective Juror J.J.: (1) At an earlier stage in her life, J.J. was against the death penalty (at the time of trial, however, J.J. said she no longer opposed the death penalty);

---

[2] Although the record does not state the race and ethnicity of the other prospective jurors, it is reasonable to infer that, at the time of the prosecutor's peremptory challenges, a majority of the prospective jurors were White. Only two of the jurors who served on the guilt phase jury had Hispanic surnames; none had Asian surnames.

5

(2) because J.J. was an administrative law judge, the prosecutor feared that she would "control the deliberative process." These reasons are plausible and I see no reason to second-guess them. Although defendant points out that the prosecutor did not peremptorily challenge Juror C.S., a law school graduate, C.S., unlike J.J., did not serve in a judicial capacity and had not opposed the death penalty at an earlier stage in life.

With respect to Prospective Juror S.B., the prosecutor peremptorily challenged her because she wrote in the jury questionnaire that a killer had to have "something wrong . . . in their mind because you don't just go out and kill someone." The prosecutor explained his concern that S.B. would give undue weight to psychiatric testimony for the defense. Defendant acknowledges that this explanation was race neutral on its face, but he asserts that the explanation was pretextual, noting the prosecutor's failure to peremptorily challenge Prospective Juror J.P., who commented in the jury questionnaire that some criminals were mentally ill. Unlike S.B., however, J.P. did not express a belief that a *killer* must have psychological problems. Because this was a murder trial, it was reasonable for the prosecutor to regard Prospective Juror S.B. as being potentially more sympathetic to the defense than J.P.

As to Prospective Juror A.M., the prosecutor's peremptory challenge was based on his unfavorable impression of A.M.'s demeanor and on A.M.'s view that, as the prosecutor characterized it, "jurors could be hoodwinked by the advocates in the case." The prosecutor's first reason, although vague, is a permissible race-neutral ground for challenging a prospective juror (see *People v. Fuentes* (1991) 54 Cal.3d 707, 715 [prospective juror's "body language" is a permissible basis for a challenge]), particularly when, as here, defense counsel did not dispute the prosecutor's description of A.M.'s demeanor. Also race neutral is the prosecutor's second reason for challenging A.M. (see generally *People v. Cornwell* (2005) 37

6

Cal.4th 50, 70 [prospective juror's "distrust of the criminal justice system" is a permissible basis for a challenge]). The record supports this explanation: A.M. said in his questionnaire that he had no objection to the death penalty so long as there was no "corruption," and when asked by the prosecutor to elaborate on this, he expressed concern that jurors could be "manipulated . . . into giving the desired decision . . . for the death penalty or for life in prison." Although several other prospective jurors who were not challenged by the prosecutor also expressed a distrust of lawyers, they did not link that distrust to their views on capital punishment; moreover, unlike those jurors, the prosecutor's unfavorable impression of A.M.'s demeanor apparently increased his concern that A.M. might view the prosecution as "hoodwinking" the jury at trial.

With regard to Prospective Juror T.C., the prosecutor challenged him because he had "specific training and experience in issues that bear on this case," because he had "minister[ed] to . . . people in the jail" and was "involved in . . . social programs," and because the trial might interfere with T.C.'s "opportunity for promotional advancement." In his jury questionnaire, T.C. mentioned that he was a licensed pastoral counselor; on voir dire he testified that he had a master's degree in "Christian psychology," and that he counseled drug addicts and child abusers. He also said that at work he had been chosen for promotion to a "management position," but that he was required to take 15 weeks of out-of-town training, which was scheduled to begin shortly. Defendant acknowledges that the prosecutor's explanation for challenging T.C. "appears on its face to be race-neutral." But defendant points out that the prosecutor did not excuse other prospective jurors who had taken psychology courses or had conflicts with employment, and therefore, defendant argues, the prosecutor's reasons were pretextual. I disagree: None of the unchallenged prospective jurors defendant

7

mentions presented the combination of concerns that the prosecutor expressed about T.C.

When, as here, the trial court has ruled that the prosecutor's race-neutral reasons for challenging a prospective juror are genuine and not pretextual, that finding will be upheld on appeal if supported by substantial evidence. (*People v. Lenix*, *supra*, 44 Cal.4th at p. 627.) Here, as I have explained, substantial evidence supports the trial court's acceptance of the prosecutor's race-neutral reasons for his peremptory challenges of Prospective Jurors J.J., A.M., S.B., and T.C.

I now turn to the second and final issue (the witness-killing special circumstance) in this separate opinion.

## II

The jury found true three special circumstance allegations — murder during a robbery (Pen. Code, § 190.2, subd. (a)(17)(A)),[3] murder in the commission of attempted rape (*id*., subd. (a)(17)(C)), and murder to prevent the victim from testifying in a criminal proceeding (*id*., subd. (a)(10)). On appeal, this court's majority rejects defendant's challenges to the sufficiency of the evidence on each of those three findings. (Maj. opn., *ante*, at pp. 102-120.) I agree with that conclusion with respect to the special circumstance findings of murder during a robbery and murder in the commission of attempted rape, but *not* with respect to the witness-killing special circumstance.

---

[3]     All further statutory citations are to the Penal Code.

## A.

The pertinent facts are these:

Although murder victim Laurie Farkas was only 14 years old, defendant had expressed a sexual interest in her, saying on one occasion, "I know she wants me."

On the evening of the murder, after learning that Farkas and 15-year-old Angie Higgins had gone to a movie theater in Fresno, defendant met the two young girls there and offered them a ride in his car. They went to a deserted park outside Fresno. Defendant went into the men's restroom, then yelled for toilet paper. After Farkas brought him some paper towels, Higgins heard Farkas screaming at defendant to "stop." Higgins went into the restroom and saw Farkas lying motionless and apparently unconscious on the concrete floor, her head between defendant's knees. The floor was strewn with personal items belonging to Farkas. When Higgins grabbed Farkas's legs and tried to pull her away from defendant, defendant knocked Higgins down and began choking her. He then left the restroom. On his return defendant hugged Farkas (who had regained consciousness) and said he was sorry. He again left the restroom and returned with a rope, which he then used to tie Higgins's hands behind her back. He left to get more rope, with which he tied Higgins to a toilet. He then told Farkas to come with him. Higgins heard screams, the sound of scuffling, then silence.

Defendant came back into the restroom, saying Farkas had run away. He then put Higgins in the car and drove around for hours, eventually stopping in a rural part of southwest Fresno at 3:00 a.m. He told Higgins to walk to the trunk of the car, after which he approached her from behind and strangled her into unconsciousness. When another car approached, he fled.

Farkas's body was found early the next morning. A rope was around her neck; her blouse was pulled up, her bra was above her breasts, and her pockets

9

were empty. She had been strangled. She also had four broken ribs and she had head injuries that could have been caused by being struck with a blunt object or being slammed against a concrete floor.

## B.

A defendant convicted of first degree murder can be sentenced either to death or to life imprisonment without the possibility of parole if the jury finds true a special circumstance allegation that "[t]he victim was a witness to a crime who was intentionally killed for the purpose of preventing his or her testimony in any criminal . . . proceeding, and the killing was not committed during the commission . . . of the crime to which he or she was a witness . . . ." (§ 190.2, subd. (a)(10).) This special circumstance has three elements: "(1) a victim who has witnessed a crime prior to, and separate from, the killing; (2) the killing was intentional; and (3) the purpose of the killing was to prevent the victim from testifying about the crime he or she had witnessed." (*People v. Garrison* (1989) 47 Cal.3d 746, 792.)

In this case, I question the adequacy of the prosecution's evidence on the last of the three elements just described — that defendant killed Farkas to prevent her from testifying about seeing defendant tie Higgins to a toilet. As discussed in part A., *ante*, Higgins interrupted defendant's brutal assault on Farkas in an attempt to rescue Farkas. After defendant subdued Higgins and tied her up, defendant resumed the assault on Farkas, culminating in her death. Under those circumstances, it is unlikely that defendant murdered Farkas because she witnessed his attack on Higgins. But I need not determine whether the prosecution presented sufficient evidence that defendant committed the murder for that purpose, because the evidence fails to satisfy the first element of the witness-killing special circumstance: that the victim must have "witnessed a crime *prior to, and separate from*, the killing." (*People v. Garrison*, *supra*, 47 Cal.3d at p. 792, italics added.)

10

Here, defendant's attack on murder victim Farkas's friend Higgins began well *after* his brutal attack on Farkas, when Higgins, in response to Farkas's screams, entered the restroom and tried to pull Farkas away from defendant. At that point, defendant knocked Higgins down to the floor and began choking her. After tying Higgins to a toilet, defendant took Farkas outside the restroom and resumed his attack on her, strangling her.

Although defendant briefly left Higgins and Farkas alone in the restroom three or four times after he began his assaults against them and before he killed Farkas, he did so only to obtain items that he used to facilitate the commission of, and to destroy the evidence of, his ongoing criminal activity: a flashlight that he used to check for evidence that could be used against him, a basin of water that he used to wash blood off of the restroom floor, and two ropes that he used to bind Higgins's hands and to tie her to a toilet. No interruption occurred in defendant's "common criminal intent" (*People v. San Nicolas* (2004) 34 Cal.4th 634, 655) towards Farkas and Higgins.

Higgins was still tied to the toilet when defendant took Farkas, who by then had regained consciousness, outside the restroom and strangled her. Defendant's tying up of Higgins was the only crime that Farkas witnessed. (Farkas was unconscious when defendant, before tying Higgins to the toilet, knocked her to the floor.) Hence, the crimes against Higgins were *not* "prior to, and separate from" (*People v. Garrison*, *supra*, 47 Cal.3d at p. 792) the assault that ended in Farkas's death. Rather, the crimes defendant committed against Higgins and Farkas were a "continuous transaction." (*People v. Silva* (1988) 45 Cal.3d 604, 631.)

Because the prosecution here presented no substantial evidence that the crime witnessed by Farkas was prior to and separate from the murder itself, I would reverse the witness-killing special circumstance. That conclusion, however, would not require reversing the judgment of death, as explained below.

11

## C.

When, on appeal, the evidence is determined to be insufficient to support a special circumstance finding, the judgment of death need not be reversed if the defendant suffered no prejudice.  Prejudice results if the special circumstance was necessary to make the defendant eligible for the death penalty.  But even if another special circumstance made the defendant eligible for the death penalty, the defendant may still have suffered prejudice if the jury's penalty verdict was influenced by evidence pertaining to the invalid special circumstance that was not otherwise admissible.  (See *Brown v. Sanders* (2006) 546 U.S. 212, 220; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1354.)  Neither form of prejudice exists here.

Although, in my view, the evidence does not support the witness-killing special circumstance, two valid special circumstances remain:  murder during a robbery and murder in the commission of a sexual assault.  Thus, the invalid special circumstance was not essential to make defendant eligible for the death penalty.  Nor did the existence of the invalid special circumstance affect the balance of aggravating and mitigating circumstances that the jury considered at the penalty phase.  The evidence pertaining to the invalid witness-killing special circumstance — that is, the evidence that defendant killed Farkas after she saw defendant tie up Higgins — was properly considered by the jury as "circumstances of the crime."  (See § 190.3, factor (a).)  Because the invalid witness-killing special circumstance did not prejudice defendant, I join the majority in affirming the judgment of death.


KENNARD, J.

12

**CONCURRING AND DISSENTING OPINION BY WERDEGAR, J.**

I concur in part II of Justice Kennard's concurring and dissenting opinion, and for the reasons she states would reverse the witness-killing special circumstance. In all other regards, I concur in the majority opinion.

**WERDEGAR, J.**

1

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Clark
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S045078
**Date Filed:** August 29, 2011
_____

**Court:** Superior
**County:** Fresno
**Judge:** John Fitch


_____

**Counsel:**

Melissa Hill, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Robert R. Anderson, Mary Jo Graves and Dane R. Gillette, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Eric Christoffersen, Kathleen A. McKenna, Ward A. Campbell, Louis M. Vasquez, Lloyd G. Carter and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Melissa Hill
P.O. Box 2758
Corrales, NM  87048
(505) 898-2977

William K. Kim
Deputy Attorney General
2550 Mariposa Mall, Room 5090
Fresno, CA  93721
(559) 477-1675